**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HYPERQUEST, INC.,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )   Case No. _____
                                     )            PH
N'SITE SOLUTIONS, INC., and UNITRIN  )
DIRECT AUTO INSURANCE                )
                                     )
                Defendants.          )   JURY DEMAND

**FILED**

**JANUARY 22, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**08 C 483**

**JUDGE SHADUR**
**MAGISTRATE JUDGE MASON**

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, HyperQuest, Inc., by and through its undersigned counsel, for its Complaint against Defendants, N'Site Solutions, Inc. and Unitrin Direct Auto Insurance, alleges as follows:

### GENERAL ALLEGATIONS

#### The Parties

1.      HyperQuest, Inc. f/k/a HQ, Inc. ("HQ"), is a Delaware corporation with its principal place of business in Skokie, Illinois.  HQ is a provider of primarily internet-based technology products and services to insurance companies and others in the property and casualty insurance industry, including repair shops, professional appraisers and parts suppliers.

2.      N'Site Solutions, Inc. ("N'Site") is a Delaware corporation with its principal place of business in Overland Park, Kansas.  When it was initially founded in 2000, N'Site was in the business of providing outsourced claims services for property and casualty insurance companies, such as first notice of loss taking and desk review of automobile insurance repair claim estimates.  Currently N'Site advertises itself as "a leading provider of web-based

integrated technology and service solutions for the property and casualty insurance industry."

3.     Upon information and belief, Unitrin Direct Auto Insurance ("Unitrin") is an insurance company incorporated in Illinois, with its principal place of business in Chicago, Illinois.   Unitrin actively markets and sells automobile insurance directly to consumers in approximately 25 different states.

### Jurisdiction And Venue

4.     This action arises under the Copyright Act, 17 U.S.C. § 101 et seq.

5.     This Court has jurisdiction over this action under 28 U.S.C. §§1331 and 1338(a).

6.     Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to HQ's claims occurred in this district.

### The April 2001 Quivox/N'Site Limited Use License and the eDoc Express Software

7.     On or about April 1, 2001, N'Site entered into a Software Application Services and Integration Agreement with Quivox Systems Incorporated ("Quivox"), pursuant to which Quivox agreed, among other things, to give N'Site a limited non-exclusive license to use and display certain application software developed by Quivox, commonly referred to as "eDoc Express." A copy of the Software Application Services and Integration Agreement, dated April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License") is attached hereto as Exhibit A.

8.     The eDoc Express software is application software initially designed for use primarily in connection with the electronic processing of insurance claims. As an application software program, in contrast to software packages that are packaged and sold through commercial and retail channels, eDoc Express is accessed and used by customers through the

internet.

9.    Under the terms of the Quivox/N'Site Limited Use License, N'Site was to pay certain license fees ranging from $.25 to $10.00 per transaction depending upon, among other things, the module of the software being used and the volume of transactions for which the software was used.

10.    The term of the Quivox/N'Site Limited Use License was for five years commencing April 1, 2001.

11.    Under the terms of the Quivox/N'Site Limited Use License, N'Site's right to use the eDoc Express software was limited in many ways.  Among other things: (i) N'Site could only use eDoc Express within its immediate organization and could only install it in its own facility at locations specified in writing and approved by Quivox; (ii) N'Site could only use the eDoc Express software for the purpose of electronically collecting, storing and transferring claim information; (iii) N'Site could only use eDoc Express for its own use and the use of its subsidiaries; (iv) N'Site could not "sell, market or in any other manner distribute to any third party or to any location" the eDoc Express software (except that N'Site could distribute printed copies and electronic copies of information derived from the eDoc Express software to insurance agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business); (v) N'Site could not make any modifications to the eDoc Express software without Quivox's prior written consent; and (vi) N'Site could not create any derivative work based upon eDoc Express without Quivox's prior written consent.

## Quivox Cessation of Operations and Sale of Assets to Safelite

12.    Upon information and belief, in or about July 2001, Quivox ceased operations.

13.    After Quivox ceased operations, N'Site obtained a copy of the source code for the eDoc Express software.

14.    On May 9, 2003, Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") entered into an Asset Purchase Agreement ("APA") with Quivox.

15.    Also on May 9, 2003, pursuant to the terms of the APA, and through an Assignment of Software agreement (the "May 2003 Quivox/Safelite Assignment"), Quivox assigned all rights, title and interest in and to numerous computer software programs, including but not limited to eDoc Express, to Safelite.

16.    The May 2003 Quivox/Safelite Assignment included an assignment of all licenses, sublicenses or agreements pursuant to which any of the software, including eDoc Express, had been licensed for use by third parties.

17.    On or about June 9, 2003, Safelite notified N'Site of Safelite's acquisition of the assets of Quivox, including the assignment to Safelite of all rights, title and interest in the eDoc Express software and the Quivox/N'Site Limited Use License.

18.    On or about October 1, 2003, Safelite notified N'Site in writing of Safelite's exclusive copyright in the eDoc Express software.

19.    Also on or about October 1, 2003, Safelite notified N'Site that N'Site was in breach of the Quivox/N'Site Limited Use License because N'Site had failed to pay certain license fees to Safelite, and Safelite demanded that N'Site cease use of the eDoc Express software.

20.    In the spring of 2004, Safelite and N'Site attempted to resolve the disputes between them related to Safelite's acquisition of the Quivox/N'Site Limited Use License and N'Site's continued use of the eDoc Express software.

21.    Among other things, Safelite and N'Site attempted to negotiate terms of a revised license agreement with respect to the eDoc Express software.

22.    Safelite and N'Site were unable to resolve the disputes between them and no revised license agreement between Safelite and N'Site was ever executed.

### Safelite's Grant to HQ of an Exclusive License to Use the eDoc Express Software

23.    On July 6, 2004, Safelite granted to HQ an exclusive license to use the eDoc Express software. A copy of the July 6, 2004 Software License between HQ and Safelite (the "Safelite/HQ Exclusive License Agreement") is attached hereto as Exhibit B.

24.    Specifically, pursuant to the terms of the Safelite/HQ Exclusive License Agreement, Safelite granted to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc Express software.

### Expiration of N'Site's Rights under the April 2001 N'Site/Quivox Agreement

25.    Given Safelite's October 1, 2003 notice of breach, N'Site had no right to use the eDoc Express software in any way for any purpose after October 1, 2003.

26.    Even absent N'Site's prior breach, any rights that N'Site had to use the eDoc Express software expired no later than April 1, 2006.

### N'Site's Infringing Software Product

27.    In violation of the limitations set forth in the Quivox/N'Site Limited Use License: (i) N'Site installed the eDoc Express software at locations other than its own facility; (ii) N'Site did not use the eDoc Express software only within its immediate organization, solely for its own use and the use of its wholly owned subsidiaries, and solely for the purpose of

electronically collecting, storing and transferring claim information; (iii) N'Site modified and created derivative works based upon the eDoc Express software; and (iv) N'Site marketed and sold the eDoc Express software and/or derivative works based upon the eDoc Express software to third parties.

28.    Among other things, in 2004, 2005 and 2006, N'Site was marketing and selling its "N'Solutions" software which was a derivative work based upon the eDoc Express software.

29.    Not only was N'Site marketing and selling its infringing N'Solutions software on a per transaction usage basis, but also, in or about the summer of 2006, N'Site sold the source code of its infringing "N'Solutions" software to Unitrin for over $700,000.

