UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HYPERQUEST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08 C 483 |
| | ) |
| N'SITE SOLUTIONS, INC., and | ) Honorable Milton I. Shadur |
| UNITRIN DIRECT AUTO INSURANCE | ) Magistrate Judge Michael T. Mason |
| | ) |
| Defendants. | ) JURY DEMAND |

**HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Plaintiff, HyperQuest, Inc. ("HQ"), by and through its undersigned counsel, hereby submits its opposition to the motion of Defendants N'Site Solutions, Inc. ("N'Site") and Unitrin Direct Insurance Company ("Unitrin") (collectively, "Defendants") to dismiss for lack of subject-matter jurisdiction.

**I.      INTRODUCTION**

Defendants concede, as they must, that exclusive licensees have standing to sue for copyright infringement under the Copyright Act.  See Memorandum of Law in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction and Hearing Request ("Memorandum") at 3.  Defendants argue, however, that HQ is, in fact, a "non-exclusive licensee." Memorandum at 3-6.  Therefore, Defendants argue that HQ lacks standing to bring the claims asserted in this case.  Id.

Although it is not entirely clear from Defendants' pleadings, Defendants appear to argue that HQ is a "non-exclusive" licensee for three reasons: (i) the grant of the exclusive license from Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite") to HQ was

"subject to N'Site's use of the copyrighted materials;" (ii) Safelite "reserved to itself the sole discretion to enforce the copyright against N'Site and the sole right to terminate N'Site's license;" and (iii) "the license contains additional restrictions which are inconsistent with the grant of an exclusive license." See Memorandum at 5-6.

There are several problems with Defendants' arguments. First, the main problem with all of these arguments is that Defendants ignore the relevant language of the Copyright Act and applicable case law expressly acknowledging the divisibility of rights under a copyright and granting a statutory cause of action to the "legal or beneficial owner of <u>an</u> exclusive right under a copyright. . . to institute an action for any infringement <u>of that particular right</u> committed while he or she is the owner of it."   17 U.S.C.A. § 501(b) (emphasis added). Second, Defendants simply fail to acknowledge that N'Site never had any right to reproduce, create derivative works based upon, or distribute the eDoc software -- those rights have belonged exclusively to HQ since July 6, 2004. Third, Defendants also fail to acknowledge that any limited rights that N'Site might have had to use the eDoc software expired no later than April 1, 2006. Accordingly, since at least April 1, 2006, HQ's rights to the eDoc software have been completely exclusive. Fourth, Defendants base their argument about the alleged "retention" of "enforcement rights" by Safelite on a complete mischaracterization of language in the license agreement between HQ and Safelite whereby Safelite undertook affirmative obligations to HQ to enforce certain contractual rights of Safelite's.

For these reasons, explained in more detail below, defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied.

## II.  STANDARD OF REVIEW

When considering the sufficiency of a complaint under Rule 12(b)(1), a court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor. *Marcavage v. City of Chicago*, 467 F. Supp. 2d 823, 825 (N.D. Ill. 2006) (citing *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 701 (7th Cir. 2003). The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is largely identical to the standard for a Rule 12(b)(6) motion. *Johnson v. Orr*, 2007 WL 4531798, at *2 (N.D. Ill. December 19, 2007) (citing *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). The lone difference is that the court is not limited to the jurisdictional contentions asserted in the complaint, but may consider other evidence submitted to determine whether subject matter jurisdiction exists. *Id.*[1]

## III.  FACTUAL BACKGROUND

On July 6, 2004, Safelite granted to HQ an exclusive license to use certain software commonly referred to as eDoc Express software. Complaint at ¶23-24; *see also* July 6, 2004 Software License between HQ and Safelite (the "Safelite/HQ Exclusive License Agreement"), attached to the Complaint as Exhibit B, at ¶ 2. The scope of the grant from Safelite to HQ was quite broad – Safelite granted to HQ a perpetual, worldwide, exclusive license to use, develop, modify, enhance, copy, reproduce, make, have made, store,

---

[1]  Defendants have not submitted any additional evidence and HQ does not believe this Court needs any additional evidence in order to determine that HQ has standing to bring this action. HQ believes that its standing to bring this action is evident from the uncontested factual allegations in HQ's Complaint for Injunctive Relief and Damages (the "Complaint") and the unambiguous terms of the agreements attached thereto. Nonetheless, out of an abundance of caution, HQ submits herewith the Declaration of Jeffrey J. Hogan ("Hogan Declaration"), a copy of which is attached hereto as Exhibit A, regarding certain aspects of the negotiations between HQ and Safelite as additional evidence regarding the meaning of certain relevant terms of the agreements in the event that this Court disagrees with HQ's position and finds certain relevant terms to be ambiguous and requiring parol evidence be admitted in order to determine the meaning of such terms.

demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sub-license the eDoc Express software. *Id*.