30.    In 2007, N'Site released a new version of its N'Solutions software which it renamed "ClaimHub." N'Site continues to market and sell "ClaimHub."

31.    The "ClaimHub" software, upon information and belief, like the prior "N'Solutions" software, is a derivative work based upon the eDoc Express software.

## Registration of Copyright

32.    In November 2006, Safelite filed a U.S. copyright application for registration of the eDoc Express software.  On November 21, 2006, the U.S. Copyright Office issued to Safelite copyright registration TXu001318816 for the eDoc Express software.

## Recordation of Exclusive License

33.    HQ formally recorded the Safelite/HQ Exclusive License with the U.S. Copyright Office on January 7, 2008.

## COUNT I

### Copyright Infringement against N'Site

1-33.    HQ hereby repeats and realleges the allegations contained in paragraphs 1-33 of the General Allegations as if fully set forth herein.

34.    The foregoing acts, practices, and conduct of N'Site constitute the infringement of HQ's exclusive rights in the eDoc Express software including HQ's exclusive rights to: (i) reproduce the eDoc Express software; (ii) prepare derivative works based upon the eDoc Express software; (iii) distribute copies of the eDoc Express software; and (iv) display the eDoc Express software pursuant to 17 U.S.C. §§ 106(1), (2), (3) and (5) and 17 U.S.C. § 501(a).

35.    N'Site's conduct constitutes willful infringement of HQ's exclusive rights pursuant to 17 U.S.C. § 504(c)(2).

36.    HQ has no adequate remedy at law because the eDoc Express software is intellectual property to which HQ has exclusive rights such that damages alone cannot fully compensate HQ for N'Site's misconduct.

37.    Unless enjoined by the Court, N'Site will continue to infringe on HQ's exclusive rights to the eDoc Express software. This threat of future injury to HQ's rights requires injunctive relief to prevent such infringement and to ameliorate and mitigate HQ's injury.

**WHEREFORE,** HQ respectfully requests a judgment in its favor and against N'Site: (i) entering a preliminary and permanent injunction against N'Site prohibiting N'Site from copying, displaying, distributing and creating derivative works based upon any protected material from the eDoc Express software pursuant to 17 U.S.C. § 502; (ii) ordering the destruction of N'Site's infringing plans, software, computer files and/or other media comprising

infringing copies or derivative works of HQ's copyrighted eDoc Express software pursuant to 17 U.S.C. § 503; and (iii) awarding HQ damages as proven at trial along with a disgorgement of N'Site's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), plus prejudgment interest, court costs, statutory damages, attorneys' fees, and such other and further relief as this Court deems just.

## COUNT II

### Copyright Infringement against Unitrin

1-33.    HQ hereby repeats and realleges the allegations contained in paragraphs 1-33 of the General Allegations as if fully set forth herein.

34.    Since its purchase of the infringing N'Solutions software from N'Site in or about the summer of 2006, Unitrin has copied, modified, distributed, and used the software.

35.    The foregoing acts, practices, and conduct of Unitrin constitute the infringement of HQ's exclusive rights in the eDoc Express software including HQ's exclusive rights to: (i) reproduce the eDoc Express software; (ii) prepare derivative works based upon the eDoc Express software; (iii) distribute copies of the eDoc Express software; and (iv) display the eDoc Express software pursuant to 17 U.S.C. §§ 106(1), (2), (3) and (5) and 17 U.S.C. § 501(a).

36.    HQ has no adequate remedy at law because the eDoc Express software is intellectual property to which HQ has exclusive rights such that damages alone cannot fully compensate HQ for Unitrin's misconduct.

37.    Unless enjoined by the Court, Unitrin will continue to infringe on HQ's exclusive rights to the eDoc Express software. This threat of future injury to HQ's rights requires injunctive relief to prevent such infringement and to ameliorate and mitigate HQ's injury.

**WHEREFORE**, HQ respectfully requests a judgment in its favor and against Unitrin: (i) entering a preliminary and permanent injunction against Unitrin prohibiting Unitrin from copying, displaying, and distributing any protected material from the eDoc Express software pursuant to 17 U.S.C. § 502; (ii) ordering the destruction of Unitrin's infringing plans, software, computer files and/or other media comprising infringing copies or derivative works of HQ's copyrighted eDoc Express software pursuant to 17 U.S.C. § 503; and (iii) awarding HQ damages as proven at trial along with a disgorgement of Unitrin's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), plus prejudgment interest, court costs, statutory damages, attorneys' fees, and such other and further relief as this Court deems just.

Dated: January 22, 2008

HYPERQUEST, INC.


By: /s/ Deborah Rzasnicki Hogan
    One of Its Attorneys


Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

# EXHIBIT A

## Software Application Services and Integration Agreement

This Agreement ("Agreement") is entered into as of April 1, 2001 (the "Effective Date"), between Quivox Systems Incorporated, a Delaware corporation ("Quivox") and N'SITE Solutions, Inc. and its affiliates ("Customer").

### RECITALS

A. Customer desires to license and make use of the application software developed by Quivox (collectively the "Licensed Product") as well as procure custom programming services. The services provided by Quivox to the Customer will be for electronic claims processing and related functions.

In consideration of the promises and the mutual agreements, provisions and covenants herein contained, Quivox and Customer hereby agree as follows:

1. **Professional Services:** During the term of this Agreement Quivox agrees to provide Customer with professional consulting, software development and integration services as requested by Customer and mutually agreed upon with Quivox, along with a limited non-exclusive license to use the Licensed Product and certain other computer software owned by Quivox (collectively called "Professional Services").

2. **Term:** The term of this Agreement shall be for a period of five (5) years, commencing on the Effective Date. As long as the Agreement is not terminated by either party by reason of any default, as hereafter provided, of the other party during the first five (5) year term, the Agreement shall continue thereafter and will be automatically renewed for successive terms of one (1) year, unless either party notifies the other in writing not less than 180 days prior to the end of the initial five (5) year term, or any successive one year term. This Agreement may not be modified orally and may only be amended in writing executed by all parties hereto.

3. **Payment Terms:** Customer agrees to pay Quivox for such Professional Services, including a fee for the Licensed Product (the "License Fee") in the amounts set forth in Exhibit A attached hereto and incorporated herein by this reference. Professional services may include and without limitation Quivox personnel's reasonable travel, food and lodging expenses incurred in performance of Professional Services hereunder as agreed upon beforehand between Quivox and Customer . The charges invoiced to Customer by Quivox in accordance with this Agreement shall be payable by Customer within thirty (30) days of Customer's receipt of the invoice. Customer agrees to pay, upon demand, any and all sales, use, or other similar tax, which may be assessed on Quivox by any governmental agency on any aspect of the transaction, contemplated hereby. Customer shall be solely responsible for procuring and maintaining any license or franchise, and paying any fees, required to operate its business in each country, state, county and city in which the Licensed Product is utilized.

4. **Licensed Product:** Customer agrees to use Licensed Product in the manner set forth in this Section 4. In consideration of Customer's payment of the Professional Services fees, and of Customer's agreement to abide by the terms and conditions of this Agreement, Quivox grants Customer a non-exclusive nontransferable right to use and display the Licensed Product (hereafter the "License"), and to render services to customers using the Licensed Product and documentation during the term of this Agreement and any renewals thereof. Quivox retains the right to terminate this License, at any time, should Customer violate any of its provisions. Quivox reserves all rights relating to the Licensed Product not expressly granted to Customer. During the term of this Agreement, Customer may

4.1 Use the Licensed Product on an unlimited basis within its immediate organization.

4.2 Install the Licensed Product only in its own facility(s) at location(s) specified by Customer in writing and approved by Quivox.