Nonetheless, despite the broad grant of a perpetual, worldwide, exclusive license to HQ, HQ acknowledged that it was aware of a prior limited use license that had been granted to N'Site by Safelite's predecessor in interest to the eDoc software, Quivox Systems Incorporated ("Quivox"). *See* Safelite/HQ Exclusive License Agreement at ¶ 2(b). Specifically, HQ acknowledged that it was aware of the Software Application Services and Integration Agreement dated as of April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License"). *Id*. HQ further acknowledged that it was aware that N'Site and Safelite were in the process of attempting to negotiate terms of a revised license (the "Revised License") and that HQ had received a copy of the latest draft of the Revised License. *Id*.

Notably, N'Site's right to use the eDoc Express software under the Quivox/N'Site Limited Use License was limited in many ways:

- (i) N'Site could only use eDoc Express within its immediate organization and could only install it in its own facility at locations specified in writing and approved by Quivox;

- (ii) N'Site could only use the eDoc Express software for the purpose of electronically collecting, storing and transferring claim information;

- (iii) N'Site could only use eDoc Express for its own use and the use of its subsidiaries;

- (iv) N'Site could not "sell, market or in any other manner distribute to any third party or to any location" the eDoc Express software (except that N'Site could distribute printed copies and electronic copies of information derived from the eDoc Express software to insurance

      agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business);

   (v)  N'Site could not make any modifications to the eDoc Express software without Quivox's prior written consent; and

   (vi)  N'Site could not create any derivative work based upon eDoc Express without Quivox's prior written consent.

Complaint at ¶ 11; *see also* Quivox/N'Site Limited Use License, attached to the Complaint as Exhibit A, at ¶ 4.1, 4.2, 4.3, 4.4, and 4.10.

   Moreover, no Revised License was ever executed by Safelite and N'Site, and any such Revised License would have necessarily been similarly limited in scope. Complaint at ¶ 22; Hogan Declaration at ¶¶ 7-10 and Revised License attached thereto as Exhibit 4. One of the principal aspects of consideration in the July 2004 transaction between Safelite and HQ was the grant to HQ of the exclusive license to the eDoc Software. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 3-6. Safelite did not retain the right to give any rights to the eDoc software to anyone else other than N'Site and Safelite retained only the limited right to enter into the Revised License with N'Site, or a Revised License with similarly restrictive terms. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 3-10.

   In any event, Safelite and HQ agreed that Safelite would terminate the Quivox/N'Site Limited Use License or any Revised License no later than April 1, 2006. Safelite/HQ Exclusive License at ¶ 2; Hogan Declaration at ¶¶ 11-12. Safelite did not retain the right to give any rights to the eDoc software to anyone for any purpose – not even N'Site – after April 1, 2006. *Id.*

## IV. ARGUMENT

### A. Defendants' Arguments Ignore The Principle Of Divisibility Under the Copyright Act.

Under the Copyright Act, rights are divisible and owners of an exclusive right have standing to bring an infringement action to enforce that right. Nonetheless, Defendants argue that HQ cannot be an exclusive licensee because the grant of exclusivity was "subject to N'Site's use" of the eDoc software and because the license contains certain restrictions (for example, regarding HQ's ability to sell the eDoc software to Safelite's competitors without Safelite's consent). Defendants' arguments ignore well-settled principles of divisibility and standing under the Copyright Act.

The Copyright Act explicitly recognizes the divisibility of rights under a copyright and provides that the exclusive licensee of any exclusive right under a copyright has standing to bring an infringement action to enforce that right. Specifically, Section 501(b) of the Copyright Act provides:

> (b) The legal or beneficial <u>owner of an exclusive right</u> under a copyright <u>is entitled . . . to institute an action for any infringement</u> of that particular right committed while he or she is the owner of it.

17 U.S.C.A. §501(b) (emphasis added). Moreover, Section 201(d) of the Copyright Act provides:

> (1) <u>The ownership of a copyright may be transferred in whole or in part</u> by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property b the applicable law of intestate succession.
>
> (2) <u>Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately</u>. The owner of any particular exclusive right is entitled, to the extent of that right, to

>all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C.A. §201(d) (emphasis added).  Similarly, Section 101 of the Copyright Act defines "transfer of copyright ownership" as:

>an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright <u>or of any of the exclusive rights comprised in a copyright,</u> <u>whether or not it is limited in time or place of effect</u>, but not including a nonexclusive licensee.