4.3 Use the Licensed Product solely for its own use, and within wholly owned subsidiaries, and solely for the purpose of electronically collecting, storing and transferring claim information. Recognizing that Customer may elect to utilize this License through a partnership or subsidiary corporation in which Customer is the controlling partner or the majority shareholder, Quivox hereby grants to Customer (but not the Customer's Assignee) the limited right to assign this Agreement with its rights to use the Licensed Product licensed hereunder to any business entity of which Customer is and continues to be a controlling partner or majority shareholder ("Assignee"), for operations within a particular territory.

4.3.1  If at any point Customer ceases to be the controlling partner or majority shareholder of the Assignee, then Quivox may, but need not, require the termination of any assignment. If Quivox requires the termination of the assignment under this provision, said assignment shall by itself terminate with no further action on the part of Quivox, and the License shall be deemed reassigned to Customer. Customer shall be required to provide supporting documentation of any such change in control with respect to Assignee. This provision does not limit Customer to be organized as a limited liability corporation. (LLC)

4.3.2 Customer shall continue to be liable for all sums due from the Assignee and no failure on the part of the Assignee to make payments due to Quivox shall relieve Customer from its individual obligation to make said payments. The bankruptcy or insolvency of the Assignee or of Customer itself shall be cause for immediate termination of this License except as specified in Section 11 of this Agreement, and should Quivox be unable to terminate the License because of the provisions of the United States Bankruptcy Laws, then the trustee or other party in possession of the software and documentation shall be obligated to protect the trade secret status of the said information by executing a trade secret agreement or returning any Source Code and internal documentation which it may possess to Quivox immediately upon request. The Assignee holding this License under any assignment shall have no authority whatsoever to further assign or to sublicense this License or any software and documentation and on termination or liquidation of the Assignee, the assignment shall automatically terminate and all the rights granted in this License shall be revested in Quivox.

4.4   Customer may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product or any information contained in or derived from the Licensed Product. Notwithstanding the above, Customer may distribute printed copies and electronic copies of information derived from the Licensed Product to insurance agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business.

4.5   Customer shall pay Quivox for all Professional Services fees described in this Agreement and the attached exhibit(s) on or before their due dates.

4.6 Customer agrees to comply with the terms and conditions of this License and agrees not to use the software and documentation licensed hereunder in any way beyond the scope of this License. Customer agrees to promptly advise Quivox and take all reasonable steps to protect the software and documentation from theft or from use by others contrary to the terms of this License.

4.7 Customer agrees that all agreements between Customer and its customers, by which portions of the software and documentation are used by such customers, shall be in writing, shall be in such form and substance as Quivox shall reasonably approve. Customer may use a form agreement, previously approved by Quivox, but shall nonetheless provide Quivox with true copies of all such licenses signed, without further request of Quivox. However, without limitation of the foregoing, Customer shall cause each such agreement to contain the following provision:

Notwithstanding anything herein to the contrary, in the event of the termination of the certain Application Software Services and Integration Agreement dated April 1, 2001 between Quivox and Customer, at the election of Customer all rights of Customer under this Agreement shall be assigned and transferred to Quivox. Quivox shall not be liable to any party hereto for any liability or obligation of Customer whatsoever except as specified in Section 11 of this Agreement, including without limitation any computer software or databases licensed by Quivox to Customer; provided, however, that if Quivox shall elect to have Customer's rights in this Agreement assigned to Quivox, as above provided, then Quivox shall be liable for all of Customer's obligations under such Agreement that do not arise during or in any way relate to the period prior to such assignment. The provisions of this paragraph are for the express benefit of Quivox, its successors or assignees.

4.8    Within ten (10) days after entering into an agreement with any customer and before the customer starts receiving any services, Customer shall provide Quivox with a copy of each customer agreement. All information provided to Quivox will be considered "Company Confidential" and as such shall not be duplicated, forwarded, or shared without the express written consent of Customer.

4.9 Customer agrees to return the original and all existing copies of the software and documentation issued with respect to the Licensed Product to Quivox within five (5) days after the termination date set forth in the written notice of Quivox's termination of this License for any authorized reason, whether a breach or expiration under this Agreement.

4.10    An express condition of this License is that Quivox shall at all times retain ownership of the Licensed Product recorded on the original media copy or copies and all subsequent copies of the Licensed Product, regardless of the form or media in or on which the original and other copies may subsequently exist. This License is not a sale of the Licensed Product data content recorded on Customer's copy or any subsequent copy. Customer agrees not to make any modifications to the Licensed Product and agrees not to create any derivative of the Licensed Product without the prior written consent of Quivox, which may be withheld in its sole and absolute discretion except as specified in Section 11 of this Agreement.

5.  Confidentiality of Licensed Product.  Customer acknowledges that the Licensed Product comprises information, which constitutes a trade secret of Quivox in which Quivox has a proprietary interest. Customer agrees that the information constituting the Licensed Product shall not be disclosed to others, copied, reproduced or used for any purpose other than those uses expressly authorized by this Agreement. Customer will use all reasonable efforts to ensure that all its personnel and all other persons afforded access to the Licensed Product shall protect the Licensed Product from unauthorized use, dissemination or disclosure.  For purposes of this Agreement, the term "TRADE SECRET" means the program structure, logic, data structures, design, processes, procedures, formulae, and algorithms contained in the ordered set of instructions, which together constitute the software that, may be disclosed by either the software or the documentation. Trade Secret does not include information which is publicly known through no fault of Customer or Customer's employees, contractors, or agents, nor does it include information which is lawfully received by Customer from a third party not bound in a confidential relationship to Quivox, nor information disclosed by Quivox to a third party without obligation of confidentiality.

5.1 Notwithstanding the above, Customer hereby consents to and Quivox reserves the right to utilize, Customer's claim information for the sole purpose of generating industry statistical intelligence.  Customer's information will be utilized for generating summary information only. Quivox covenants to keep strictly confidential, any specific information pertaining to insurance carrier, independent adjusting company, body shop, insured or claimant.  The right granted

Quivox to utilize such claim information is a continuing right vesting in Quivox the right to maintain and disburse such summary information for any reason, subject to maintaining strict confidentiality of the insurance carrier, independent adjusting company, body shop, insured or claimant, which shall survive termination of this Agreement for any reason.

    5.2 Customer and Quivox shall advise their employees of the confidential nature of the Confidential Information and Professional Service being provided hereunder and shall enforce such employees' strict compliance with the provisions of this Section.

6. Warranty: QUIVOX has no control over the conditions under which Customer uses the Licensed Product. Therefore, Quivox does not and cannot warrant the results that may be obtained by its use. However, Quivox provides the following limited performance warranties:

    6.1    Quivox warrants that it owns and possesses all rights and interests necessary to grant the License to Customer. Quivox warrants that the Licensed Product shall not violate or infringe on any contractual, trade secret, proprietary information and non-disclosure rights or any intellectual property rights. Quivox further warrants that if Customer is precluded from using the Licensed Product because of an actual or claimed infringement or any patent right, copyright, trademark or other intellectual property right, or for any other reason, then, at Quivox' option and Quivox' expense: (i) Quivox shall either procure for buyer the right to continue to use the Licensed Product; (ii) replace or modify the Licensed Product so that the Licensed Product becomes non-infringing; (iii) obtain substantially equivalent replacements for the Licensed Product acceptable to Customer; (iv) or terminate this Agreement and refund to Customer a pro rata portion of the License Fee paid.