17 U.S.C.A. §101 (emphasis added).

Section 106 of the Copyright Act in turn sets forth the several different exclusive rights which are "comprised in a copyright" (and which may be further subdivided and transferred and owned separately under Section 201(d)):

>Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
>(1)   to reproduce the copyrighted work in copies or phonorecords;
>
>(2)   to prepare derivative works based upon the copyrighted work;
>
>(3)   to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
>(4)   in the case of literary, musical, dramatic, and choreographed works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
>(5)   in the case of literary, musical, dramatic, and choreographed works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
>(6)   in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C.A. §106.

In light of these provisions, it is well-settled that the owner of any of the exclusive rights set forth in Section 106 (including any further subdivided exclusive right under Section 106) has standing to bring a cause of action for infringement of that particular right. *See, e.g.,* Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright § 10.02[A], at 10-20-10-22 (2007) (discussing the "abolition of indivisibility"; the relevant provisions of the Copyright Act; the legislative history; and relevant case law). *See also Burns v. Rockwood Distributing Co.*, 481 F. Supp. 841 (N.D. Ill. 1979) (in accordance with Section 201(d) of the Copyright Act, the owner of a copyright has certain divisible rights which may be transferred in whole or in part by means of an exclusive license); *Library Publications, Inc. v. Medical Economics Co.*, 548 F.Supp. 1231, 1233-34 (E.D. Pa. 1982) ("The legislative history of section 201 makes it clear that an exclusive license can be limited to given rights at a particular time. For example, a local broadcasting station can hold an exclusive license to transmit a particular work within a particular geographic area for a particular time. H.R. Report, No. 94-1476, 94th Cong., 2nd Sess. 123, reprinted in (1976) U.S. Code Cong. & Ad. News 5659, 5739. Furthermore, there appears to be no limit on how narrow the scope of exclusive rights can be yet still constitute a "transfer of ownership," provided the licensed rights are exclusive. See Nimmer on Copyright s 10.02(A) (1982). An exclusive license to a newsstand dealer to distribute a given edition of a given newspaper at a designated corner on a particular afternoon, for example, gives the dealer "ownership" of that right. Id."); *Swarovski America Ltd. v. Silver Deer Ltd.*, 537 F.Supp. 1201, 1205 (D. Co. 1982) ("I note at the outset that this is an action for infringement of both the plaintiff's right to manufacture and the plaintiff's right to distribute or sell, the copyrighted figurines. These rights are extended to copyright owners pursuant to 17 U.S.C. s 106(1) and s 106(3) respectively.

Since the plaintiff has not granted the right of manufacture to any other party, there is no question that it has an exclusive right to manufacture the copyrighted materials and thus, standing to sue for infringement of the right of manufacture. The situation regarding the plaintiff's right to distribute or sell the copyrighted materials is more complex.")

Given these well-settled principles of divisibility and standing under the Copyright Act, the fact that the grant of the exclusive license to HQ may have been "subject to N'Site's [limited] use of the copyrighted material" (Memorandum at 5), does not mean that HQ is a "non-exclusive licensee" without standing to sue. The relevant inquiry is not whether any other party has any rights at all with respect to the copyrighted material. Instead, the inquiry is whether the claimant has <u>an</u> exclusive right under the copyright at issue which the claimant is attempting to enforce.

> B.  **HQ Is An "Exclusive Licensee" Because N'Site Was Never Granted Any Right To Reproduce, Prepare Derivative Works Based Upon Or Distribute The eDoc Software – Those Rights Have Belonged Exclusively To HQ Since July 6, 2004.**

In light of the limited scope of the license granted to N'Site in the Quivox/N'Site Limited Use License there can be no doubt that even if the Quivox/N'Site Limited Use License were still in effect today (which it is not), HQ has <u>an</u> exclusive right under the copyright at issue and standing to sue. For example, N'Site was never granted any right to reproduce, prepare derivative works based upon, or distribute the eDoc software. *See* Quivox/N'Site Limited Use License at ¶ 4 (listing limited rights and explicitly stating, among other things, "[N'Site] may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product …" and "[N'Site] agrees to comply with the terms and conditions of this License and agrees not to use the software and documentation

licensed hereunder in any way beyond the scope of this License…."). N'Site does not and cannot argue otherwise. Therefore, the rights to reproduce, prepare derivative works based upon, and distribute the eDoc software have belonged exclusively to HQ since July 6, 2004. Accordingly, HQ has standing to bring an infringement action to enforce those rights.