    6.2    During the Term of this Agreement, should the Licensed Product fail to perform as warranted, Customer shall provide to Quivox a Discrepancy Report (DR) identifying with specificity deficiencies in the Licensed Product. Quivox, in conjunction with Customer, shall assess the severity of the deficiency and will communicate back to Customer the appropriate closed loop corrective action. Quivox shall address all critical product deficiencies, identified as being a deficiency that prevents users from using all or a portion of the Licensed Product, within 3 business days of its receipt of the DR from Customer. With critical deficiencies Quivox will give immediate top priority to resolving the deficiency(s) and respond within three business hours to Customer and make a best effort to resolve the deficiency(s) as fast as possible. Quivox shall address deficiencies that are not serious, identified as being deficiencies of a non-critical nature, within thirty (30) days of its receipt of the DR from Customer. Quivox shall not be responsible or liable for restoring or reconstructing any lost or altered files, data, or programs regardless of the cause of the loss. Customer acknowledges that the warranty given hereunder shall be contingent upon Customer's complying with routine operating procedures and processes for the Licensed Product in accordance with specific operating specifications which shall be specifically disclosed to Customer by Quivox, and to implement any reasonable temporary measures recommended by Quivox while Quivox remedies any deficiency. The warranty set forth in this Paragraph 6 shall apply only to critical deficiencies of the life of the licensed produce and may not apply to non-critical deficiencies for all claims made during the Term of this Agreement, notwithstanding Quivox may not correct any identified deficiency within the Warranty Period.

    6.3    EXCEPT FOR THE WARRANTIES DESCRIBED IN THE PRECEDING PARAGRAPHS, QUIVOX MAKES NO WARRANTIES OR GUARANTEES, EXPRESS, ORAL, IMPLIED OR STATUTORY. QUIVOX HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OR WARRANTIES OTHERWISE ARISING BY OPERATION OF LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL QUIVOX, ITS AGENTS OR EMPLOYEES BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR LOSS OF PROFITS, LOSS OF USE OR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, CONTINGENT, SECONDARY, SPECIAL OR OTHER DAMAGES OR EXPENSES OF ANY NATURE WHATSOEVER AND HOWSOEVER ARISING, EVEN IF QUIVOX HAS BEEN ADVISED OF THE POSSIBILITY OR CERTAINTY OF

SUCH DAMAGES. CUSTOMER'S SOLE REMEDY FOR ANY BREACH OF WARRANTY BY QUIVOX SHALL BE LIMITED TO THE SPECIFIC WARRANTY REMEDIES DESCRIBED IN SECTION 6. NOTHING CONTAINED IN THIS SECTION 6 SHALL ASSURE THAT THE FUNCTIONS CONTAINED IN THE LICENSED PRODUCT WILL MEET CUSTOMER'S REQUIREMENTS OR ASSURE THE UNINTERRUPTED OPERATION OF THE LICENSED PRODUCT OR THE CUSTOMER'S BUSINESS. QUIVOX' LIABILITY FOR DAMAGES TO CUSTOMER FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER FOR CONTRACT OR TORT, INCLUDING NEGLIGENCE, SHALL BE LIMITED TO THE LICENSE FEE FOR THE THEN CURRENT TERM OF THIS AGREEMENT.

6.4     This warranty allocates risks of product failure between Customer and Quivox. Quivox's pricing for Professional Services reflects this allocation of risk and the limitations of liability contained in this warranty. The warranties set forth above are in lieu of all other express warranties, whether oral or written, and the remedies set forth above are Customer's sole and exclusive remedies. The agents and employees of Quivox are not authorized to make modifications to this warranty, or additional warranties binding on Quivox. Accordingly, additional statements such as advertising or presentations, whether oral or written, do not constitute warranties by Quivox and should not be relied upon.

7. Limitation of Liability: Quivox shall not be obligated under Section 6 to take any action with respect to a Licensed Product, which has been misused or damaged by Customer in any respect, or if the Customer has not reported to Quivox the existence and nature of such nonconformity or defect within the period set forth in Section 6. Quivox is not responsible for obsolescence of the Licensed Product that may result from changes in Customer's requirements after the effective date. Quivox' obligations under this Agreement shall apply only to the most current version of Licensed Product issued by Quivox from time to time. Quivox shall have no responsibility for suspended, outdated or uncorrected versions of the Licensed Product. Quivox does agree to make a best effort to resolve any federal and/or state regulatory for the Customer to maintain compliance.

8. Disclaimer: Neither party shall be responsible for consequential indirect or special damages including without limitation any damages for lost business or lost or anticipatory profits, interruption of service or otherwise arising under any circumstances, or from any cause of action whatsoever including contract, warranty, strict liability or negligence, even if a party has been advised of such damages.

9. Termination: Upon any use, transfer or dissemination of the Licensed Product which is not expressly permitted herein, the appointment of a receiver to the possession of Customer's assets or the institution of bankruptcy by or against the User or default in payment of the License Fee, the Customer shall immediately stop using the Licensed Product. In the event either party breaches any term of the Agreement, which is not cured after appropriate notification, (if applicable) the other party shall be entitled to terminate this Agreement by giving a written notice of termination to Customer, pursuant to Section 22 herein.

10. Acts of Insolvency: Either party may terminate this Agreement by written notice to the other and may regard the party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment of the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to proceedings under bankruptcy or insolvency laws, or has wound up or liquidated, voluntarily or otherwise, and such proceeding is not discharged within ninety (90) days of filing. In the event that any of the above events occurs, the party shall immediately notify the other of its occurrence.

11. Source Code Escrow: "Source Code" shall mean all drawings, documents, source code, programmer's comments, design specification, flow charts, file layouts, report layouts, screen layouts and other documents used by Quivox to create the Licensed Product. In the event that Quivox becomes insolvent as outlined in Section 10 above; and if Customer was not the cause of

insolvency, a nonexclusive license to the Source Code shall be granted to Customer for the remaining term of the agreement and shall be subjected to the terms and conditions of Section 4 of this agreement. Quivox agrees to place a current version of the Source Code with a third party escrow agent mutually agreed upon with Customer.

12. Force Majeure: In the event that Quivox is unable to perform its obligations under this Agreement or to enjoy any of its benefits because of (or if failure to perform the services is caused by) natural disaster, actions or decrees of government bodies, acts of God, or other causes beyond the reasonable control of Quivox (herein referred to as a "Force Majeure Event"), Quivox shall immediately give notice to Customer and shall do everything within its reasonable control to resume performance. Upon receipt of such notice, all obligations under this Agreement shall be immediately suspended. If the period of non-performance exceeds sixty (60) days from the receipt of notice of the "Force Majeure Event", the Customer may, by giving written notice, terminate this Agreement.

13. General Obligations: Each of the parties (Quivox and Customer) will use reasonable efforts to (a) cause all of the obligations imposed upon it in this Agreement to be duly complied with, and to cause all conditions precedent to such obligations to be satisfied; and (b) obtain any and all consents, waivers, amendments, modifications, approvals, authorizations, notations and licenses necessary to the consummation of the transactions contemplated by this Agreement.