    C.    **HQ Is An "Exclusive Licensee" Because Any Right That N'Site Had To Use The eDoc Software Expired In 2003, Or At The Very Latest, In April 2006.**

In addition, HQ has alleged that any rights that N'Site had with respect to the copyrighted material expired in 2003 or, at the very latest, in April 2006. Complaint at ¶¶ 25-26. Defendants have not challenged HQ's allegations in this regard, nor have Defendants submitted any evidence to contradict such allegations. Accordingly, taking such allegations as true for purposes of Defendants' motion to dismiss, notwithstanding HQ's acknowledgement of the Quivox/N'Site Limited Use License in the Safelite/HQ Exclusive License, HQ's rights have been completely exclusive since at least April 1, 2006. HQ has standing to bring this infringement action for this reason as well.[2]

    D.    **Defendants' Argument That HQ Is Not An "Exclusive Licensee" Because Safelite "Retained" Certain "Enforcement Rights" Is Based On A Complete Mischaracterization Of The Relevant Language In The Safelite/HQ Exclusive License and Misplaced Reliance On The Decision In *Althin v. West Suburban Kidney Center*.**

Defendants argue that Safelite "<u>reserved</u> to itself the <u>sole discretion</u> to enforce <u>the copyright</u> against N'Site and the sole right to terminate N'Site's license." Memorandum at 5 (emphasis added). Notably, that is not what the agreement between Safelite and HQ actually says. The agreement states:

> <u>Safelite</u> covenants to HQ that prior to April 1, 2006, Safelite shall notify N'Site in writing of Safelite's intention to terminate the Original License and/or the revised license in accordance with their respective terms and <u>further covenants</u> to take whatever action (if any) Safelite deems appropriate (1) <u>to enforce its rights under the License and/or Revised License</u> and (2) to terminate the License and/or Revised License.

Safelite/HQ Exclusive License at ¶ 2(b). Accordingly, under the terms of the Safelite/HQ Exclusive License, Safelite undertook an affirmative obligation to HQ to take certain action to enforce "[Safelite's] rights under the License …."

For example, under the Quivox/N'Site Limited Use License, Safelite had the contractual right to terminate the license in advance of April 1, 2006, if N'Site defaulted on payment of License Fees. *See* Quivox/N'Site Limited Use License at ¶ 9. Safelite promised to HQ that Safelite would take actions that Safelite deemed appropriate in such circumstances to enforce Safelite's contractual rights. Nothing in the Safelite/HQ Exclusive License refers to any "retention" of rights by Safelite that would otherwise be transferred to HQ – such as the statutory right to bring an infringement action for infringement of any of the exclusive rights being licensed to HQ. And nothing in the Safelite/HQ Exclusive License refers to any "sole discretion" on the part of Safelite to bring infringement actions.

Defendants appear to be mischaracterizing the language of the Safelite/HQ Exclusive License in a misguided attempt to analogize the license agreement in this case to the license agreement at issue in *Althin CD Med., Inc. v. W. Suburban*, 873 F. Supp. 837

---

(continued)
[2]   In the event that this Court determines that HQ has the burden at this stage of the proceedings to submit evidence proving that N'Site's license was, in fact, terminated prior to April 1, 2006, even though Defendants have not disputed that fact, HQ respectfully requests that HQ be permitted to conduct discovery with respect to that issue.

(N.D. Ill. 1995). The problem for Defendants is that the grant of rights in *Althin* was significantly different from the grant of rights at issue in this case.

*Althin* does not stand for the proposition that any time a copyright owner retains contractual rights to terminate limited non-exclusive licenses, the copyright owner is therefore precluded from transferring exclusive rights to a license. In *Althin*, the license provided by the copyright owner expressly forbade the licensee from bringing copyright infringement suits: "Licensee shall not institute any suit or take any action on account of such infringements without first obtaining Licensor's written consent." *Id.* at 839. HQ's license was wholly different; it provided no limitation whatsoever on HQ's ability to bring suit for copyright infringement against alleged infringers of the exclusive rights granted to HQ.

## V.    CONCLUSION

For these reasons HQ has standing to bring suit under the Copyright Act as an exclusive licensee and Defendants' motion to dismiss should be denied.

Dated:  February 21, 2008

                                Respectfully submitted,

                                **HYPERQUEST, INC.**


                              By: /s/ Deborah Rzasnicki Hogan
                                  One of Its Attorneys

Deborah Rzasnicki Hogan
Chad A. Blumenfield
GOLDBERG, KOHN, BELL, BLACK,
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 21, 2008, she caused a copy of the attached **HYPERQUEST'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** to be served via the Court's electronic notification system upon:

>Paul R. Kitch
>Jodi Rosen Wine
>Elizabeth W. Baio
>Nixon Peabody LLP
>161 N. Clark St., 48th floor
>Chicago IL 60601
>
>Steven L. Tiedemann
>8820 Columbia 100 Parkway Suite 400
>Columbia Maryland 21045

By:   /s/ Deborah Rzasnicki Hogan