14. Entire Agreement Amendments: This Agreement constitutes the entire agreement between Quivox and Customer, and as such supersedes all previous agreements, promises, proposals, representations, understandings, and negotiations, whether written or oral, between the Parties representing subject matter hereof. All Schedules referred to in this Agreement shall be deemed to be incorporated in and be a part of the "entire Agreement". Notwithstanding the foregoing, however, the parties may amend, or modify this Agreement in such a manner as may be agreed upon, by a written instrument executed by both Quivox and Customer.

15. Counterparts: This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

16. Severability: In the event that any of the terms, conditions and provisions of this Agreement are held to be invalid, illegal, or unenforceable by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, and provisions shall not be affected thereby and the illegal, unenforceable or invalid provision shall be replaced by a mutually acceptable provision that, which being legal, enforceable and valid, comes closest to the intention of the parties underlying the illegal, unenforceable or invalid provision.

18. Binding Effect: This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors, and Assignees. Without limiting the foregoing, Quivox and Customer acknowledge and agree that this Agreement shall remain in full force and effect in the event of a sale of the assets or change in ownership of Quivox or Customer, as applicable.

19. No Assignment: This Agreement may not be assigned by either party without the prior written consent of the other party; provided however, Customer and Quivox shall be entitled to assign this Agreement to an affiliate or in connection with a sale of all or substantially all of its assets to a third party or in the manner and subject to the limitations set forth in section 4 of this Agreement.

20. Advertising: Neither Quivox nor Customer shall use the name of the other in advertising/promotion efforts in each instance without securing written approval in advance.

**21. Applicable Law:** The laws of the State of Kansas shall govern this Agreement and the transactions contemplated hereunder. Any legal action between Quivox and Customer regarding this Agreement shall be brought in, and Quivox and Customer hereby consent to the jurisdiction of and venue in, the federal and state courts located Johnson County in the State of Kansas.

**22. Notices:** Except as otherwise expressly provided, all notices, consents, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by facsimile transmission with confirmation of receipt, or if mailed by certified mail, return receipt requested, with first class postage prepaid, addressed as follows:

To Quivox:          Quivox Systems Incorporated
                    1225 W 190th Street, Suite 250
                    Gardena, CA 90248

                    Attention: Contracts Manager

To Customer:        N'Site Solutions, Inc.
                    10536 Justin Drive
                    Urbandale, Iowa 50322

**23. Indemnity:** Customer, and its permitted Assignees, if any, agrees that they, jointly and severally, if more than one individual or entity, shall indemnify and hold Quivox harmless from any and all liability and claims against Quivox by anyone, which arise out of or in connection with the use of the Licensed Product and the database contained therein in the operation of Customer's business and which are not caused by Quivox. The indemnity shall include all costs, attorney fees, and damages, which Quivox is required to pay by reason of litigation or claims against Quivox for such reason. Quivox shall have the right to retain, at Customer's cost, legal counsel of Quivox's selection for the purpose of defending such claims, but no settlement of any such claims will be made without consultation with Customer and its insurance carriers, if any.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"Quivox"                          "Customer"
Quivox Systems Incorporated       N'SITE Solutions, Inc.

By: _Alan B. Cory_                By: _Kirb D._

Title: _CEO_                      Title: _Exec. UP_

Date: _5-22-01_                   Date: _5/22/2001_

# Exhibit A

## Software Application Services and Integration Pricing Schedule for: N'Site Solutions, Inc.

### A. Software Development

As part of this Agreement, Quivox agrees to develop and implement a First Notice of Loss (FNOL) Internet thin client application for the Customer. This FNOL application is based upon functional specifications contained in a Detailed Requirements Document mutually agreed upon and signed by Quivox and the Customer. The Requirements Document is a part of Exhibit A of the final agreement between Quivox and the Customer.

### B. Pricing

The Customer requires various modules of eDoc Express to perform different tasks and functions for various customers. The currently defined functions and modules and their pricing may be amended as a part of this agreement based upon future customer needs of N'Site.

| | Processed records | Pricing per transaction |
|---|---|---|
| 1. FNOL | 1 – 25,000 | $1.25 |
| | 25,001 – 50,000 | $1.00 |
| | 50,001 – 100,000 | $ .75 |
| | 100,001 – 200,000 | $ .70 |
| | 200,001 – 399,999 | $ .65 |
| | 400,000 or more | $ .60 |

| | Processed records | Pricing per transaction |
|---|---|---|
| 2. Messaging | 1 – 25,000 | $ .50 |
| | 25,001 – 50,000 | $ .45 |
| | 50,001 – 100,000 | $ .40 |
| | 100,001 – 200,000 | $ .35 |
| | 200,001 – 399,999 | $ .30 |
| | 400,000 or more | $ .25 |

| | per transaction |
|---|---|
| 3. Dispatch | $.50 |

| | per assigned and processed Claim |
|---|---|
| 4. Estimatics<br>estimate upload and approval | $ 3.00 |

5. Auto/Property Claims Handling
all eDoc modules except ENOL and Messaging

$10.50 per assigned and processed Claim

6. Independent Adjuster Management
dispatch, invoice upload with images

$ 3.50 per assigned and processed Claim

7. Glass Claims Management
dispatch, invoice upload with images

$ 3.50 per assigned and processed Claim

8. Rental Car Management
dispatch extension notification and invoice upload

$ 2.00 per assigned and processed Claim

"Quivox"
Quivox Systems Incorporated

By: _Alfrs B. Cory_

Title: _CEO_

Date: _5-22-01_

"Customer"
N'Site

By: _Rub DD_

Title: _EXEC. UP_

Date: _5/22/2001_

# EXHIBIT B

## SOFTWARE LICENSE AGREEMENT

This Software License Agreement (the "**License Agreement**") is made and entered into as of the 6th day of July, 2004, by and between HQ, Inc., an Illinois corporation ("**HQ**"), and Safelite Group, Inc., a Delaware corporation ("**Safelite**"). HQ and Safelite hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties.**"

### RECITALS

A.     Safelite owns all rights to collision claims management software commonly referred to as eDoc ("**eDoc Software**").

B.     Safelite and HQ have entered into an Agreement dated as of the date hereof (the "**Master Agreement**") pursuant to which Safelite has agreed to license to HQ the source code for the eDoc Software, subject to the terms and conditions set forth in this License Agreement.

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which are specifically incorporated herein by this reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     **Definitions**.

(a)     "**HQ Services**" means those services HQ provides to various users and industries including, but not limited to, the insurance, professional repair and parts supply industries for the purpose of ensuring the proper identification, selection, procurement and use of parts and for the purpose of reporting information on such activities and related processes. HQ Services does not include the eDoc software.

(b)     "**HQ Modifications**" means all modifications, derivative works, adaptations, partial versions or improvements of or to the eDoc Software authored, invented, developed, conceived or first reduced to practice by HQ. All HQ Modifications shall be deemed a part of the eDoc Software.

(c)     "**HQ System**" means HQ's system, consisting of hardware and equipment used by HQ upon which is installed HQ's software and data used to perform the HQ Services and support HQ's business.

(d)     "**Intellectual Property Rights**" means patent, copyright, trade secret, trademark, source codes, object codes or other proprietary rights.

(e)     "**Market Ready**" means that HQ is prepared to offer the eDoc Software product to its customers.

(f) **"Other Documents"** shall mean the Master Agreement, the Note (as defined in the Master Agreement), the Security Agreement (as defined in the Master Agreement) and the Shareholders Agreement (as defined in the Master Agreement).

(g) **"Territory"** means the United States of America and Canada.

2. **License Grant.**

(a) <u>Grant To HQ</u>. Subject to all limitations and obligations set forth in this License Agreement, Safelite grants to HQ a perpetual (subject to termination only as provided in <u>Section 4</u>), worldwide, exclusive (except as set forth in <u>Section 2(b)</u>) license (i) to use the eDoc Software, in source code form, to support the development and commercialization of HQ Services, and (ii) to develop, modify and enhance the eDoc Software as HQ in its sole discretion determines; provided, that such modifications and enhancements are solely related to the development and commercialization of HQ Services. The term "use" means use, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sublicense the eDoc Software to a third party pursuant to an agreement, the terms of which shall provide that such third party: (i) shall have no right, license, or authority to sub-license, rent, or grant access to all, or any part, of the eDoc Software to any person or entity; (ii) shall have no right to use the terms "eDoc" or "Safelite" in any promotional or advertising materials created or published in relation to such third party's use of the eDoc Software; (iii) shall indemnify, defend, and hold Safelite, its directors, officers, subsidiaries, agents, and employees (collectively, **"Safelite Indemnitees"**), harmless from and against any and all claims, damages, liabilities, costs, judgements, and fees (including reasonable attorney fees) incurred by Safelite Indemnities in relation to any breach by such third party of it agreement with HQ or in relation to any unauthorized use by such third party of the eDoc Software. Notwithstanding the foregoing, HQ may not, without the prior written consent of Safelite, which consent shall not be unreasonably withheld, rent, sell, lease, transfer or sublicense the eDoc Software to any person or entity that competes with Safelite in the manufacture, distribution, or sale of automotive glass or related services, including but not limited to, those competitors set forth on <u>Schedule 2(a)</u>.

(b) <u>Exclusivity</u>. Except as otherwise provided in this Section 2(b), HQ's license to the eDoc Software is exclusive in the Territory. Such exclusivity shall terminate if a Sale of of HQ (as defined in the Master Agreement) occurs prior to July 5, 2009. Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing or development. Safelite will not use the eDoc Software in a manner that competes with HQ Services, except as part of Safelite's claims management solutions which does and will include a comprehensive estimate audit capability. Safelite's comprehensive estimate audit capability will provide for the auditing of an entire estimate and/or specific line items within an estimate for the

purpose of adherence and reporting. However, Safelite's comprehensive estimate audit capability will not encompass adherence to part use rules, reporting on parts usage, adherence to insurance operating guidelines for estimate development as related to parts, or for the determination, provisioning, or procurement of correct parts through its own or another company's database of parts, except to the extent that these services are used for the sole purpose of identifying and addressing auto glass parts. Notwithstanding the foregoing, HQ acknowledges the eDoc Software is licensed ("License") to N'SITE Solutions, Inc. ("N'SITE"). HQ further acknowledges Safelite and N'SITE are presently negotiating the terms of a revised license ("Revised License") regarding N'SITE's use of the eDoc Software. Safelite represents and warrants to HQ that Safelite has delivered to HQ a true and accurate copy of the latest draft of the Revised License and a true and accurate copy of the Software Application Services and Integration Agreement ("Services and Integration Agreement") dated as of April 1, 2001, by and between N'SITE and Quivox Systems Incorporated. HQ acknowledges receipt of a copy of the Revised License and the Services and Integration Agreement. Safelite covenants to HQ that prior to April 1, 2006, Safelite shall notify N'Site, in writing, of Safelite's intention to terminate the Original License and/or the Revised License in accordance with their respective terms and further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License. Safelite agrees to periodically apprise HQ of the status of its discussions with N'SITE regarding the execution of the Revised License and in the event the Revised License is modified to include terms substantially different than the Revised License provided to HQ, Safelite will advise and include HQ in the determination of the final terms of the Revised License.

(c)    Support. Safelite shall make its employees listed on Schedule 2(c) available to HQ at HQ's request, without charge to HQ and on the terms and conditions set forth in Schedule 2(c) in order to support and advise HQ with respect to the development, marketing, deployment and ongoing support of the eDoc Software.

(d)    Royalty. HQ will pay Safelite a royalty as follows: (i) before Full Integration if HQ uses all or any part of eDoc Software to process a claim, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim processed and (ii) after Full Integration, all claims processed by HQ, except where HQ can demonstrate and document that the functionality of the eDoc Software was not used in whole or in part, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim invoiced. HQ shall generate a report setting forth all claims invoiced by HQ each month and shall pay the royalties due to Safelite on a monthly basis within niney (90) days after the end of each calendar month.

(e)    Audit. During the Term of this License Agreement, Safelite shall have the right to audit, including by inspecting the books and records of HQ to verify HQ's compliance with the terms of Section 2(d). Safelite shall condut such audits upon at least ten (10) days prior written notice, during HQ's normal business hours and in such a manner as not to interfere unreasonably with HQ's normal business operations.

Safelite may conduct such audits from time to time, but not more than once every six (6) months, as Safelite deems necessary to determine if HQ is making proper royalty payments in compliance with Section 2(d). HQ shall pay such audit expenses if such audit shows underpayment of royalty payments of 10% or more.

(f)    HQ agrees that the source code for the eDoc Software are Safelite's Confidential Information (as defined below) and shall treat and handle eConfidential iInformation in accordance with Section 7.

(g)    HQ shall have the eDoc Software Market Ready by the first anniversary of the Effective Date.

(h)    HQ shall timely provide HQ's updates and patches of the HQ Modification, if any, to Safelite in accordance with Schedule 2(h).

3.    **Ownership.**

(a)    Ownership prior to Full Integration.    Subject to Section 3(b) below, all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite, and all right, title and interest in and to the HQ Modifications shall vest in Safelite upon creation. Subject to Section 3(b) below, all Intellectual Property Rights in or related to the eDoc Software are and will remain the exclusive property of Safelite, and all Intellectual Property Rights in or related to the HQ Modifications will be the exclusive property of Safelite. Subject to Section 3(b) below, HQ assigns all rights, title, and ownership interest in the HQ Modification to Safelite. HQ agrees to enter into any additional documents reasonably necessary to perfect Safelite's ownership rights.

(b)    Ownership after Full Integration.    The eDoc Software will be fully integrated and embedded into the HQ System to a degree that the eDoc Software will no longer be identifiable as a software program independent of the other components of the HQ System (the completion of that process being "Full Integration" and the resulting software or system being "Full Integration Software"). HQ and Safelite will jointly determine when Full Integration is accomplished.    HQ will not accomplish Full Integration within 2 years of the date of this License Agreement without Safelite's consent. Promptly following Full Integration, HQ will deliver to Safelite a written notice setting forth the date on which Full Integration was accomplished accompanied by a copy of the eDoc Software with all HQ Modifications thereto (including source code, object code and all required instructions) as of Full Integration. All modifications to the Full Integration Software made by HQ from and after Full Integration ("Future Modifications") will not be considered "HQ Modifications" but will become part of the Full Integration Software. Subject to Safelite's rights under this Agreement and the Master Agreement, HQ will own all right, title and interest in and to the Future Modifications, and all Intellectual Property Rights in or related in the Future Modifications will be the exclusive property of HQ. Prior to transferring, licensing, or

assigning the Full Integration Software to any person listed on Schedule 3(b), HQ must obtain the prior written consent of Safelite which consent may be withheld at Safelite's sole discretion.

(c)    Ownership of HQ System. In no event shall Safelite have any right, title or interest in the HQ System or any part thereof other than through Safelite's ownership interests in HQ.

4.    **Term and Termination**.

(a)    Term.  This License Agreement will commence on the Effective Date and continue in perpetuity, unless earlier terminated as provided herein.

(b)    Termination for Breach.  Either Party may terminate this License Agreement upon ninety (90) days written notice to the other Party if the other Party has committed an Event of Default under this License Agreement and such Event of Default is not cured within such ninety (90) day period.   Notwithstanding anything in this Agreement to the contrary, in the event of a material breach by HQ of it obligations under Sections 2(a) or 7 of this Agreement, Safelite shall have the right to declare HQ in violation of its obligations hereunder.   If HQ materially breaches its obligations under Section 2(a) or 7 of this Agreement, HQ shall have the limited right to continue to use the eDoc Software, HQ Modifications and Future Modifications for a period of forty-five (45) days from the date of Safelite's written notice to HQ generally identifying such breach.  At the option of Safelite, all rights granted to HQ hereunder shall terminate on the expiration of any such forty-five (45) day period..   The Parties acknowledge and agree that the occurrence of one or more of the following events shall constitute an event of default ("Event of Default"):

(i)    if a Party materially breaches or fails or neglects to perform, keep or observe any material provision, covenant or term of this License Agreement or any Other Document;

(ii)    if any representation or warranty made by a Party in this License Agreement shall prove to have been inaccurate or untrue in any material respect on the date when made or deemed to have been made; or

(iii)    if a Party ceases to do business or becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a Party; or if such a petition is filed by any third party, or an application for a receiver is made by anyone.

(c)    Termination for Failure to have eDoc Software Market Ready. Safelite  may  terminate  this  License  Agreement  by  delivering  written  notice  of

termination to HQ within fifteen (15) days after the first anniversary of the Effective Date if the eDoc Software is not Market Ready prior to the first anniversary of the Effective Date. Safelite agrees that it shall not license the HQ Modifications to a third party if Safelite terminates this License Agreement pursuant to this Section 4(c) unless Safelite pays to HQ a mutually agreed upon amount; provided, that, in determining such amount, Safelite shall receive full credit for the costs and expenses associated with the support services provided by Safelite pursuant to Section 2(c).

(d)    Obligations On Termination.    Within ten (10) days after termination of this License Agreement, (i) HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications (provided, however, in the event of a material breach by HQ of Sections 2(a) or 7 of this Agreement, HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications in accordance with the terms of Section 4(b) above), and (ii) pay Safelite any accrued but unpaid royalty fees within thirty (30) days after the termination of this License Agreement. HQ will deliver to Safelite or destroy, as directed by Safelite, and certify in writing to Safelite of such destruction, any full or partial copies of eDoc Software received hereunder, HQ Modifications and Future Modifications, in HQ's possession or under its control Safelite within thirty (30) days after termination of this License Agreement.

(e)    Survival.    Subject to this Section 4 (Term and Termination), the provisions set forth in Sections 3 (Ownership), 4(d) (Obligations on Termination), 4(e) (Survival), 6 (Limitation of Liability), 7 (Confidential Information), 8 (Indemnity) and 9 (Miscellaneous) will survive termination of this License Agreement.

5.    **Warranties.**

(a)    HQ Authority. (i) HQ has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) HQ has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) HQ has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) HQ has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of HQ, enforceable against HQ in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(b)    Safelite Authority. (i) Safelite has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under

this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) Safelite has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) Safelite has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) Safelite has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of Safelite, enforceable against Safelite in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(c)    Non-Infringement. Except as set forth on Schedule 5(c), Safelite represents and warrants that it owns or has the right, under valid and enforceable agreements, to grant the license of the eDoc Software herein; the eDoc Software does not, and its use by HQ and its customers as contemplated by this License Agreement will not infringe or otherwise violate any Intellectual Property Rights or other proprietary rights of any third party, and Safelite has not received any charge, complaint, claim, demand or notice alleging any such infringement or violation.   HQ represents and warrants that in connection with the use of the eDoc Software and HQ Modifications, it has not and shall not infringe on any Intellectual Property Rights or other proprietary right of any third party. Neither HQ nor any other company or individual involved with the use of eDoc Software and HQ Modifications is under any obligations to assign or give any work under this License Agreement to a third party.

(d)    Disclaimer. EXCEPT AS SET FORTH ABOVE, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS AND WARRANTIES INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

6.    Limitation of Liability.

(a)    Disclaimer of Indirect Damages. NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, INCLUDING LOST PROFITS, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. SAFELITE SHALL NOT BE LIABLE TO HQ FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES FROM USE OF THE EDOC SOFTWARE IN A MANNER NOT AUTHORIZED BY THIS LICENSE AGREEMENT, USE OR INABILITY TO USE THE EDOC SOFTWARE AND LOSS OF DATA.

(b)  Exclusions.  Notwithstanding the foregoing, the limitations of liability set forth in this Article 6 will not apply to losses in connection with (i) death or personal injury caused by a Party; (ii) a Party's breach of the confidentiality provisions or or (iii) claims pursuant to the indemnification provisions set forth in Article 8.

7.  **Confidential Information.**

(a)  Confidential Information.  Each Party has made and will continue to make available to the other Party information (including, without limitation, the source code for the eDoc Software) that is not generally known to the public and at the time of disclosure is identified, or would reasonably be understood by the receiving Party, to be proprietary or confidential ("**Confidential Information**").  Confidential Information may be disclosed in oral, written, visual, electronic or other form.

(b)  Obligations.  The receiving Party will use the same care and discretion to avoid disclosure, publication or dissemination of any Confidential Information received from the disclosing Party as the receiving Party uses with its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care).  The receiving Party will be liable for any unauthorized disclosure or use of Confidential Information by any of its personnel, agents, subcontractors or advisors.  The receiving Party will promptly report to the disclosing Party any breaches in security that may materially affect the disclosing Party and will specify the corrective action to be taken.  Upon the termination of this License Agreement, each Party shall return to the other Party the Confidential Information of the other Party.

(c)  Third Party.  Subject to the terms and conditions herein, HQ may disclose Safelite's Confidential Information to any affiliates, contractors, consultants, and other third parties (the "Third Party") that have a need-to-know and are obligated to maintain the confidentiality of Safelite's Confidential Information upon terms similar to those contained in this License Agreement; provided, that the Third Party executes a non-disclosure and confidentiality agreement in form and substance attached hereto as Schedule 7(c).  HQ will be liable for any unauthorized disclosure or use of Safelite's Confidential Information by the Third Party.  HQ will promptly report to Safelite any breaches in security that may materially affect Safelite and will specify the corrective action to be taken.  HQ shall promptly deliver to Safelite a signed copy of all such confidentiality agreements.

(d)  Injunctive Relief.  HQ acknowledges that the unauthorized use, transfer or disclosure of the source code of the eDoc Software or any HQ Modifications will (i) substantially diminish the value to Safelite of the trade secrets and other proprietary interests that are the subject of this License Agreement; (ii) render Safelite's remedy at law for such unauthorized use, disclosure or transfer inadequate; and (iii) cause irreparable injury in a short period of time.  If HQ breaches any of its obligations with respect to the use or confidentiality of the source code of the eDoc Software or HQ

Modifications, Safelite shall be entitled to equitable relief to protect its interests therein, including, but not limited to, preliminary and permanent injunctive relief.

        (e)        <u>Exceptions to Confidential Treatment.</u>

        (i)        <u>Exclusions.</u>  The obligations set forth in <u>Section 7</u> do not apply to any Confidential Information that the receiving Party can demonstrate: (i) the receiving Party possessed prior to disclosure by the disclosing Party, without an obligation of confidentiality; (ii) is or becomes publicly available without breach of this License Agreement by the receiving Party; (iii) is or was independently developed by the receiving Party without the use of any Confidential Information of the disclosing Party; or (iv) is or was received by the receiving Party from a third Party that does not have an obligation of confidentiality to the disclosing Party.

        (ii)        <u>Legally Required Disclosure.</u>  If the receiving Party is legally required to disclose any Confidential Information of the disclosing Party in connection with any legal or regulatory proceeding, the receiving Party will endeavor to notify the disclosing Party within a reasonable time prior to disclosure, and will allow the disclosing Party a reasonable opportunity to seek appropriate protective measures or other remedies prior to disclosure and/or waive compliance with the terms of this License Agreement.  If these protective measures or other remedies are not obtained, or the disclosing Party waives compliance with the terms of this License Agreement, the receiving Party may disclose only that portion of that Confidential Information that it is, according to the opinion of counsel, legally required and will exercise all reasonable efforts to obtain assurance that confidential treatment will be accorded to that Confidential Information.

8.        <u>Indemnity.</u>

        (a)        <u>Safelite Indemnification.</u> Safelite will indemnify, defend and hold harmless HQ and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all losses, liabilities, damages and claims (including taxes), and all related costs and expenses, including reasonable legal fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties (collectively, "Losses"), due to third party claims arising from, or in connection with, (i) Safelite's breach of this License Agreement, (ii) any actual or alleged U.S. or Canadian infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the eDoc Software (or the use of the eDoc Software) or (iii) grossly negligent or willful acts or omissions of or by Safelite or its personnel. The foregoing indemnity will not cover third party infringement claims (i) outside the United States and Canada, or (ii) to the extent resulting from HQ Modifications.

        (b)        <u>HQ Indemnification.</u> HQ will indemnify, defend and hold harmless

Safelite and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all Losses due to third party claims arising from, or in connection with, (i) HQ's breach of this License Agreement, (ii) any actual or alleged infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the HQ Modifications (or the use of the HQ Modifications) or the Future Modifications (or the use of the Future Modifications), or (iii) grossly negligent or willful acts or omissions of or by HQ or its personnel. The foregoing indemnity will not cover third party infringement claims to the extent resulting from modifications by any party other than HQ or HQ's employees, sublicensees, agents, representatives or licensees to the eDoc Software.

      (c)    <u>Indemnification Procedures</u>. The obligations of an indemnifying party under this <u>Section 7</u> are subject to the conditions that: (i) the indemnifying party is notified promptly in writing by the indemnified party of any claim; (ii) the indemnifying party has sole control of the defense and all negotiation for any settlement or compromise; and (iii) the indemnified party reasonably assists the indemnifying party in the defense of the claim. No settlement or compromise that imposes any liability or obligation on any indemnified party will be made without such party's prior written consent (not to be unreasonably withheld).

    9.    <u>**Miscellaneous.**</u>

      (a)    <u>Non-solicitation</u>. Each Party covenants and agrees that it, directly or indirectly, shall not, during the term of this License Agreement and for a period of two years after the termination of this License Agreement, solicit any of the employees, consultants or subcontractors of the other Party.

      (b)    <u>Notices</u>. All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

    To HQ:        HQ, Inc.
                  1300 West Belmont Avenue
                  Suite 200
                  Chicago, IL 60657
                  Attn: Jeff Hogan

| With a copy to: | Sachnoff & Weaver, Ltd. |
| | 30 S. Wacker Drive |
| | 29th Floor |
| | Chicago, IL 60606 |
| | Attn:   Stewart Dolin, Esq. |
| | |
| To Safelite: | Safelite Group, Inc. |
| | 2400 Farmers Drive |
| | Columbus, OH 43235 |
| | Attn: Chief Financial Officer |
| | |
| With a copy to: | Safelite Group, Inc. |
| | 2400 Farmers Drive |
| | Columbus, OH 43235 |
| | Attention:  General Counsel |

or to such other place and with such other copies as any Party may designate as to itself by written notice to the other Parties.

       (b)   Successors and Assigns; Third Party Beneficiaries.  This License Agreement will be binding upon the Parties and their respective successors, personal representatives, heirs and assigns; however, no Party will have any right to assign any of its rights and obligations pursuant to this License Agreement except with the prior written consent of the other Party, except that HQ may assign this License Agreement in connection with a Sale of HQ (as that term is defined in the Master Agreement) without Safelite's consent.   Notwithstanding the foregoing, HQ must have the prior written consent of Safelite to assign this License Agreement in connection with a Sale of HQ prior to July 6, 2009 to Visteon Corporation, PPG Industries, Inc., Pilkington, or any affiliate or subsidiary thereof, or to any third party that, at the time of such Sale of HQ, competes with Safelite in the business of glass manufacturing or automotive glass repair or replacement.

       (c)   Further Execution. The Parties agree to execute any additional documents or instruments, and to take any and all other actions, necessary to carry out the purposes of this License Agreement.

       (d)   Headings. The headings herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the Sections at the beginning of which they appear.

       (e)   Entire Agreement.   This License Agreement and the related agreements referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any

provision hereof shall be binding upon any Party unless it is in writing and executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance.

(f)    Governing Law; Jurisdiction.    This License Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles.  Each of the Parties hereby submits to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois, with respect to any dispute concerning or arising out of this License Agreement.

(g)    Counterparts and Facsimile Signature.    This License Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. For purposes of executing and delivering this License Agreement or any of the other documents or instruments required hereunder, a signed document transmitted by facsimile machine ("Fax") shall be treated in all manner and respect as an original document. The signature of any Party by Fax shall be considered for these purposes as an original signature. Any such Fax shall be considered to have the same binding legal effect as an original document.  At the request of either Party, any Fax document subject to this License Agreement shall be re-executed by both Parties in an original form.  The Parties hereby agree that none of the Parties shall raise the use of the Fax or the fact that any signature or document was transmitted or communicated through the use of a Fax as a defense to the formation of this License Agreement.

(h)    Severability.    If any provision (in whole or in part) of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, then such provision shall be deemed modified, restricted, or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted, or reformulated or as if such provision had not been originally incorporated herein, as the case may be.  The parties hereto further agree to seek a lawful substitute for any provision found to be unlawful.  If such modification, restriction or reformulation is not reasonably possible, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and the provisions of this Agreement shall be severable in any such instance.

**[Signature Pages Follows]**

**IN WITNESS WHEREOF,** the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.


HQ, INC.


_____
Jeffrey J. Hogan
Its: President


SAFELITE GROUP, INC.


_____
Douglas A. Herron
Its: Executive Vice President, CFO

07/06/2004 11:15 FAX                                 ☒004

**IN WITNESS WHEREOF**, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____

Douglas A. Herron
Its: Executive Vice President, CFO

License Agreement Signature Page
20×361/0000/666139

IN WITNESS WHEREOF, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____

Douglas A. Herron
Its: Executive Vice President, CFO