# EXHIBIT A

.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HYPERQUEST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08 C 483 |
| | ) |
| N'SITE SOLUTIONS, INC., and | ) Honorable Milton I. Shadur |
| UNITRIN DIRECT AUTO INSURANCE | ) Magistrate Judge Michael T. Mason |
| | ) |
| Defendants. | ) JURY DEMAND |

## DECLARATION OF JEFFREY J. HOGAN

I, Jeffrey J. Hogan, declare and state as follows:

1.      I am the President and founder of HyperQuest, Inc. f/k/a HQ, Inc. ("HQ").

2.      I am over 18 years of age and the information contained in this declaration is based on my personal knowledge, and I could and would testify to such information if called to do so in connection with the above-captioned matter.

3.      On or about July 6, 2004, HQ entered into a Software License Agreement with Safelite Group Inc. f/k/a Safelite Glass Corp. ("Safelite"). A true and correct copy of that Software License Agreement (the "Safelite/HQ Exclusive License Agreement") is attached hereto as Exhibit 1.

4.      I was the principal negotiator of the terms of the Safelite/HQ Exclusive License Agreement on behalf of HQ.

5.      I was also the principal negotiator on behalf of HQ of the terms of certain other related agreements also entered into between Safelite and HQ on or about July

6, 2004, including the Master Agreement referred to in the Safelite/HQ Exclusive License Agreement. A true and correct copy of the Master Agreement is attached hereto as Exhibit 2.

6. Pursuant to the Master Agreement, HQ agreed, among other things, to issue certain shares of HQ common stock to Safelite representing 15% of the pro forma common stock of HQ at that time. One of the principal aspects of consideration Safelite gave to HQ in the July 2004 transaction between Safelite and HQ was the grant to HQ of the exclusive license to the eDoc Software.

7. During the negotiations of the terms of the Safelite/HQ Exclusive License Agreement, I discussed with Safelite the existence of a prior license that had been granted to N'Site Solutions, Inc. ("N'Site") by Quivox Systems Incorporated ("Quivox") and then subsequently "inherited" by Safelite. In addition, shortly before closing, an actual copy of the Software Application Services and Integration Agreement dated April 1, 2001 between N'Site and Quivox (the "Quivox/N'Site Limited Use License") was provided to me. A true and correct copy of the Quivox/N'Site Limited Use License that was provided to me in or about early July 2004 is attached hereto as Exhibit 3.

8. During the negotiations, I also discussed with Safelite the fact that Safelite and N'Site were attempting to negotiate terms of a revised license.

9. During these negotiations, Safelite repeatedly assured me that N'Site's rights to use the eDoc software were quite limited. For example, Safelite explained to me that N'Site could only use the eDoc software within its own four walls. Safelite also repeatedly assured me that any revised license that it was negotiating with N'Site would be similarly restrictive in scope.

10.    As with the Quivox/N'Site Limited Use License, I was provided an actual copy of the proposed draft revised license (the "Revised License") that Safelite was considering entering into with N'Site shortly before closing. A true and correct copy of the Revised License that was provided to me in or about early July 2004 is attached hereto as Exhibit 4.

11.    In addition, during the negotiations, Safelite informed me that the term of the Quivox/N'Site Limited Use License would expire on April 1, 2006.

12.    In my discussions with Safelite, I insisted that Safelite agree that under no circumstances would Safelite continue to license the eDoc software to N'Site in any way – under either the Quivox/N'Site Limited Use License or any revised license – after April 1, 2006.  Safelite agreed with my request and agreed that under no circumstances would Safelite continue to license the eDoc software to N'Site after April 1, 2006.

13.    In my discussions with Safelite I also explained that it was important to HQ that if N'Site was in breach of the Quivox/N'Site Limited Use License or any revised license prior to April 1, 2006, and Safelite therefore had the contractual right to terminate either the Quivox/N'Site Limited Use License or any revised license prior to April 1, 2006, that Safelite do so.  In response to my request, Safelite agreed to include the language in the agreement which states that Safelite "further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License."

14.    At no time in my discussions with Safelite did Safelite request, or HQ agree to give to Safelite, rights to pursue infringement actions against N'Site or any other

potential infringer of the exclusive rights in the eDoc software which were being granted to HQ.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on February 21, 2008.

Jeffrey J. Hogan

# EXHIBIT 1

# SOFTWARE LICENSE AGREEMENT

This Software License Agreement (the "**License Agreement**") is made and entered into as of the 6th day of July, 2004, by and between HQ, Inc., an Illinois corporation ("**HQ**"), and Safelite Group, Inc., a Delaware corporation ("**Safelite**"). HQ and Safelite hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties.**"

## RECITALS

A.    Safelite owns all rights to collision claims management software commonly referred to as eDoc ("**eDoc Software**").

B.    Safelite and HQ have entered into an Agreement dated as of the date hereof (the "**Master Agreement**") pursuant to which Safelite has agreed to license to HQ the source code for the eDoc Software, subject to the terms and conditions set forth in this License Agreement.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, which are specifically incorporated herein by this reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **Definitions**.

    (a)    "**HQ Services**" means those services HQ provides to various users and industries including, but not limited to, the insurance, professional repair and parts supply industries for the purpose of ensuring the proper identification, selection, procurement and use of parts and for the purpose of reporting information on such activities and related processes. HQ Services does not include the eDoc software.

    (b)    "**HQ Modifications**" means all modifications, derivative works, adaptations, partial versions or improvements of or to the eDoc Software authored, invented, developed, conceived or first reduced to practice by HQ. All HQ Modifications shall be deemed a part of the eDoc Software.

    (c)    "**HQ System**" means HQ's system, consisting of hardware and equipment used by HQ upon which is installed HQ's software and data used to perform the HQ Services and support HQ's business.

    (d)    "**Intellectual Property Rights**" means patent, copyright, trade secret, trademark, source codes, object codes or other proprietary rights.

    (e)    "**Market Ready**" means that HQ is prepared to offer the eDoc Software product to its customers.

(f) **"Other Documents"** shall mean the Master Agreement, the Note (as defined in the Master Agreement), the Security Agreement (as defined in the Master Agreement) and the Shareholders Agreement (as defined in the Master Agreement).

(g) **"Territory"** means the United States of America and Canada.

2. **License Grant.**

(a) <u>Grant To HQ</u>. Subject to all limitations and obligations set forth in this License Agreement, Safelite grants to HQ a perpetual (subject to termination only as provided in <u>Section 4</u>), worldwide, exclusive (except as set forth in <u>Section 2(b)</u>) license (i) to use the eDoc Software, in source code form, to support the development and commercialization of HQ Services, and (ii) to develop, modify and enhance the eDoc Software as HQ in its sole discretion determines; provided, that such modifications and enhancements are solely related to the development and commercialization of HQ Services. The term "use" means use, copy, reproduce, make, have made, store, demonstrate, market, promote, display, give access to, transmit, communicate, perform, adapt, modify, prepare derivative works based upon, develop, import, rent, lease and/or sublicense the eDoc Software to a third party pursuant to an agreement, the terms of which shall provide that such third party: (i) shall have no right, license, or authority to sub-license, rent, or grant access to all, or any part, of the eDoc Software to any person or entity; (ii) shall have no right to use the terms "eDoc" or "Safelite" in any promotional or advertising materials created or published in relation to such third party's use of the eDoc Software; (iii) shall indemnify, defend, and hold Safelite, its directors, officers, subsidiaries, agents, and employees (collectively, **"Safelite Indemnitees"**), harmless from and against any and all claims, damages, liabilities, costs, judgements, and fees (including reasonable attorney fees) incurred by Safelite Indemnities in relation to any breach by such third party of it agreement with HQ or in relation to any unauthorized use by such third party of the eDoc Software. Notwithstanding the foregoing, HQ may not, without the prior written consent of Safelite, which consent shall not be unreasonably withheld, rent, sell, lease, transfer or sublicense the eDoc Software to any person or entity that competes with Safelite in the manufacture, distribution, or sale of automotive glass or related services, including but not limited to, those competitors set forth on <u>Schedule 2(a)</u>.

(b) <u>Exclusivity</u>. Except as otherwise provided in this Section 2(b), HQ's license to the eDoc Software is exclusive in the Territory. Such exclusivity shall terminate if a Sale of of HQ (as defined in the Master Agreement) occurs prior to July 5, 2009. Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing or development. Safelite will not use the eDoc Software in a manner that competes with HQ Services, except as part of Safelite's claims management solutions which does and will include a comprehensive estimate audit capability. Safelite's comprehensive estimate audit capability will provide for the auditing of an entire estimate and/or specific line items within an estimate for the

purpose of adherence and reporting. However, Safelite's comprehensive estimate audit capability will not encompass adherence to part use rules, reporting on parts usage, adherence to insurance operating guidelines for estimate development as related to parts, or for the determination, provisioning, or procurement of correct parts through its own or another company's database of parts, except to the extent that these services are used for the sole purpose of identifying and addressing auto glass parts. Notwithstanding the foregoing, HQ acknowledges the eDoc Software is licensed ("License") to N'SITE Solutions, Inc. ("N'SITE"). HQ further acknowledges Safelite and N'SITE are presently negotiating the terms of a revised license ("Revised License") regarding N'SITE's use of the eDoc Software. Safelite represents and warrants to HQ that Safelite has delivered to HQ a true and accurate copy of the latest draft of the Revised License and a true and accurate copy of the Software Application Services and Integration Agreement ("Services and Integration Agreement") dated as of April 1, 2001, by and between N'SITE and Quivox Systems Incorporated. HQ acknowledges receipt of a copy of the Revised License and the Services and Integration Agreement. Safelite covenants to HQ that prior to April 1, 2006, Safelite shall notify N'Site, in writing, of Safelite's intention to terminate the Original License and/or the Revised License in accordance with their respective terms and further covenants to take whatever action (if any) Safelite deems appropriate (1) to enforce its rights under the License and/or Revised License and (2) to terminate the License and/or Revised License. Safelite agrees to periodically apprise HQ of the status of its discussions with N'SITE regarding the execution of the Revised License and in the event the Revised License is modified to include terms substantially different than the Revised License provided to HQ, Safelite will advise and include HQ in the determination of the final terms of the Revised License.

(c)     Support. Safelite shall make its employees listed on Schedule 2(c) available to HQ at HQ's request, without charge to HQ and on the terms and conditions set forth in Schedule 2(c) in order to support and advise HQ with respect to the development, marketing, deployment and ongoing support of the eDoc Software.

(d)     Royalty. HQ will pay Safelite a royalty as follows: (i) before Full Integration if HQ uses all or any part of eDoc Software to process a claim, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim processed and (ii) after Full Integration, all claims processed by HQ, except where HQ can demonstrate and document that the functionality of the eDoc Software was not used in whole or in part, the lesser of (x) 7.5% of all fees associated with such claim processing or (y) $1.50 per claim invoiced. HQ shall generate a report setting forth all claims invoiced by HQ each month and shall pay the royalties due to Safelite on a monthly basis within niney (90) days after the end of each calendar month.

(e)     Audit. During the Term of this License Agreement, Safelite shall have the right to audit, including by inspecting the books and records of HQ to verify HQ's compliance with the terms of Section 2(d). Safelite shall condut such audits upon at least ten (10) days prior written notice, during HQ's normal business hours and in such a manner as not to interfere unreasonably with HQ's normal business operations.

Safelite may conduct such audits from time to time, but not more than once every six (6) months, as Safelite deems necessary to determine if HQ is making proper royalty payments in compliance with Section 2(d). HQ shall pay such audit expenses if such audit shows underpayment of royalty payments of 10% or more.

        (f)      HQ agrees that the source code for the eDoc Software are Safelite's Confidential Information (as defined below) and shall treat and handle eConfidential iInformation in accordance with Section 7.

        (g)      HQ shall have the eDoc Software Market Ready by the first anniversary of the Effective Date.

        (h)      HQ shall timely provide HQ's updates and patches of the HQ Modification, if any, to Safelite in accordance with Schedule 2(h).

3.     **Ownership.**

        (a)    Ownership prior to Full Integration.  Subject to Section 3(b) below, all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite, and all right, title and interest in and to the HQ Modifications shall vest in Safelite upon creation. Subject to Section 3(b) below, all Intellectual Property Rights in or related to the eDoc Software are and will remain the exclusive property of Safelite, and all Intellectual Property Rights in or related to the HQ Modifications will be the exclusive property of Safelite. Subject to Section 3(b) below, HQ assigns all rights, title, and ownership interest in the HQ Modification to Safelite. HQ agrees to enter into any additional documents reasonably necessary to perfect Safelite's ownership rights.

        (b)    Ownership after Full Integration. The eDoc Software will be fully integrated and embedded into the HQ System to a degree that the eDoc Software will no longer be identifiable as a software program independent of the other components of the HQ System (the completion of that process being "**Full Integration**" and the resulting software or system being "**Full Integration Software**"). HQ and Safelite will jointly determine when Full Integration is accomplished. HQ will not accomplish Full Integration within 2 years of the date of this License Agreement without Safelite's consent. Promptly following Full Integration, HQ will deliver to Safelite a written notice setting forth the date on which Full Integration was accomplished accompanied by a copy of the eDoc Software with all HQ Modifications thereto (including source code, object code and all required instructions) as of Full Integration. All modifications to the Full Integration Software made by HQ from and after Full Integration ("**Future Modifications**") will not be considered "HQ Modifications" but will become part of the Full Integration Software. Subject to Safelite's rights under this Agreement and the Master Agreement, HQ will own all right, title and interest in and to the Future Modifications, and all Intellectual Property Rights in or related in the Future Modifications will be the exclusive property of HQ. Prior to transfering, licensing, or

assigning the Full Integration Software to any person listed on <u>Schedule 3(b)</u>, HQ must obtain the prior written consent of Safelite which consent may be withheld at Safelite's sole discretion.

(c)    <u>Ownership of HQ System</u>. In no event shall Safelite have any right, title or interest in the HQ System or any part thereof other than through Safelite's ownership interests in HQ.

4.    **<u>Term and Termination</u>**.

(a)    <u>Term</u>.  This License Agreement will commence on the Effective Date and continue in perpetuity, unless earlier terminated as provided herein.

(b)    <u>Termination for Breach</u>.  Either Party may terminate this License Agreement upon ninety (90) days written notice to the other Party if the other Party has committed an Event of Default under this License Agreement and such Event of Default is not cured within such ninety (90) day period.    Notwithstanding anything in this Agreement to the contrary, in the event of a material breach by HQ of it obligations under <u>Sections 2(a)</u> or <u>7</u> of this Agreement, Safelite shall have the right to declare HQ in violation of its obligations hereunder.   If HQ materially breaches its obligations under <u>Section 2(a)</u> or <u>7</u> of this Agreement, HQ shall have the limited right to continue to use the eDoc Software, HQ Modifications and Future Modifications for a period of forty-five (45) days from the date of Safelite's written notice to HQ generally identifying such breach.  At the option of Safelite, all rights granted to HQ hereunder shall terminate on the expiration of any such forty-five (45) day period..  The Parties acknowledge and agree that the occurrence of one or more of the following events shall constitute an event of default ("**Event of Default**"):

(i)    if a Party materially breaches or fails or neglects to perform, keep or observe any material provision, covenant or term of this License Agreement or any Other Document;

(ii)    if any representation or warranty made by a Party in this License Agreement shall prove to have been inaccurate or untrue in any material respect on the date when made or deemed to have been made; or

(iii)    if a Party ceases to do business or becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a Party; or if such a petition is filed by any third party, or an application for a receiver is made by anyone.

(c)    <u>Termination for Failure to have eDoc Software Market Ready</u>. Safelite may terminate this License Agreement by delivering written notice of

termination to HQ within fifteen (15) days after the first anniversary of the Effective Date if the eDoc Software is not Market Ready prior to the first anniversary of the Effective Date. Safelite agrees that it shall not license the HQ Modifications to a third party if Safelite terminates this License Agreement pursuant to this <u>Section 4(c)</u> unless Safelite pays to HQ a mutually agreed upon amount; provided, that, in determining such amount, Safelite shall receive full credit for the costs and expenses associated with the support services provided by Safelite pursuant to <u>Section 2(c)</u>.

(d)    <u>Obligations On Termination</u>.    Within ten (10) days after termination of this License Agreement, (i) HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications (provided, however, in the event of a material breach by HQ of <u>Sections 2(a)</u> or <u>7</u> of this Agreement, HQ shall cease all use of the eDoc Software, HQ Modifications and Future Modifications in accordance with the terms of <u>Section 4(b)</u> above), and (ii) pay Safelite any accrued but unpaid royalty fees within thirty (30) days after the termination of this License Agreement. HQ will deliver to Safelite or destroy, as directed by Safelite, and certify in writing to Safelite of such destruction, any full or partial copies of eDoc Software received hereunder, HQ Modifications and Future Modifications, in HQ's possession or under its control Safelite within thirty (30) days after termination of this License Agreement.

(e)    <u>Survival</u>.    Subject to this <u>Section 4</u> (Term and Termination), the provisions set forth in <u>Sections 3</u> (Ownership), <u>4(d)</u> (Obligations on Termination), <u>4(e)</u> (Survival), <u>6</u> (Limitation of Liability), <u>7</u> (Confidential Information), <u>8</u> (Indemnity) and <u>9</u> (Miscellaneous) will survive termination of this License Agreement.

5.    **Warranties**.

(a)    <u>HQ Authority</u>.    (i) HQ has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) HQ has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) HQ has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) HQ has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of HQ, enforceable against HQ in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(b)    <u>Safelite Authority</u>.    (i) Safelite has all requisite legal and corporate power to execute and deliver this License Agreement, to perform its obligations under

this License Agreement and to consummate the transactions contemplated by this License Agreement, (ii) Safelite has taken all corporate action necessary for the authorization, execution and delivery of this License Agreement and the consummate the transactions contemplated by this License Agreement, (iii) Safelite has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this License Agreement, (iv) Safelite has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this License Agreement and (v) this License Agreement constitutes legal, valid, and binding obligations of Safelite, enforceable against Safelite in accordance with its respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(c)     Non-Infringement. Except as set forth on Schedule 5(c), Safelite represents and warrants that it owns or has the right, under valid and enforceable agreements, to grant the license of the eDoc Software herein; the eDoc Software does not, and its use by HQ and its customers as contemplated by this License Agreement will not infringe or otherwise violate any Intellectual Property Rights or other proprietary rights of any third party, and Safelite has not received any charge, complaint, claim, demand or notice alleging any such infringement or violation.   HQ represents and warrants that in connection with the use of the eDoc Software and HQ Modifications, it has not and shall not infringe on any Intellectual Property Rights or other proprietary right of any third party.  Neither HQ nor any other company or individual involved with the use of eDoc Software and HQ Modifications is under any obligations to assign or give any work under this License Agreement to a third party.

(d)     Disclaimer.   EXCEPT AS SET FORTH ABOVE, NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS AND WARRANTIES INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

6.     **Limitation of Liability**.

(a)     Disclaimer of Indirect Damages.  NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, INCLUDING LOST PROFITS, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. SAFELITE SHALL NOT BE LIABLE TO HQ FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES FROM USE OF THE EDOC SOFTWARE IN A MANNER NOT AUTHORIZED BY THIS LICENSE AGREEMENT, USE OR INABILITY TO USE THE EDOC SOFTWARE AND LOSS OF DATA.

(b)    Exclusions.  Notwithstanding the foregoing, the limitations of liability set forth in this Article 6 will not apply to losses in connection with (i) death or personal injury caused by a Party; (ii) a Party's breach of the confidentiality provisions or or (iii) claims pursuant to the indemnification provisions set forth in Article 8.

7.    **Confidential Information.**

(a)    Confidential Information.  Each Party has made and will continue to make available to the other Party information (including, without limitation, the source code for the eDoc Software) that is not generally known to the public and at the time of disclosure is identified, or would reasonably be understood by the receiving Party, to be proprietary or confidential ("**Confidential Information**").  Confidential Information may be disclosed in oral, written, visual, electronic or other form.

(b)    Obligations.  The receiving Party will use the same care and discretion to avoid disclosure, publication or dissemination of any Confidential Information received from the disclosing Party as the receiving Party uses with its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care).  The receiving Party will be liable for any unauthorized disclosure or use of Confidential Information by any of its personnel, agents, subcontractors or advisors.  The receiving Party will promptly report to the disclosing Party any breaches in security that may materially affect the disclosing Party and will specify the corrective action to be taken.  Upon the termination of this License Agreement, each Party shall return to the other Party the Confidential Information of the other Party.

(c)    Third Party.  Subject to the terms and conditions herein, HQ may disclose Safelite's Confidential Information to any affiliates, contractors, consultants, and other third parties (the "Third Party") that have a need-to-know and are obligated to maintain the confidentiality of Safelite's Confidential Information upon terms similar to those contained in this License Agreement; provided, that the Third Party executes a non-disclosure and confidentiality agreement in form and substance attached hereto as Schedule 7(c).  HQ will be liable for any unauthorized disclosure or use of Safelite's Confidential Information by the Third Party.  HQ will promptly report to Safelite any breaches in security that may materially affect Safelite and will specify the corrective action to be taken.  HQ shall promptly deliver to Safelite a signed copy of all such confidentiality agreements.

(d)    Injunctive Relief.  HQ acknowledges that the unauthorized use, transfer or disclosure of the source code of the eDoc Software or any HQ Modifications will (i) substantially diminish the value to Safelite of the trade secrets and other proprietary interests that are the subject of this License Agreement; (ii) render Safelite's remedy at law for such unauthorized use, disclosure or transfer inadequate; and (iii) cause irreparable injury in a short period of time.  If HQ breaches any of its obligations with respect to the use or confidentiality of the source code of the eDoc Software or HQ

Modifications, Safelite shall be entitled to equitable relief to protect its interests therein, including, but not limited to, preliminary and permanent injunctive relief.

(e)    Exceptions to Confidential Treatment.

(i)    Exclusions.  The obligations set forth in Section 7 do not apply to any Confidential Information that the receiving Party can demonstrate: (i) the receiving Party possessed prior to disclosure by the disclosing Party, without an obligation of confidentiality; (ii) is or becomes publicly available without breach of this License Agreement by the receiving Party; (iii) is or was independently developed by the receiving Party without the use of any Confidential Information of the disclosing Party; or (iv) is or was received by the receiving Party from a third Party that does not have an obligation of confidentiality to the disclosing Party.

(ii)    Legally Required Disclosure.  If the receiving Party is legally required to disclose any Confidential Information of the disclosing Party in connection with any legal or regulatory proceeding, the receiving Party will endeavor to notify the disclosing Party within a reasonable time prior to disclosure, and will allow the disclosing Party a reasonable opportunity to seek appropriate protective measures or other remedies prior to disclosure and/or waive compliance with the terms of this License Agreement. If these protective measures or other remedies are not obtained, or the disclosing Party waives compliance with the terms of this License Agreement, the receiving Party may disclose only that portion of that Confidential Information that it is, according to the opinion of counsel, legally required and will exercise all reasonable efforts to obtain assurance that confidential treatment will be accorded to that Confidential Information.

8.    **Indemnity.**

(a)    Safelite Indemnification. Safelite will indemnify, defend and hold harmless HQ and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all losses, liabilities, damages and claims (including taxes), and all related costs and expenses, including reasonable legal fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties (collectively, "**Losses**"), due to third party claims arising from, or in connection with, (i) Safelite's breach of this License Agreement, (ii) any actual or alleged U.S. or Canadian infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the eDoc Software (or the use of the eDoc Software) or (iii) grossly negligent or willful acts or omissions of or by Safelite or its personnel. The foregoing indemnity will not cover third party infringement claims (i) outside the United States and Canada, or (ii) to the extent resulting from HQ Modifications.

(b)    HQ Indemnification. HQ will indemnify, defend and hold harmless

Safelite and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all Losses due to third party claims arising from, or in connection with, (i) HQ's breach of this License Agreement, (ii) any actual or alleged infringement, violation or misappropriation of the Intellectual Property Rights of a third party by the HQ Modifications (or the use of the HQ Modifications) or the Future Modifications (or the use of the Future Modifications), or (iii) grossly negligent or willful acts or omissions of or by HQ or its personnel. The foregoing indemnity will not cover third party infringement claims to the extent resulting from modifications by any party other than HQ or HQ's employees, sublicensees, agents, representatives or licensees to the eDoc Software.

(c)    Indemnification Procedures. The obligations of an indemnifying party under this Section 7 are subject to the conditions that: (i) the indemnifying party is notified promptly in writing by the indemnified party of any claim; (ii) the indemnifying party has sole control of the defense and all negotiation for any settlement or compromise; and (iii) the indemnified party reasonably assists the indemnifying party in the defense of the claim. No settlement or compromise that imposes any liability or obligation on any indemnified party will be made without such party's prior written consent (not to be unreasonably withheld).

9.    **Miscellaneous.**

(a)    Non-solicitation. Each Party covenants and agrees that it, directly or indirectly, shall not, during the term of this License Agreement and for a period of two years after the termination of this License Agreement, solicit any of the employees, consultants or subcontractors of the other Party.

(b)    Notices. All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

To HQ:         HQ, Inc.
               1300 West Belmont Avenue
               Suite 200
               Chicago, IL 60657
               Attn: Jeff Hogan

With a copy to:          Sachnoff & Weaver, Ltd.
                         30 S. Wacker Drive
                         29th Floor
                         Chicago, IL 60606
                         Attn:  Stewart Dolin, Esq.


To Safelite:             Safelite Group, Inc.
                         2400 Farmers Drive
                         Columbus, OH 43235
                         Attn: Chief Financial Officer


With a copy to:          Safelite Group, Inc.
                         2400 Farmers Drive
                         Columbus, OH 43235
                         Attention: General Counsel

or to such other place and with such other copies as any Party may designate as to itself by written notice to the other Parties.

      (b)   <u>Successors and Assigns; Third Party Beneficiaries</u>. This License Agreement will be binding upon the Parties and their respective successors, personal representatives, heirs and assigns; however, no Party will have any right to assign any of its rights and obligations pursuant to this License Agreement except with the prior written consent of the other Party, except that HQ may assign this License Agreement in connection with a Sale of HQ (as that term is defined in the Master Agreement) without Safelite's consent.  Notwithstanding the foregoing, HQ must have the prior written consent of Safelite to assign this License Agreement in connection with a Sale of HQ prior to July 6, 2009 to Visteon Corporation, PPG Industries, Inc., Pilkington, or any affiliate or subsidiary thereof, or to any third party that, at the time of such Sale of HQ, competes with Safelite in the business of glass manufacturing or automotive glass repair or replacement.

      (c)   <u>Further Execution</u>. The Parties agree to execute any additional documents or instruments, and to take any and all other actions, necessary to carry out the purposes of this License Agreement.

      (d)   <u>Headings</u>. The headings herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the Sections at the beginning of which they appear.

      (e)   <u>Entire Agreement</u>.  This License Agreement and the related agreements referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any

provision hereof shall be binding upon any Party unless it is in writing and executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance.

(f)  Governing Law; Jurisdiction.  This License Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles.  Each of the Parties hereby submits to the exclusive jurisdiction and venue of the federal and state courts presiding in Cook County, Illinois, with respect to any dispute concerning or arising out of this License Agreement.

(g)  Counterparts and Facsimile Signature.  This License Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. For purposes of executing and delivering this License Agreement or any of the other documents or instruments required hereunder, a signed document transmitted by facsimile machine ("Fax") shall be treated in all manner and respect as an original document. The signature of any Party by Fax shall be considered for these purposes as an original signature.  Any such Fax shall be considered to have the same binding legal effect as an original document.  At the request of either Party, any Fax document subject to this License Agreement shall be re-executed by both Parties in an original form.  The Parties hereby agree that none of the Parties shall raise the use of the Fax or the fact that any signature or document was transmitted or communicated through the use of a Fax as a defense to the formation of this License Agreement.

(h)  Severability.  If any provision (in whole or in part) of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, then such provision shall be deemed modified, restricted, or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted, or reformulated or as if such provision had not been originally incorporated herein, as the case may be.  The parties hereto further agree to seek a lawful substitute for any provision found to be unlawful.  If such modification, restriction or reformulation is not reasonably possible, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and the provisions of this Agreement shall be severable in any such instance.

**[Signature Pages Follows]**

**IN WITNESS WHEREOF**, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____
Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____
Douglas A. Herron
Its:  Executive Vice President, CFO

07/06/2003 11:13 FAX                                    @004

**IN WITNESS WHEREOF**, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President


SAFELITE GROUP, INC.


_____

Douglas A. Herron
Its: Executive Vice President, CFO

**IN WITNESS WHEREOF**, the undersigned have caused this License Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____

Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____

Douglas A. Herron
Its: Executive Vice President, CFO

# EXHIBIT 2

## MASTER AGREEMENT

This Agreement (the "**Agreement**") is made and entered into as of the 6th day of July, 2004, by and between HQ, Inc., an Illinois corporation ("**HQ**"), and Safelite Group, Inc., a Delaware corporation ("**Safelite**"). HQ and Safelite hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties**."

## RECITALS

A.     Safelite owns all rights to collision claims management software commonly referred to as eDoc ("**eDoc Software**").

B.     Safelite desires to grant HQ a perpetual license to the eDoc Software in consideration for certain royalties, an equity interest in HQ and certain rights regarding future equity financings of HQ or a sale of HQ, all as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which are specifically incorporated herein by this reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     <u>Closing</u>.  The closing of the transactions provided for herein (the "**Closing**") will occur at the offices of HQ, or other mutually agreed upon location, on the date hereof.  All actions to be taken at Closing will be considered to be taken simultaneously, and no document, agreement, or instrument will be considered to be delivered until all items which are to be delivered at the Closing have been delivered.  At the Closing, the following actions will occur:

(a)     <u>Software License</u>.  Safelite and HQ will enter into the Software License Agreement attached hereto as <u>Exhibit A</u> (the "**Software License Agreement**") and Safelite will deliver to HQ any updates to the source code for the eDoc Software previously delivered to HQ.

(b)     <u>Software Services Agreement</u>.  Safelite and HQ will enter into the Services Agreement attached hereto as <u>Exhibit B</u> (the "**Services Agreement**") and the Supplements related to the Collision Glass Solution and Vandalism Solution that are included in <u>Exhibit B</u>.

(c)     <u>Shareholder Agreement</u>.  Safelite, HQ and all of the shareholders of HQ will enter into the Amended and Restated Shareholders Agreement attached hereto as <u>Exhibit C</u> ("**Shareholders Agreement**").

(d)     <u>Safelite Loan to HQ</u>.  Safelite will make available to HQ up to Four Hundred Fifty Thousand Dollars ($450,000) pursuant to that certain promissory note in the form of <u>Exhibit D</u> attached hereto ("**Note**") and HQ shall execute the Note.

(e)     <u>Security Agreement</u>.  Safelite and HQ will enter into the Security Agreement attached hereto as <u>Exhibit E</u> ("**Security Agreement**", and collectively with the Software License Agreement, Services Agreement, Shareholders Agreement and Note, the "**Other Agreements**").

(f) **Issuance of HQ Shares to Safelite.** HQ will issue to Safelite 1,232 shares of Common Stock, par value $0.001 per share (the "**Shares**"), in consideration for $10.00 and Safelite shall pay the purchase price of $10.00.

(g) **Representations True.** All of the representations and warranties made by each of the Parties in this Agreement shall be true and correct in all respects as of the Closing Date.

(h) **No Default.** There shall exist as of the date hereof no condition or event that constitutes, or that after notice or lapse of time, or both, would constitute, an Event of Default under this Agreement or under any of the Other Agreements.

(i) **Proceedings.** All corporate and other proceedings and all documents incidental to the transactions contemplated herein, including but not limited, to the purchase of the Shares shall be reasonably satisfactory in substance and form to Safelite and Safelite shall have received the following:

(i) The Certificate of Incorporation certified by the Secretary of State of the State of Illinois;

(ii) Certificates as to the corporate good standing of HQ issued by the Secretary of State of the State of Illinois;

(iii) By-laws of HQ, certified by its Secretary as of the Closing Date; and

(iv) Resolutions of the Board of Directors of HQ ("**Board**") and shareholders of HQ, authorizing and approving all matters in connection with this Agreement and the transactions contemplated hereby, certified by the Secretary of HQ as of the Closing Date.

(j) **Board of Directors.** The Board shall consist of those members appointed in accordance with Section 8 of the Shareholders Agreement.

(k) **Other Acts.** The Parties will execute any other documents reasonably required to carry out the intent of this Agreement. Each of the Parties shall have performed in all material respects all obligations and agreements and complied with all covenants and other items contained in this Agreement required to be performed or fulfilled by such Party on or before the applicable date of performance of fulfillment.

(l) **Closing Costs.** Safelite and HQ shall pay their respective closing costs and all other items required to be paid at Closing, except as otherwise provided herein. Safelite and HQ shall sign all required documents at or before Closing.

2.     **[Reserve].**

3.     **Representations and Warranties by HQ.** HQ represents and warrants to Safelite as follows:

(a)     <u>Capitalization</u>.  The authorized capital stock of HQ consists of 100,000 shares of common stock, par value $0.001 per share (the "**Common Stock**"), of which 6,981 shares are issued and outstanding, and 3,000 shares of preferred stock, none of which are issued and outstanding.  All of the issued and outstanding shares of common stock are duly authorized, validly issued, fully paid and nonassessable, and were issued in conformity with all applicable state and federal securities laws.  Except as described on <u>Schedule 3(a)</u>, HQ has no other equity securities of any class issued, reserved for issuance, or outstanding.  Except as described on <u>Schedule 3(a)</u>, there are no outstanding options, offers, warrants, conversion rights, agreements, or other rights to subscribe for or to purchase from HQ, or commitments by HQ to issue, transfer, or sell (either written or oral, formal or informal, firm or contingent), shares of or interests in the capital stock or other securities of HQ (whether debt, equity, or a combination thereof) or obligating HQ to grant, extend or enter into any such agreement or commitment.  The Shares represent fifteen percent (15%) of the Pro Forma Stock of HQ.  "**Pro Forma Stock**" means, as of the date of this Agreement, all issued and outstanding shares of Common Stock plus all shares of Common Stock which would then be issuable upon conversion or exchange of all issued and outstanding options, warrants, or other rights to acquire shares of Common Stock, and securities and other instruments that are convertible into or exchangeable for shares of the Common Stock.

(b)     <u>Authority</u>. (i) HQ has all requisite legal, corporate power and authority to enter into this Agreement and the Other Agreements, to perform its obligations under this Agreement and the Other Agreements and to consummate the transactions contemplated by this Agreement and the Other Agreements; (ii) all necessary corporate action has been taken by and on behalf of HQ and its shareholders with respect to the execution, delivery, and performance by HQ of this Agreement and the Other Agreements and the consummation of the transactions contemplated by this Agreement and the Other Agreements; (iii) HQ has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement and the Other Agreements; (iv) HQ has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this Agreement and the Other Agreements; and (v) this Agreement and the Other Agreements constitute legal, valid, and binding obligations of HQ, enforceable against HQ in accordance with their respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(c)     <u>Shareholder List and Agreements</u>.  <u>Schedule 3(c)</u> is an accurate and complete list of the shareholders of HQ, showing the number of Common Stock or other securities of HQ held by such shareholder as of the date of this Agreement.  Except as contemplated by this Agreement or as set forth in <u>Schedule 3(c)</u>, there are no agreements, written or oral, between HQ and any holder of its capital stock, or, to HQ's knowledge, among any holders of its capital stock, relating to the acquisition, disposition or voting of the capital stock of HQ.

(d)     <u>Noncontravention</u>.  Neither the execution, delivery, and performance of this Agreement, the Other Agreements, and the other instruments and transactions contemplated by this Agreement, nor the sale of the Shares will violate any provision of law, any order of any court or other agency of government, the certificate of incorporation or by-laws of HQ or any

3

agreement or instrument to which HQ is a party or by which HQ is bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time, or both) a default under any such agreement or instrument, or result in the creation or imposition of any lien of any nature whatsoever upon the Shares or, except as set forth on Schedule 3(d) require HQ to obtain any consents or approvals of any governmental authority or third party.

(e)    Financial Statements.  The balance sheet of HQ as of December 31, 2003 and income statements of HQ for the 12 months ended December 31, 2003, are attached hereto as Schedule 3(e) (collectively the "**Financial Statements**"), have been prepared from and are in accordance with the books and records of HQ.  The Financial Statements fairly present the financial condition and results of operations of HQ as of the dates and for the periods stated or covered thereby in all material respects.  The Financial Statements do not omit or fail to identify material nonrecurring income or other specific items, do not omit or fail to identify the existence of material transactions not in the ordinary course of business, and contain no excessive write-downs or write-ups of any material assets.  Except as set forth on Schedule 3(e) and other than those shown in the Financial Statements, HQ does not have any material liabilities or material obligations of any nature whatsoever, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, nor does HQ have knowledge of any basis for the assertion against HQ of any material liability of any nature whatsoever, unless such liability has been fully reflected or reserved against in the Financial Statements.  Since December 31, 2003, (a) there has been no material adverse change in the business, assets or condition, financial or otherwise, operations or prospects of HQ; and (b) HQ has not entered into any material transaction other than in the ordinary course of business or made any distribution on its capital stock.

(f)    Litigation.  Except as set forth on Schedule 3(f), there is no claim, litigation, action, suit, proceeding, investigation or inquiry, administrative or judicial, at law, in equity or before or by any federal, state, local or other governmental authority, pending or, to HQ's knowledge, threatened against or that could be threatened or affecting HQ or any of its properties or assets, including, without limitation, any for the purpose of enjoining or preventing the consummation of the transactions contemplated by this Agreement and the Other Agreements, or otherwise claiming that this Agreement and the Other Agreements, the transactions contemplated by this Agreement and the Other Agreements, or the consummation of those transactions are improper.  HQ and its properties and assets are not subject to any order, writ, injunction or decree of any court or any governmental authority.

(g)    Securities.  The Shares have been duly authorized and will be validly issued, fully paid and nonassessable and will be free of restrictions on transfers other than restrictions imposed on HQ or its shareholders as set forth on Schedule 3(g) as are contained in this Agreement, the Shareholders Agreement and under applicable state and federal securities laws.

(h)    Securities Laws.  No consent, authorization, approval, permit, or order of or filing with any governmental or regulatory authority is required under current laws and regulations in connection with the execution and delivery of either this Agreement, the Other Agreements, or the issuance, sale, or delivery of the Shares to Safelite in conformity with the terms of this Agreement and the Other Agreements other than the notification with respect thereto, if required, under applicable federal and state securities laws, which notification has

been or will be effected. HQ has not: (a) issued any securities in violation of the requirements of Section 5 of the Securities Act or any other law; (b) violated any rule, regulation or requirement under the Securities Act or the Securities Exchange Act of 1934, as amended; (c) issued any securities in violation of any state securities laws; or (d) redeemed any securities in violation of any applicable state or federal securities law or any agreement or contract governing the redemption of such securities.

(i)     Material Contracts and Agreements.     Schedule 3(i) lists all material contracts, agreements, leases, commitments, instruments, arrangements and understandings, whether written or oral, to which HQ is a party (the "**Material Contracts**"). The Material Contracts are valid and binding, are in full force and effect and are enforceable in accordance with their respective terms, except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy. HQ has not assigned, mortgaged, pledged, encumbered or otherwise hypothecated any of its right, title and interest under the Material Contracts. Except as set forth on Schedule 3(i), neither HQ nor, to the HQ's knowledge, any other party thereto is in violation of, or in default in respect of any Material Contract. HQ has not received any oral or written notice claiming any such violation or default by HQ or indicating the desire or intention of any other party thereto to amend, modify, rescind or terminate a Material Contract.

(j)     Proprietary Rights.     Schedule 3(j) lists or describes all patents, trademarks, service names, trade names, copyrights, licenses and other proprietary rights used in HQ's business as now conducted (the "**Proprietary Rights**"). HQ owns, or has the right to use under the agreements or upon the terms described in Schedule 3(j), all of the Proprietary Rights, and has taken all actions reasonably necessary to protect the Proprietary Rights. HQ has not received any oral or written notice that it is infringing upon or otherwise acting adversely to the right or claimed right of any Person under or with respect to any of the foregoing, and to HQ's knowledge, there is no basis for any such claim. HQ has no knowledge of any violation by a third party of any of the Proprietary Rights. HQ has no knowledge that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with his or her duties to HQ or that would materially conflict with HQ's business as presently conducted. HQ does not believe it is or will be necessary to utilize any inventions of any of its employees made prior to their employment by HQ, except for inventions that have been assigned to HQ.

(k)     Subsidiaries.     HQ has no Subsidiaries and does not otherwise own or control, directly or indirectly, any interest in any corporation, partnership, limited liability company, joint venture or other entity or business concern.

(l)     Regulation.     Except as provided in Schedule 3(l), HQ has obtained, or is in the process of obtaining, all licenses, permits and other authorizations required by any federal, state, or local regulatory body to conduct the business of HQ, the failure of which to obtain would reasonably be expected to have a material adverse effect on HQ, and there is no regulatory

5

restriction that has a material adverse effect on the ability of HQ to conduct its business as presently conducted.

(m) <u>Other Agreements of Employees</u>. Except as set forth on <u>Schedule 3(m)</u>, to HQ's knowledge, no officer, director, stockholder, or employee of HQ is a party to or bound by any agreement, contract, or commitment that affects the business, operations or prospects of HQ, or the right of any such person to participate in HQ's affairs and perform the duties of his or her office or capacity in connection therewith, or that obligates any such person to perform any duty for any prior employer or principal.

(n) <u>Title to Properties and Assets; Liens, etc.</u> HQ has good and marketable title to its properties and assets and good title to all its leasehold estates, in each case subject to no mortgage, pledge, lien, encumbrance or charge, other than Permitted Liens. HQ owns no real property and with respect to the property and assets that HQ leases, HQ is in material compliance with all terms of each such lease and holds a valid leasehold interest free of any liens, claims or encumbrances except for Permitted Liens. **"Permitted Liens"** means (a) liens for taxes, assessments or governmental charges or levies not yet due and payable; (b) liens imposed by law, such as materialmen's, mechanics', carriers', workers', employees' and repairmen's liens; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations of HQ; (d) the Security Interests existing on the date of this Agreement disclosed on <u>Schedule 3(n)</u>; (e) Security Interests created in connection with and limited to capitalized lease obligations disclosed on <u>Schedule 3(n)</u>; or (f) zoning restrictions, easements, licenses, restrictions on the use of real property or minor irregularities in title thereto that do not materially impair the use of such property in the operation of its business or the value of such property for the purpose of such business; provided, however, that none of the liens, Security Interests or other encumbrances listed in clauses (a), (b), (c) or (d) will constitute a "Permitted Lien" on and after the commencement in respect thereof of any enforcement, collection, execution, levy or foreclosure or forfeiture proceeding that remains unstayed or unbonded for ten consecutive days and that involves more than $100,000. **"Security Interest"** means any lien, pledge, mortgage, encumbrance, charge or security interest of any kind whatsoever (including, without limitation, the lien or retained security title of a conditional vendor) whether arising under a security instrument or as a matter of law, judicial process or otherwise or the agreement by any Person to grant any lien, security interest or pledge, mortgage or encumber any asset.

(o) <u>Taxes</u>. The amount shown on the Financial Statements as provision for taxes is sufficient in all material respects for payment of all accrued and unpaid federal, state, county, local and foreign taxes for the period then ended and all prior periods. HQ has filed or has obtained presently effective extensions with respect to all federal, state, county, local and foreign tax returns that are required to be filed by it. All returns filed by HQ are accurate and correct in all material respects and all taxes shown on those returns to be due have been timely paid, except where the failure to timely pay would not have a material adverse effect on HQ. HQ's federal income tax returns have not been audited by the Internal Revenue Service, and no controversy with respect to taxes to any type is pending or, to HQ's knowledge, threatened.

(p) <u>No Preemptive Rights</u>. Except as set forth on <u>Schedule 3(p)</u>, no person has any right of first refusal or any preemptive rights in connection with the issuance of the

Shares or any future issuance of securities by HQ, except pursuant to and as set forth in this Agreement and the Shareholders Agreement.

(q)    Registration Rights.  HQ is not under any contractual obligation to register with the Securities Exchange Commission or any state any of its currently outstanding securities or any of its securities that may hereafter be issued.

(r)    Employee Benefit Plans.  Except as set forth on Schedule 3(r), HQ does not maintain or contribute to, and has never maintained or contributed to, any employee benefit plan.

(s)    Employees.   Except as set forth on Schedule 3(s), no employee or consultant of HQ has any written agreement with HQ governing, relating or otherwise regarding such employee's employment with HQ.  Except as set forth in Schedule 3(s), all the employees and consultants of HQ are at-will employees.  To HQ's knowledge, no employee of or consultant to HQ is in violation of any term of any employment contract or any other contract or agreement relating to the relationship of any such person with HQ or any other party because of the nature of the business conducted by HQ.  To HQ's knowledge, there is no material information that is proprietary to another party that HQ is now utilizing that was provided by any employee of HQ.  HQ is not aware of any key employee of HQ who has any plans to terminate his or her employment with HQ.

(t)    Labor Agreements and Actions.  HQ is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or has sought to represent any of the employees, representatives or agents of HQ.  There is no strike or other labor dispute involving HQ pending, or, to HQ's knowledge, threatened, nor is HQ aware of any labor organization activity involving employees of HQ.

(u)    Insurance.  Schedule 3(q) contains a description of each insurance policy maintained by HQ with respect to its properties, assets and business, and each such policy is presently in full force and effect.  HQ is not in material default with respect to any insurance policy maintained by it.

(v)    Representations Complete.  No representation or warranty of HQ made in this Agreement or any of the Other Agreements, or in any schedule, document or certificate furnished pursuant to this Agreement or any of the Other Agreements, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make any statement of fact contained herein or therein not misleading.  There is no fact or circumstance that is not disclosed in this Agreement, the Other Agreements or the schedules hereto that could reasonably be expected to have a material adverse effect on the HQ's financial condition, operating results, assets, supplier relations, customer relations, employee relations or business prospects.

4.    **Representations, Warranties and Covenants by Safelite**.  Safelite represents and warrants as follows:

(a)     Authority. (i) Safelite has all requisite corporate power and authority to enter into this Agreement and the Other Agreements, to perform its obligations under this Agreement and the Other Agreements and to consummate the transactions contemplated by this Agreement and the Other Agreements; (ii) all necessary corporate action has been taken by and on behalf of Safelite and its shareholders with respect to the execution, delivery, and performance by Safelite of this Agreement and the Other Agreements and the consummation of the transactions contemplated by this Agreement and the Other Agreements; (iii) Safelite has no agreement or understanding with any third party that interferes with or will interfere with its performance of its obligations under this Agreement and the Other Agreements except as set forth on Schedule 4(a); (iv) Safelite has obtained and will maintain all rights, approvals and consents necessary to perform its obligations under this Agreement and the Other Agreements except as set forth on Schedule 4(a); and (v) this Agreement and the Other Agreements constitute legal, valid, and binding obligations of Safelite, enforceable against Safelite in accordance with their respective terms except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both state and federal, affecting the enforcement of creditors' rights or remedies in general from time to time in effect and the exercise by courts of equity powers or their application of principles of public policy.

(b)     Noncontravention.  Neither the execution, delivery, and performance by Safelite of this Agreement, the Other Agreements, and the other instruments and transactions contemplated by this Agreement and the Other Agreements will violate any provision of law, any order of any court or other agency of government, the certificate of incorporation or by-laws of Safelite or any agreement or instrument to which Safelite is a party or by which Safelite is bound, or be in conflict with, result in a breach of, or constitute (with notice or lapse of time, or both) a default under any such agreement or instrument.

(c)     Investment Representations.

(i)     Safelite represents that the Shares are being acquired for Safelite's own account, for investment purposes only and not with a view towards distribution or resale to others. Safelite will not attempt to sell, transfer, assign, pledge or otherwise dispose of all or any portion of the Shares unless it is registered under the Securities Act of 1933, as amended ("Securities Act"), or unless in the opinion of counsel satisfactory to HQ an exemption from such registration is available.

(ii)     Safelite confirms that HQ has made available to it the opportunity to ask questions of and receive answers and additional information from HQ concerning HQ and the activities of HQ.

(iii)     Safelite has relied solely upon the investigations made by or on behalf of Safelite in evaluating the suitability of an investment in HQ. Safelite recognizes that an investment in HQ involves a high degree of risk.  Safelite is familiar with and understands the terms of this Agreement and has not relied on any representations or warranties of HQ in evaluating the investment other than the representations and warranties contained herein or in the Other Documents.

8

(iv)   In making an investment decision, Safelite must rely on its own examination of HQ and the terms of this Agreement, including the merits and risks involved.  Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Shares.

(v)   The Shares are subject to restrictions on transferability and resale under applicable law and may not be transferred or resold except as permitted under the Securities Act and the applicable state securities laws, pursuant to registration or exemption therefrom.  Safelite acknowledges that it will be required to bear the financial risks of this investment for an indefinite period of time.

(vi)   Safelite is an "accredited investor" as that term is defined under Regulation D of the Securities Act of 1933, as amended.

5.   **Covenants of HQ.**

(a)   HQ shall deliver the following to Safelite:

(i)   As soon as available and in any event within 90 days after the end of each fiscal year of HQ: (x) a balance sheet of HQ as of the end of such year, a statement of income and of surplus for such year and a statement of changes in financial position during such year (collectively the **"Annual Financial Statements"**), including such annual financial statements that set forth in comparative form, if possible, the corresponding figures for the preceding year. Such Annual Financial Statements must be certified by an officer of HQ as complete and accurate to the best of his or her knowledge, and were prepared in accordance with GAAP (except for the lack of footnotes).

(ii)   As soon as available and in any event within 60 days after the end of the first three quarters of each fiscal year of HQ, a balance sheet of HQ as of the end of such period(s), a statement of income and surplus for such period(s) and the fiscal year to that date and a statement of changes in financial position for the fiscal year to that date, subject to changes resulting from normal year-end adjustments, setting forth in each case in comparative form, if possible, the corresponding figures for the corresponding period of the preceding fiscal year and the corresponding figures for sales, gross profit, net income and the heading titled "EBIT" for the corresponding period for the budget for the current fiscal year.  Such balance sheet and statements must be certified by an officer of HQ as complete and accurate to the best of his or her knowledge, subject to normal year-end adjustments.

(iii)   Concurrent with the furnishing of the Annual Financial Statements pursuant to paragraph (i) and each of the quarterly statements pursuant to paragraph (ii), a certificate of an officer of HQ that contains a statement, in form and substance satisfactory to Safelite, to the effect that, to his or her knowledge and belief, no Event of Default, or any event that, upon notice or lapse of time, or both, would constitute an Event of Default, has occurred, or if there shall have been an Event of Default, or an event that upon notice or lapse of time, or both, would constitute an Event of Default,

208361/0000/666226/Version #:.4

such certificate must disclose the details thereof. In each such certificate the officer of HQ must also certify that the financial statements furnished pursuant to paragraphs (i) and (ii) were prepared in accordance with GAAP (except for the lack of footnotes).

(b)    If all or any portion of any indebtedness of HQ is declared due and payable before its express maturity, or if HQ otherwise is in continuous default under any agreement with respect to indebtedness of HQ, which default may reasonably be expected to have a material adverse effect on the HQ's business, HQ shall give written notice thereof to Safelite, within ten days after the occurrence of each such event.

(c)    HQ shall give notice to Safelite as soon as practicable and in any event within ten days after the occurrence of any of the following events, stating in detail the nature thereof: (i) any proceeding instituted against HQ or any Subsidiary by or in any federal or state court or before any commission, board, or other regulatory body, federal, state, or local; (ii) the occurrence of any event that is, or with notice or passage of time, or both, would be, an Event of Default under any of the Other Agreements; or (iii) any condition or event that may have a material adverse effect on HQ's financial condition, operating results, assets, operations, business or prospects, but excluding conditions or events which effect the economy in general and/or the industry in which HQ operates in general.

(d)    HQ shall keep, and shall cause each of its Subsidiaries to keep, books and records reflecting all of its business affairs and transactions in accordance with GAAP and permit Safelite and its representatives, at Safelite's sole cost and expense, during normal business hours, at intervals not more often than one times every twelve months and upon reasonable advanced written notice to HQ of at least fifteen (15) business days, to (i) visit and inspect any of the properties of HQ and its subsidiaries, (ii) examine the corporate and financial records of HQ and its Subsidiaries, if any, and (iii) discuss the affairs, finances and accounts of any such corporations with the directors, officers and independent accountants of HQ and its Subsidiaries.

(e)    HQ shall designate Safelite as its primary provider of collision glass repair and replacement; provided, however, that HQ may revoke this designation for a particular client at any time if such client requests that HQ revoke this designation.

(f)    HQ shall comply in all material respects with all applicable laws (whether federal, state or local and whether statutory, administrative or judicial or other) and with every applicable lawful governmental order (whether administrative or judicial) regarding its business where the failure to so comply would reasonably be expected to have a material adverse effect on HQ.

(g)    The covenants and agreements of HQ contained in Subsections 5(a) through 5(f) above shall terminate upon the earlier of (a) the Sale of HQ, (b) a Qualified Public Offering, or (c) July 6, 2009.

6.    **Negative Covenants**.  HQ, for itself and for each Subsidiary that is hereafter formed or acquired, covenants to and agrees with Safelite that, prior to a Qualified Public

Offering or the Sale of HQ, neither HQ nor any Subsidiary shall do any of the following without the prior written consent of Safelite:

(a)    Except as otherwise provided herein or in the Shareholder Agreement, HQ shall not, and shall not permit any of its Subsidiaries to, (a) directly or indirectly sell, lease, or otherwise dispose of more than 50% of its properties and assets, in the aggregate, to any Person(s), whether in one transaction or in a series of transactions over any period of time other than in the ordinary course of business; (b) merge into or with or consolidate with any other Person; or (c) adopt any plan or arrangement for the dissolution or liquidation of HQ or any Subsidiary.

(b)    Except as otherwise provided herein or in the Shareholder Agreement, until the termination of Section 5(G) of the Shareholder Agreement, HQ shall not take, or authorize, any action, or fail to take any action, that would dilute the share ownership of Safelite in the Company below fifteen percent (15%).

(c)    HQ shall not, and shall not permit any of its Subsidiaries to materially change its business purpose and amend, alter or modify its Certificate of Incorporation or By-laws if such amendment, alteration or modification would affect the rights, privileges or powers of Safelite as a shareholder of HQ.

7.    **Covenants of Safelite.**  In consideration for HQ entering into this Agreement and the Other Agreements, Safelite shall pay to HQ Three Hundred Thousand Dollars ($300,000), payable as follows: Twenty Five Thousand Dollars ($25,000) at the Closing, Twenty Five Thousand Dollars ($25,000) on August 1, 2004 and Twenty Five Thousand Dollars ($25,000) on the first day of each calendar month thereafter until Safelite shall have paid the full Three Hundred Thousand Dollars ($300,000) under this Section 7.

8.    **Term and Termination.**

(a)    Term.  This Agreement will commence on the Closing Date and continue in perpetuity, unless earlier terminated as provided herein.

(b)    Termination for Breach.  Either Party may terminate this Agreement upon ninety (90) days' written notice to the other Party if the other Party has committed an Event of Default under this Agreement and such Event of Default fails to be cured within such ninety (90) day period.

9.    **Events of Default.**  The Parties acknowledge and agree that the occurrence of one or more of the following events shall constitute an event of default ("**Event of Default**"):

(a)    if either Party breaches or fails or neglects to perform, keep or observe any provision, covenant, or term of this Agreement or any Other Agreement;

(b)    if any representation or warranty made by either Party in this Agreement or any Other Agreement or in any other certificate, document or financial statement furnished at any time in connection herewith or therewith shall prove to have been misleading on the date when made or deemed to have been made; or

(c)    if a Party ceases to do business or becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as they now exist, or as they may be amended, is filed by a Party; or if such a petition is filed by any third party, or an application for a receiver is made by anyone.

10.    **Indemnification.**

(a)    <u>Safelite Indemnification</u>. Safelite will indemnify, defend and hold harmless HQ and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all losses, liabilities, damages and claims (including taxes), and all related costs and expenses, including reasonable legal fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties (collectively, "**Losses**"), due to third party claims arising from, or in connection with, Safelite's breach of this Agreement.

(b)    <u>HQ Indemnification</u>. HQ will indemnify, defend and hold harmless Safelite and its officers, directors, employees, agents, successors and assigns from any and all third party claims to recover any and all Losses due to third party claims arising from, or in connection with, HQ's breach of this Agreement.

(c)    <u>Indemnification Procedures</u>. The obligations of an indemnifying party under this <u>Section 5</u> are subject to the conditions that: (i) the indemnifying party is notified promptly in writing by the indemnified party of any claim; (ii) the indemnifying party has sole control of the defense and all negotiation for any settlement or compromise; and (iii) the indemnified party reasonably assists the indemnifying party in the defense of the claim. No settlement or compromise that imposes any liability or obligation on any indemnified party will be made without such party's prior written consent (not to be unreasonably withheld).

11.    **Miscellaneous.**

(a)    <u>Survival of Agreement</u>. This Agreement and all terms, warranties, and provisions hereof will be true and correct as of the time of Closing and will survive the Closing.

(b)    <u>Notices</u>. All notices, requests, demands, or other communications hereunder (including notices of all asserted claims or liabilities) shall be in writing and shall be either delivered personally, by messenger service, or by prepaid guaranteed overnight delivery service, or mailed by U.S. mail, certified or registered, with appropriate postage prepaid, to the addressees and addresses herein designated, or such other address as may be designated in writing by notice given in the manner provided herein, and shall be effective (a) upon personal delivery thereof, if delivered personally or by messenger service, (b) one (1) business day after delivery to the overnight delivery service for next business day delivery, if delivered by overnight delivery service, or (c) three (3) days following deposit in the U.S. mail if sent by mail, whether or not delivery is accepted:

To HQ:          HQ, Inc.
                1300 West Belmont Avenue

208361/0000/666226/Version #:.4

<table>
<tbody>
<tr><td></td><td>Suite 200<br>Chicago, IL 60657<br>Attn: Jeff Hogan</td></tr>
<tr><td>With a copy to:</td><td>Sachnoff & Weaver, Ltd.<br>30 S. Wacker Drive<br>29th Floor<br>Chicago, IL 60606<br>Attn:   Stewart Dolin, Esq.</td></tr>
<tr><td>To Safelite:</td><td>Safelite Group, Inc.<br>2400 Farmers Drive<br>Columbus, OH 43235<br>Attn: Chief Financial Officer</td></tr>
<tr><td>With a copy to:</td><td>Safelite Group, Inc.<br>2400 Farmers Drive<br>Columbus, OH 43235<br>Attention:  General Counsel</td></tr>
</tbody>
</table>

or to such other place and with such other copies as any Party may designate as to itself by written notice to the other Parties.

(c)    Successors and Assigns; Third Party Beneficiaries.  This Agreement will be binding upon the Parties and their respective successors, personal representatives, heirs and assigns; however, no Party will have any right to assign any of its obligations pursuant to this Agreement except with the prior written consent of the other Party.

(d)    Entire Agreement.  This Agreement and the related agreements referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any provision hereof shall be binding upon any Party unless it is in writing and executed by all of the Parties or, in the case of a waiver, by the Party waiving compliance.

(e)    Further Execution. The Parties agree to execute any additional documents or instruments, and to take any and all other actions, necessary to carry out the purposes of this Agreement.

(f)    Headings.  The headings herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the Sections at the beginning of which they appear.

(g)    Governing Law; Jurisdiction.  This Agreement shall be construed and governed in accordance with the internal laws of the State of Illinois, without regard to its choice of law principles.

208361/0000/666226/Version #:.4

(h)    <u>Counterparts and Facsimile Signature</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. For purposes of executing and delivering this Agreement or any of the other documents or instruments required hereunder, a signed document transmitted by facsimile machine ("Fax") shall be treated in all manner and respect as an original document. The signature of any Party by Fax shall be considered for these purposes as an original signature.  Any such Fax shall be considered to have the same binding legal effect as an original document.  At the request of either Party, any Fax document subject to this Agreement shall be re-executed by both Parties in an original form.  The Parties hereby agree that none of the Parties shall raise the use of the Fax or the fact that any signature or document was transmitted or communicated through the use of a Fax as a defense to the formation of this Agreement.

(i)    <u>Severability</u>.  If any provision (in whole or in part) of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, then such provision shall be deemed modified, restricted, or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted, or reformulated or as if such provision had not been originally incorporated herein, as the case may be.  The parties hereto further agree to seek a lawful substitute for any provision found to be unlawful.  If such modification, restriction or reformulation is not reasonably possible, the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected thereby and the provisions of this Agreement shall be severable in any such instance.

**[Signature Page Follows]**

208361/0000/666226/Version #:.4

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be duly executed as of the day and year first above written.

HQ, INC.

_____
Jeffrey J. Hogan
Its: President

SAFELITE GROUP, INC.

_____
Douglas A. Herron
Its:  Executive Vice President, CFO

# EXHIBIT 3

## Software Application Services and Integration Agreement

This Agreement ("Agreement") is entered into as of April 1, 2001 (the "Effective Date"), between Quivox Systems Incorporated, a Delaware corporation ("Quivox") and N'SITE Solutions, Inc. and its affiliates ("Customer").

### RECITALS

A.  Customer desires to license and make use of the application software developed by Quivox (collectively the "Licensed Product") as well as procure custom programming services.  The services provided by Quivox to the Customer will be for electronic claims processing and related functions.

In consideration of the promises and the mutual agreements, provisions and covenants herein contained, Quivox and Customer hereby agree as follows:

1. Professional Services:  During the term of this Agreement Quivox agrees to provide Customer with professional consulting, software development and integration services as requested by Customer and mutually agreed upon with Quivox, along with a limited non-exclusive license to use the Licensed Product and certain other computer software owned by Quivox (collectively called "Professional Services").

2. Term:  The term of this Agreement shall be for a period of five (5) years, commencing on the Effective Date.  As long as the Agreement is not terminated by either party by reason of any default, as hereafter provided, of the other party during the first five (5) year term, the Agreement shall continue thereafter and will be automatically renewed for successive terms of one (1) year, unless either party notifies the other in writing not less than 180 days prior to the end of the initial five (5) year term, or any successive one year term.  This Agreement may not be modified orally and may only be amended in writing executed by all parties hereto.

3. Payment Terms:  Customer agrees to pay Quivox for such Professional Services, including a fee for the Licensed Product (the "License Fee") in the amounts set forth in Exhibit A attached hereto and incorporated herein by this reference.  Professional services may include and without limitation Quivox personnel's reasonable travel, food and lodging expenses incurred in performance of Professional Services hereunder as agreed upon beforehand between Quivox and Customer .  The charges invoiced to Customer by Quivox in accordance with this Agreement shall be payable by Customer within thirty (30) days of Customer's receipt of the invoice.  Customer agrees to pay, upon demand, any and all sales, use, or other similar tax, which may be assessed on Quivox by any governmental agency on any aspect of the transaction, contemplated hereby.  Customer shall be solely responsible for procuring and maintaining any license or franchise, and paying any fees, required to operate its business in each country, state, county and city in which the Licensed Product is utilized.

4. Licensed Product:  Customer agrees to use Licensed Product in the manner set forth in this Section 4.  In consideration of Customer's payment of the Professional Services fees, and of Customer's agreement to abide by the terms and conditions of this Agreement, Quivox grants Customer a non-exclusive nontransferable right to use and display the Licensed Product (hereafter the "License"), and to render services to customers using the Licensed Product and documentation during the term of this Agreement and any renewals thereof.  Quivox retains the right to terminate this License, at any time, should Customer violate any of its provisions.  Quivox reserves all rights relating to the Licensed Product not expressly granted to Customer.  During the term of this Agreement, Customer may

4.1 Use the Licensed Product on an unlimited basis within its immediate organization.

4.2 Install the Licensed Product only in its own facility(s) at location(s) specified by Customer in writing and approved by Quivox.

4.3 Use the Licensed Product solely for its own use, and within wholly owned subsidiaries, and solely for the purpose of electronically collecting, storing and transferring claim information. Recognizing that Customer may elect to utilize this License through a partnership or subsidiary corporation in which Customer is the controlling partner or the majority shareholder, Quivox hereby grants to Customer (but not the Customer's Assignee) the limited right to assign this Agreement with its rights to use the Licensed Product licensed hereunder to any business entity of which Customer is and continues to be a controlling partner or majority shareholder ("Assignee"), for operations within a particular territory.

4.3.1 If at any point Customer ceases to be the controlling partner or majority shareholder of the Assignee, then Quivox may, but need not, require the termination of any assignment. If Quivox requires the termination of the assignment under this provision, said assignment shall by itself terminate with no further action on the part of Quivox, and the License shall be deemed reassigned to Customer. Customer shall be required to provide supporting documentation of any such change in control with respect to Assignee. This provision does not limit Customer to be organized as a limited liability corporation. (LLC)

4.3.2 Customer shall continue to be liable for all sums due from the Assignee and no failure on the part of the Assignee to make payments due to Quivox shall relieve Customer from its individual obligation to make said payments. The bankruptcy or insolvency of the Assignee or of Customer itself shall be cause for immediate termination of this License except as specified in Section 11 of this Agreement, and should Quivox be unable to terminate the License because of the provisions of the United States Bankruptcy Laws, then the trustee or other party in possession of the software and documentation shall be obligated to protect the trade secret status of the said information by executing a trade secret agreement or returning any Source Code and internal documentation which it may possess to Quivox immediately upon request. The Assignee holding this License under any assignment shall have no authority whatsoever to further assign or to sublicense this License or any software and documentation and on termination or liquidation of the Assignee, the assignment shall automatically terminate and all the rights granted in this License shall be revested in Quivox.

4.4 Customer may not sell, market or in any other manner distribute to any third party or to any location, the Licensed Product or any information contained in or derived from the Licensed Product. Notwithstanding the above, Customer may distribute printed copies and electronic copies of information derived from the Licensed Product to insurance agent(s), trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business.

4.5 Customer shall pay Quivox for all Professional Services fees described in this Agreement and the attached exhibit(s) on or before their due dates.

4.6 Customer agrees to comply with the terms and conditions of this License and agrees not to use the software and documentation licensed hereunder in any way beyond the scope of this License. Customer agrees to promptly advise Quivox and take all reasonable steps to protect the software and documentation from theft or from use by others contrary to the terms of this License.

4.7 Customer agrees that all agreements between Customer and its customers, by which portions of the software and documentation are used by such customers, shall be in writing, shall be in such form and substance as Quivox shall reasonably approve. Customer may use a form agreement, previously approved by Quivox, but shall nonetheless provide Quivox with true copies of all such licenses signed, without further request of Quivox. However, without limitation of the foregoing, Customer shall cause each such agreement to contain the following provision:

Notwithstanding anything herein to the contrary, in the event of the termination of the certain Application Software Services and Integration Agreement dated April 1,2001 between Quivox and Customer, at the election of Customer all rights of Customer under this Agreement shall be assigned and transferred to Quivox. Quivox shall not be liable to any party hereto for any liability or obligation of Customer whatsoever except as specified in Section 11 of this Agreement, including without limitation any computer software or databases licensed by Quivox to Customer; provided, however, that if Quivox shall elect to have Customer's rights in this Agreement assigned to Quivox, as above provided, then Quivox shall be liable for all of Customer's obligations under such Agreement that do not arise during or in any way relate to the period prior to such assignment. The provisions of this paragraph are for the express benefit of Quivox, its successors or assignees.

4.8    Within ten (10) days after entering into an agreement with any customer and before the customer starts receiving any services, Customer shall provide Quivox with a copy of each customer agreement. All information provided to Quivox will be considered "Company Confidential" and as such shall not be duplicated, forwarded, or shared without the express written consent of Customer.

4.9  Customer agrees to return the original and all existing copies of the software and documentation issued with respect to the Licensed Product to Quivox within five (5) days after the termination date set forth in the written notice of Quivox's termination of this License for any authorized reason, whether a breach or expiration under this Agreement.

4.10    An express condition of this License is that Quivox shall at all times retain ownership of the Licensed Product recorded on the original media copy or copies and all subsequent copies of the Licensed Product, regardless of the form or media in or on which the original and other copies may subsequently exist. This License is not a sale of the Licensed Product data content recorded on Customer's copy or any subsequent copy. Customer agrees not to make any modifications to the Licensed Product and agrees not to create any derivative of the Licensed Product without the prior written consent of Quivox, which may be withheld in its sole and absolute discretion except as specified in Section 11 of this Agreement.

5.  Confidentiality of Licensed Product:  Customer acknowledges that the Licensed Product comprises information, which constitutes a trade secret of Quivox in which Quivox has a proprietary interest. Customer agrees that the information constituting the Licensed Product shall not be disclosed to others, copied, reproduced or used for any purpose other than those uses expressly authorized by this Agreement. Customer will use all reasonable efforts to ensure that all its personnel and all other persons afforded access to the Licensed Product shall protect the Licensed Product from unauthorized use, dissemination or disclosure. For purposes of this Agreement, the term "TRADE SECRET" means the program structure, logic, data structures, design, processes, procedures, formulae, and algorithms contained in the ordered set of instructions, which together constitute the software that, may be disclosed by either the software or the documentation. Trade Secret does not include information which is publicly known through no fault of Customer or Customer's employees, contractors, or agents, nor does it include information which is lawfully received by Customer from a third party not bound in a confidential relationship to Quivox, nor information disclosed by Quivox to a third party without obligation of confidentiality.

5.1 Notwithstanding the above, Customer hereby consents to and Quivox reserves the right to utilize, Customer's claim information for the sole purpose of generating industry statistical intelligence. Customer's information will be utilized for generating summary information only. Quivox covenants to keep strictly confidential, any specific information pertaining to insurance carrier, independent adjusting company, body shop, insured or claimant. The right granted

Quivox to utilize such claim information is a continuing right vesting in Quivox the right to maintain and disburse such summary information for any reason, subject to maintaining strict confidentiality of the insurance carrier, independent adjusting company, body shop, insured or claimant, which shall survive termination of this Agreement for any reason.

5.2 Customer and Quivox shall advise their employees of the confidential nature of the Confidential Information and Professional Service being provided hereunder and shall enforce such employees' strict compliance with the provisions of this Section.

6. Warranty: QUIVOX has no control over the conditions under which Customer uses the Licensed Product. Therefore, Quivox does not and cannot warrant the results that may be obtained by its use. However, Quivox provides the following limited performance warranties:

6.1     Quivox warrants that it owns and possesses all rights and interests necessary to grant the License to Customer. Quivox warrants that the Licensed Product shall not violate or infringe on any contractual, trade secret, proprietary information and non-disclosure rights or any intellectual property rights. Quivox further warrants that if Customer is precluded from using the Licensed Product because of an actual or claimed infringement or any patent right, copyright, trademark or other intellectual property right, or for any other reason, then, at Quivox' option and Quivox' expense: (i) Quivox shall either procure for buyer the right to continue to use the Licensed Product; (ii) replace or modify the Licensed Product so that the Licensed Product becomes non-infringing; (iii) obtain substantially equivalent replacements for the Licensed Product acceptable to Customer; (iv) or terminate this Agreement and refund to Customer a pro rata portion of the License Fee paid.

6.2     During the Term of this Agreement, should the Licensed Product fail to perform as warranted, Customer shall provide to Quivox a Discrepancy Report (DR) identifying with specificity deficiencies in the Licensed Product. Quivox, in conjunction with Customer, shall assess the severity of the deficiency and will communicate back to Customer the appropriate closed loop corrective action. Quivox shall address all critical product deficiencies, identified as being a deficiency that prevents users from using all or a portion of the Licensed Product, within 3 business days of its receipt of the DR from Customer. With critical deficiencies Quivox will give immediate top priority to resolving the deficiency(s) and respond within three business hours to Customer and make a best effort to resolve the deficiency(s) as fast as possible. Quivox shall address deficiencies that are not serious, identified as being deficiencies of a non-critical nature, within thirty (30) days of its receipt of the DR from Customer. Quivox shall not be responsible or liable for restoring or reconstructing any lost or altered files, data, or programs regardless of the cause of the loss. Customer acknowledges that the warranty given hereunder shall be contingent upon Customer's complying with routine operating procedures and processes for the Licensed Product in accordance with specific operating specifications which shall be specifically disclosed to Customer by Quivox, and to implement any reasonable temporary measures recommended by Quivox while Quivox remedies any deficiency. The warranty set forth in this Paragraph 6 shall apply only to critical deficiencies of the life of the licensed produce and may not apply to non-critical deficiencies for all claims made during the Term of this Agreement, notwithstanding Quivox may not correct any identified deficiency within the Warranty Period.

6.3     EXCEPT FOR THE WARRANTIES DESCRIBED IN THE PRECEDING PARAGRAPHS, QUIVOX MAKES NO WARRANTIES OR GUARANTEES, EXPRESS, ORAL, IMPLIED OR STATUTORY. QUIVOX HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OR WARRANTIES OTHERWISE ARISING BY OPERATION OF LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL QUIVOX, ITS AGENTS OR EMPLOYEES BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR LOSS OF PROFITS, LOSS OF USE OR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, CONTINGENT, SECONDARY, SPECIAL OR OTHER DAMAGES OR EXPENSES OF ANY NATURE WHATSOEVER AND HOWSOEVER ARISING, EVEN IF QUIVOX HAS BEEN ADVISED OF THE POSSIBILITY OR CERTAINTY OF

SUCH DAMAGES. CUSTOMER'S SOLE REMEDY FOR ANY BREACH OF WARRANTY BY QUIVOX SHALL BE LIMITED TO THE SPECIFIC WARRANTY REMEDIES DESCRIBED IN SECTION 6. NOTHING CONTAINED IN THIS SECTION 6 SHALL ASSURE THAT THE FUNCTIONS CONTAINED IN THE LICENSED PRODUCT WILL MEET CUSTOMER'S REQUIREMENTS OR ASSURE THE UNINTERRUPTED OPERATION OF THE LICENSED PRODUCT OR THE CUSTOMER'S BUSINESS. QUIVOX' LIABILITY FOR DAMAGES TO CUSTOMER FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER FOR CONTRACT OR TORT, INCLUDING NEGLIGENCE, SHALL BE LIMITED TO THE LICENSE FEE FOR THE THEN CURRENT TERM OF THIS AGREEMENT.

6.4 This warranty allocates risks of product failure between Customer and Quivox. Quivox's pricing for Professional Services reflects this allocation of risk and the limitations of liability contained in this warranty. The warranties set forth above are in lieu of all other express warranties, whether oral or written, and the remedies set forth above are Customer's sole and exclusive remedies. The agents and employees of Quivox are not authorized to make modifications to this warranty, or additional warranties binding on Quivox. Accordingly, additional statements such as advertising or presentations, whether oral or written, do not constitute warranties by Quivox and should not be relied upon.

7. Limitation of Liability: Quivox shall not be obligated under Section 6 to take any action with respect to a Licensed Product, which has been misused or damaged by Customer in any respect, or if the Customer has not reported to Quivox the existence and nature of such nonconformity or defect within the period set forth in Section 6. Quivox is not responsible for obsolescence of the Licensed Product that may result from changes in Customer's requirements after the effective date. Quivox' obligations under this Agreement shall apply only to the most current version of Licensed Product issued by Quivox from time to time. Quivox shall have no responsibility for suspended, outdated or uncorrected versions of the Licensed Product. Quivox does agree to make a best effort to resolve any federal and/or state regulatory for the Customer to maintain compliance.

8. Disclaimer: Neither party shall be responsible for consequential indirect or special damages, including without limitation any damages for lost business or lost or anticipatory profits, interruption of service or otherwise arising under any circumstances, or from any cause of action whatsoever including contract, warranty, strict liability or negligence, even if a party has been advised of such damages.

9. Termination: Upon any use, transfer or dissemination of the Licensed Product which is not expressly permitted herein, the appointment of a receiver to the possession of Customer's assets or the institution of bankruptcy by or against the User or default in payment of the License Fee, the Customer shall immediately stop using the Licensed Product. In the event either party breaches any term of the Agreement, which is not cured after appropriate notification, (if applicable) the other party shall be entitled to terminate this Agreement by giving a written notice of termination to Customer, pursuant to Section 22 herein.

10. Acts of Insolvency: Either party may terminate this Agreement by written notice to the other and may regard the party as in default of this Agreement, if the other party becomes insolvent, makes a general assignment of the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, or becomes subject to proceedings under bankruptcy or insolvency laws, or has wound up or liquidated, voluntarily or otherwise, and such proceeding is not discharged within ninety (90) days of filing. In the event that any of the above events occurs, the party shall immediately notify the other of its occurrence.

11. Source Code Escrow: "Source Code" shall mean all drawings, documents, source code, programmer's comments, design specification, flow charts, file layouts, report layouts, screen layouts and other documents used by Quivox to create the Licensed Product. In the event that Quivox becomes insolvent as outlined in Section 10 above; and if Customer was not the cause of

insolvency, a nonexclusive license to the Source Code shall be granted to Customer for the remaining term of the agreement and shall be subjected to the terms and conditions of Section 4 of this agreement. Quivox agrees to place a current version of the Source Code with a third party escrow agent mutually agreed upon with Customer.

12. Force Majeure:  In the event that Quivox is unable to perform its obligations under this Agreement or to enjoy any of its benefits because of (or if failure to perform the services is caused by) natural disaster, actions or decrees of government bodies, acts of God, or other causes beyond the reasonable control of Quivox (herein referred to as a "Force Majeure Event"), Quivox shall immediately give notice to Customer and shall do everything within its reasonable control to resume performance. Upon receipt of such notice, all obligations under this Agreement shall be immediately suspended. If the period of non-performance exceeds sixty (60) days from the receipt of notice of the "Force Majeure Event", the Customer may, by giving written notice, terminate this Agreement.

13. General Obligations:  Each of the parties (Quivox and Customer) will use reasonable efforts to (a) cause all of the obligations imposed upon it in this Agreement to be duly complied with, and to cause all conditions precedent to such obligations to be satisfied; and (b) obtain any and all consents, waivers, amendments, modifications, approvals, authorizations, notations and licenses necessary to the consummation of the transactions contemplated by this Agreement.

14. Entire Agreement; Amendments:  This Agreement constitutes the entire agreement between Quivox and Customer, and as such supersedes all previous agreements, promises, proposals, representations, understandings, and negotiations, whether written or oral, between the Parties representing subject matter hereof. All Schedules referred to in this Agreement shall be deemed to be incorporated in and be a part of the "entire Agreement". Notwithstanding the foregoing, however, the parties may amend, or modify this Agreement in such a manner as may be agreed upon, by a written instrument executed by both Quivox and Customer.

15. Counterparts:  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

16. Severability:  In the event that any of the terms, conditions and provisions of this Agreement are held to be invalid, illegal, or unenforceable by any court of competent jurisdiction, the legality, validity, and enforceability of the remaining terms, conditions, and provisions shall not be affected thereby and the illegal, unenforceable or invalid provision shall be replaced by a mutually acceptable provision that, which being legal, enforceable and valid, comes closest to the intention of the parties underlying the illegal, unenforceable or invalid provision.

18. Binding Effect:  This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors, and Assignees. Without limiting the foregoing, Quivox and Customer acknowledge and agree that this Agreement shall remain in full force and effect in the event of a sale of the assets or change in ownership of Quivox or Customer, as applicable.

19. No Assignment:  This Agreement may not be assigned by either party without the prior written consent of the other party; provided however, Customer and Quivox shall be entitled to assign this Agreement to an affiliate or in connection with a sale of all or substantially all of its assets to a third party or in the manner and subject to the limitations set forth in section 4 of this Agreement.

20. Advertising:  Neither Quivox nor Customer shall use the name of the other in advertising/promotion efforts in each instance without securing written approval in advance.

21. Applicable Law:  The laws of the State of Kansas shall govern this Agreement and the transactions contemplated hereunder.  Any legal action between Quivox and Customer regarding this Agreement shall be brought in, and Quivox and Customer hereby consent to the jurisdiction of and venue in, the federal and state courts located Johnson County in the State of Kansas.

22. Notices:  Except as otherwise expressly provided, all notices, consents, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by facsimile transmission with confirmation of receipt, or if mailed by certified mail, return receipt requested, with first class postage prepaid, addressed as follows:

To Quivox:          Quivox Systems Incorporated
                    1225 W 190th Street, Suite 250
                    Gardena, CA  90248

                    Attention: Contracts Manager

To Customer:        N'Site Solutions, Inc.
                    10536 Justin Drive
                    Urbandale, Iowa 50322

23. Indemnity:  Customer, and its permitted Assignees, if any, agrees that they, jointly and severally, if more than one individual or entity, shall indemnify and hold Quivox harmless from any and all liability and claims against Quivox by anyone, which arise out of or in connection with the use of the Licensed Product and the database contained therein in the operation of Customer's business and which are not caused by Quivox.  The indemnity shall include all costs, attorney fees, and damages, which Quivox is required to pay by reason of litigation or claims against Quivox for such reason.  Quivox shall have the right to retain, at Customer's cost, legal counsel of Quivox's selection for the purpose of defending such claims, but no settlement of any such claims will be made without consultation with Customer and its insurance carriers, if any.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

"Quivox"                              "Customer"
Quivox Systems Incorporated           N'SITE Solutions, Inc.

By: _Alan B. Cory_                    By: _Kirk D_

Title: _CEO_                          Title: _Exec. UP_

Date: _5-22-01_                       Date: _5/22/2001_

# Exhibit A

## Software Application Services and Integration Pricing Schedule for:
## N'Site Solutions, Inc.

### A. Software Development

As part of this Agreement, Quivox agrees to develop and implement a First Notice of Loss (FNOL) Internet thin client application for the Customer. This FNOL application is based upon functional specifications contained in a Detailed Requirements Document mutually agreed upon and signed by Quivox and the Customer. The Requirements Document is a part of Exhibit A of the final agreement between Quivox and the Customer.

### B. Pricing

The Customer requires various modules of eDoc Express to perform different tasks and functions for various customers. The currently defined functions and modules and their pricing may be amended as a part of this agreement based upon future customer needs of N'Site.

| | Processed records | Pricing per transaction |
|---|---|---|
| **1. FNOL** | 1 – 25,000 | $1.25 |
| | 25,001 – 50,000 | $1.00 |
| | 50,001 – 100,000 | $ .75 |
| | 100,001 – 200,000 | $ .70 |
| | 200,001 – 399,999 | $ .65 |
| | 400,000 or more | $ .60 |

| | Processed records | Pricing per transaction |
|---|---|---|
| **2. Messaging** | 1 – 25,000 | $ .50 |
| | 25,001 – 50,000 | $ .45 |
| | 50,001 – 100,000 | $ .40 |
| | 100,001 – 200,000 | $ .35 |
| | 200,001 – 399,999 | $ .30 |
| | 400,000 or more | $ .25 |

| | per transaction |
|---|---|
| **3. Dispatch** | $.50 |

| | per assigned and processed Claim |
|---|---|
| **4. Estimatics** estimate upload and approval | $ 3.00 |

5. Auto/Property Claims Handling
   all eDoc modules except FNOL and Messaging        $10.50 per assigned and processed Claim

6. Independent Adjuster Management
   dispatch, invoice upload with images               $ 3.50 per assigned and processed Claim

7. Glass Claims Management
   dispatch, invoice upload with images               $ 3.50 per assigned and processed Claim

8. Rental Car Management
   dispatch extension notification and invoice upload  $ 2.00 per assigned and processed Claim


"Quivox"                                    "Customer"
Quivox Systems Incorporated ...              N'Site

By: _Alex B. Cory_____              By: _Kub D_____

Title: _CEO_____               Title: _EXEC. UP_____

Date: _5-22-01_____                Date: _5/22/2001_____

# EXHIBIT 4

## SOFTWARE LICENSE AGREEMENT

This Software License Agreement (this "Agreement") is effective as of this 3rd~~——~~ day of June~~——————~~, 2004 by and between Safelite G~~roup, Inc.~~~~lass Corp~~, a Delaware corporation ("Licensor"), and N'SITE Solutions, Inc., a Delaware corporation ("Licensee").

### Background Information

A.      On April 1, 2001 Licensee entered into a Software Application Services and Integration Agreement (the "Quivox Agreement") with Quivox Systems, Inc. ("Quivox")~~, the intent of which was for Quivox to host software (the "Software") at its data center for the purpose of processing actual customer transactions for Licensee (the "Hosting Services")~~.

B.      ~~Quivox terminated its business operations and did not render the Hosting Services to Licensee (the "Quivox Default").~~

~~C.      ~~Licensor has acquired from Quivox ownership of the software commonly referred to as eDocExpress, eDocMessaging, and First Notice of Loss internet thin client application software (collectively, the "Software").~~At or about the time Quivox terminated its business operations, Quivox delivered the source code for certain components of the Software (the "Released Source Code") to Licensee under the source code escrow provision of the Quivox Agreement, along with other components of the Software in object code form (the "Object Code Modules").~~

CD~~.~~     Prior to Licensor's acquisition of the Software, Quivox delivered to Licensee the source code for certain components of the Software (the "Released Source Code") under the source code escrow provision of the license agreement between Licensee and Quivox, along with certain other components of the Software in object code form (the "Object Code Modules").

D.      Licensee made certain modifications ~~Because ~~to the Software ~~(as provided to Licensee in the form of the Released Source Code and Object Code Modules) did not function properly, Licensee made corrections (the "Corrections") to the components of the Software~~ which modifications are listed on attached Schedule 1~~2~~ (the "Modified~~Corrected~~ Modules").

E.      ~~As a result of assuming the Quivox Agreement, ~~A dispute exists between Licensor and Licensee with respect to Licensee's right to use or use of the Software (the "Dispute") which Dispute the parties desire to resolve in accordance with the terms of this Agreement.~~Licensor now disputes Licensee's rightful use of the Software (the "Dispute"), which Dispute Licensor and Licensee (each, a "Party," and together, the "Parties") now desire to resolve by the terms of this Agreement.~~

### Statement of Agreement

The Parties acknowledge the accuracy of the foregoing Background Information and hereby agree as follows:

1.      <u>License Grant</u>.

1.1      Subject to the provisions of this Agreement and the payment of the Royalties (defined below) and the Payment (defined below), Licensor grants to Licensee, and

Licensee accepts, a limited, personal, nonexclusive, nonassignable and otherwise nontransferable license (the "License") for Licensee's internal use of the Software in the form currently in Licensee's possession. Licensee shall not be entitled to any upgrades, enhancements, corrections, add-ons (including separately marketable products) or other modifications (collectively, "Modifications") of the Software which have been made previously by Licensor or on Licensor's behalf or which may be made in the future by Licensor or on Licensor's behalf (collectively, "Modifications").

The License shall be limited as follows:

(a)     Licensee shall use the Software solely for its own use within its organization.

(b)     Licensee shall install the Software only in its own facility at a location identified in writing to Licensor by Licensee provided such location is approved by Licensor.

(c)     Licensee shall use the Software solely for the purpose of electronically collecting,  storing, and transferring claim information.

(d)     Licensee shall not sell, market, or in any other manner distribute to any third party or to any location, the Software or any information contained in or derived from the Software, provided that Licensee may distribute printed copies and electronic copies of information derived from the Software to insurance agents, trading partners and insurance companies, their policyholders and claimants, as necessary in the ordinary course of business.

(e)     Licensee may use the Released Source Code, together with the Modified Modules Corrections, in Licensee's possession as of the date hereof solely for Licensee's own internal use to maintain the functionality of the Software as of the date hereof.

2.     <u>Release; Payment</u>.

2.1     Within ten (10) business days after the execution of this Agreement by both Licensor and Licensee (collectively the "Parties" and individually, a "Party") Parties, Licensee agrees to pay to Licensor Five Thousand Dollars and No Cents ($5,000.00) (the "Payment") by means of a wire transfer of immediately available funds, cashier's check or equivalent means of payment.

2.2     Licensor, on its own behalf and on behalf of its officers, directors, stockholders and affiliates, in consideration of the Payment, does hereby fully and forever release, acquit, exonerate and discharge Licensee of and from any and all claims, actions, suits, damages, expenses, debts, controversies, agreements, promises, judgments, and demands of whatever kind or nature, at law or in equity, that Licensor ever had or now has or may at any time hereafter have, against Licensee arising from or in connection with (i) any obligation Licensee ever had, now has or may have to pay fees or royalties for any use of the Software prior to and including the Effective Date by Licensee; or (ii) any use of the Software, including the Released Source Code and the Corrections, prior to and including the Effective Date by Licensee; except that the foregoing release shall not apply to any of the agreements set forth herein..

2.3     Licensee, on its own behalf and on behalf of its officers, directors, partners, stockholders, predecessors, and affiliates, does hereby fully and forever release, acquit, exonerate and discharge Licensor, its subsidiaries, directors, officers, employees, predecessors, and assigns from and against any and all claims, actions, suits, damages, expenses, debts, controversies, agreements, promises, judgments, and demands of whatever kind or nature, at law or in equity, that Licensee ever had or now has or may at any time hereafter have, against Licensor arising from or in connection with (i) any obligation Licensor ever had, now has or may have to Licensee for any use by Licensee of the Software prior to and including the Effective Date; or (ii) any use by Licensee of the Software, including the Released Source Code and the Modified Modules, prior to and including the Effective Date.

The Parties acknowledge and agree that this Agreement is not an admission of any liability or wrongdoing by either Party, and is not an admission by either Party of any violation of the other Party's legal rights.

3.     Term.

3.1     The term of this Agreement shall begin on the Effective Date and continue for a period of six (6) months (the "Initial Term"), subject to earlier termination as set forth in Section 3.2.  Thereafter, this Agreement shall automatically renew for successive six (6) month terms (each, a "Renewal Term," and together with the Initial Term, the "Term"), unless one Party gives the other Party notice of its intent not to renew at least thirty (30) days prior to the beginning of the next Renewal Term.

3.2     Upon Licensee's failure to pay Licensor any amount owed hereunder, which failure to pay is not cured within 30 days after notice thereof, Licensor may terminate this Agreement effective immediately.  Upon (a) any other breach of this Agreement by a Party which is not cured within 30 days after notice thereof from the other Party, or (b) the institution of bankruptcy, receivership, insolvency, reorganization or other similar proceedings by or against a Party, or (c) a Party's insolvency, assignment for the benefit of creditors, or inability to pay debts as they become due, or (d) the appointment of a receiver for a Party's assets, or (e) the sale of all or substantially all of the stock or assets of a Party, the other Party may terminate this Agreement effective immediately upon notice, in addition to any other remedies which may be available hereunder, at law or in equity.

3.3     Upon the expiration or termination of this Agreement (except for termination due to the institution of bankruptcy, receivership, insolvency, reorganization or other similar proceedings by or against Licensor, or Licensor's insolvency, assignment for the benefit of creditors, or inability to pay debts as they become due) Licensee shall immediately return to Licensor the original and all copies of the Released Source Code, the Object Code Modules and the Modified ModulesCorrections (including related source code).

4.     Royalties.  Licensee shall pay Licensor the royalties set forth on the attached Schedule 21 (the "Royalties").

5.     Confidentiality.   "Confidential Information" of a Party means any information in whatever form that is provided or disclosed by a Party (the "Disclosing Party") to the other Party (the "Receiving Party"), except for any information that is: (a) publicly available other than through a breach of this Agreement; (b) known to the Receiving Party or its employees, agents or representatives prior to such disclosure, (c) independently developed by the Receiving Party or its employees, agents or representatives; or (d) subsequently lawfully obtained by the

Receiving Party or its employees, agents or representatives from a third party having no duty of confidentiality to the Disclosing Party.  The Receiving Party shall exercise the same degree of care and protection with respect to the Disclosing Party's Confidential Information as it exercises with respect to its own Confidential Information and shall not directly or indirectly disclose, copy, distribute, republish or allow any third party to have access to the Disclosing Party's Confidential Information.   Notwithstanding the above, either Party may disclose Confidential Information to (i) its employees who have a need to know or (ii) after giving reasonable advance notice and after using reasonable efforts to preserve confidentiality, as required by law.  Upon the expiration or termination of this Agreement, at the option of the Disclosing Party, the Receiving Party shall either return or destroy any Confidential Information in its possession.  The terms of this provision shall survive the expiration or termination of this Agreement.

6.   Ownership of the Software.   ~~Licensor represents and warrants, and Licensee does not dispute with Licensor, that t~~The Software and all patents, copyrights, circuit layouts, mask works, trade secrets and other proprietary rights in or related to the Software (including the Modified Modules~~Corrections~~, but not including any proprietary N'Site data organized or compiled in the Software), are and will be at all times be and remain the exclusive property of Licensor, whether or not specifically recognized or perfected under the laws of the jurisdiction in which the Software or Modified Modules are~~is~~ used or licensed.  Licensee will not knowingly take any action that jeopardizes Licensor's proprietary rights as they relate to third parties, or attempt to acquire any right in the Software, Modified Modules, ~~or~~ the Confidential Information not contemplated hereby.

7.   No Warranty.  LICENSEE IS GRANTED THE LICENSE FOR THE SOFTWARE "AS IS," AND~~, EXCEPT AS SET FORTH IN SECTION 6 HEREOF,~~ LICENSOR MAKES NO WARRANTIES WHATSOEVER TO LICENSEE REGARDING THE SOFTWARE OR MIDIFIED MODULES.  ~~LICENSEE MAKES NO WARRANTIES WHATSOEVER TO LICENSOR REGARDING THE CORRECTIONS.~~

8.   Limitation of Liability.  LICENSOR SHALL NOT BE LIABLE FOR (A) ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, ARISING FROM OR RELATED TO A BREACH OF THIS AGREEMENT OR THE OPERATION OR USE OF THE SOFTWARE EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) ANY CLAIMS MADE A SUBJECT OF A LEGAL PROCEEDING AGAINST LICENSOR MORE THAN ONE YEAR AFTER ANY SUCH CAUSE OF ACTION FIRST AROSE.  IN NO EVENT SHALL LICENSOR'S LIABILITY UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT, WARRANTY OR OTHERWISE, EXCEED THE ROYALTIES ACTUALLY RECEIVED BY LICENSOR UNDER THIS AGREEMENT.

9.   Miscellaneous.

9.1   Assignment.  Licensee may not assign or transfer this Agreement by written agreement, merger, consolidation, operation of law or otherwise, without the prior written consent of an authorized executive officer of Licensor.  Any attempt to assign this Agreement by Licensee shall be null and void.  Acquisition of an equity interest in Licensee of greater than 25 percent by any third party shall be considered an "assignment."

9.2   Amendments.  Any amendments or other modification of this Agreement shall be in writing and signed by the authorized representatives of both Parties.

9.3   <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Ohio~~Delaware~~ without regard to principles of conflicts of laws.  Any dispute arising hereunder which is not settled amicably by the Parties shall be submitted to a panel of three arbitrators, one of whom shall be selected by Safelite, one of whom shall be selected by NSite, and the other of whom shall be selected by the other two arbitrators.  Such arbitration proceedings shall be conducted in Columbus, Ohio~~Wilmington, Delaware~~ in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association.  The determination of such arbitrators shall be final and non-appealable, and any judgment on the award rendered by such arbitrators may be entered in any court having jurisdiction thereof.

9.4   <u>Entire Agreement:</u> This Agreement, together with all of its schedules and exhibits which are hereby incorporated herein, is the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous agreements, understandings and negotiations, written or oral, between them.  References to a Section or Schedule shall be to a section or schedule of this Agreement unless otherwise provided.

9.5   <u>Counterparts:</u>  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one agreement.

9.6   <u>Severability</u>.  If any provision of this Agreement is found to be invalid, illegal or unenforceable by any court of competent jurisdiction, such provision shall be deemed severed herefrom and all other provisions shall remain effective.

9.7   <u>Binding Effect:</u>  This Agreement shall inure to and be binding upon the parties and their respective legal representatives, successors and permitted assigns.  All references herein to "Licensee" shall refer interchangeably, as appropriate, to N'SITE Solutions, Inc., a Delaware corporation, and N'SITE Solutions, Inc., an Iowa corporation.

9.8   <u>Advertising:</u>  Neither Party shall use the name of the other Party in any advertising or promotional efforts without the prior written consent of Licensor.  Licensee shall not use the names "Edoc, eDocExpress, and/or eDocMessaging without the prior written consent of Licensor.

9.9   <u>Notices</u>.  All notices and other communications hereunder shall be in writing and delivered personally, sent by facsimile transmission with electronic confirmation of receipt, or sent by by certified mail, return receipt requested, with first class postage prepaid, to the address set forth below a Party's signature to this Agreement.  The addresses for notices can be changed by giving notice to the other party.

9.10   <u>Employees and Third Parties</u>. During the Term, and for a period of one year subsequent to termination of the same, each Party agrees not to offer employment, or retain as a consultant, any employee of the other Party.

Licensee:                                        Licensor:

N'SITE Solutions, Inc.                           Safelite Group, Inc.~~lass Corp.~~

By:_____    By:_____

Print:_____     Print:_____
Title:_____     Title:_____

Address:                                            Address:
10536 Justin Drive                                  2400 Farmers Drive
Urbandale, IA  50322                                Columbus, Ohio 43235
Facsimile: (800) 929-4084                           Facsimile: (614) 210 – 9251

SOFTWARE LICENSE AGREEMENT Safelite draft May 25, 2004 *N'Site Draft 2/6/04*

effective as of _____ __, 2004 by and between

Safelite Group, Inc.lass Corp. and N'Site Solutions, Inc.

**Royalties**                                                                                                  **Schedule 1**

Amount due upon execution of this Agreement:   $5,000[_____]

Amount due thereafter:   Licensee shall pay to Licensor a royalty in the amount of $5.00 for each transaction performed or conducted by Licensee using all or any part of the Software. [_____]

SOFTWARE LICENSE AGREEMENT
effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

*N'Site Draft
2/6/04*

| **Modified**~~Corrected~~ **Modules** | **Schedule 2** |
|---|---|

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions** | default.htm<br>download.asp<br>global.asa<br>nstyle.css<br>printerfriendlystylesheet.css<br>search.htm<br>special.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\approval** | additionalinfo.asp<br>approvalmanagementmain.asp<br>approvalprocessingmain.asp<br>approvalqueuestatus.asp<br>approvalserver.asp<br>default.asp<br>manualapproval.asp<br>redirector.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\assignments** | addstatus.asp<br>agent.asp<br>attachments.asp<br>attachments2.asp<br>claimant.asp<br>claimoffice.asp<br>createassignment.asp<br>default.asp<br>displayname.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimates.asp<br>frameestimate.asp<br>frameimages.asp | insured.asp<br>mailmerge.asp<br>owner.asp<br>postfunctions.asp<br>postfunctionsnew.asp<br>printimages.asp<br>repairfacility.asp<br>selectcompany.asp<br>selectoffice.asp<br>setup.asp<br>statuslog.asp<br>test.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewestimate.asp<br>viewfile.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewpd.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\audit** | auditmain.asp<br>auditqueryresults.asp<br>auditquerysetup.asp<br>auditreports.asp<br>orglevels.asp<br>printauditreport.asp<br>staffadjusters.asp<br>tpdate.asp<br>tradingpartners.asp<br>viewauditreport.asp | |

**Modified~~Corrected~~ Modules**                                    **Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\calendarcontrol** | calendar.asp<br>calendar.htm<br>html page1.htm<br>test1.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\claim** | a.asp     originalassignment.asp<br>addcomment.asp     owner.asp<br>agent.asp     pdimages.asp<br>approvalviewassignment.asp     pdleft.asp<br>processviewonlyinfo.asp     pdtop.asp<br>assignmentmain.js     ppsave.asp<br>claimant.asp     printpreferences.asp<br>claimoffice.asp     printpreferences.js<br>closeframe.asp     repairfacility.asp<br>commentlog.asp     selectclaim.asp<br>copydispatch.asp     selectclaim.js<br>default.asp     statuslog.asp<br>deleteme.asp     vehiclestatus.asp<br>editadmin.asp     vehlocation.asp<br>editagent.asp     viewassignment.asp<br>editclaimant.asp     viewassignment.js<br>editclaimoffice.asp     viewclaim.asp<br>editglass.asp     viewclaim.js<br>editinsured.asp     viewestimate.asp<br>editlocation.asp     viewestimate.js<br>editowner.asp     viewfa.asp<br>editrepairfacility.asp     viewimage.asp<br>estimateimages.asp     viewimageframe.asp<br>eventlog.asp     viewonlyadmin.asp<br>exit.htm     viewonlypic.asp<br>frameestimate.asp     viewpd2.asp<br>frameimages.asp     viewpd3.asp<br>getviewonlyinfo.asp<br>html page1.htm<br>insured.asp<br>newassignment.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\dispatch** | addstatus.asp     location.asp<br>agent.asp     locationfinder.asp<br>assignment.asp     owner.asp<br>assignmentbad.asp     selectassignment.asp<br>checkpolicy.asp     selectassignmenttype.asp<br>claimant.asp     selectclaim.asp<br>claimoffice.asp     staffadjuster.asp<br>default.htm     statuslog.asp<br>dispatch.asp     tradingpartner.asp<br>dispatchunit.asp     undispatchassignmentselect.asp<br>entity.asp     undispatchnew.asp<br>estimatics.asp     workpage.asp<br>insured.asp |

effective as of _____ __, 2004 by and between
<u>Safelite Glass Corp. and N'Site Solutions, Inc.</u>

*N'Site Draft*
*2/6/04*

| <u>**Modified**</u>~~Corrected~~ **Modules** | **Schedule 2** |
|---|---|

| **Category** | **Details** |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\editmask** | editmask.asp<br>editmask.htc<br>editmask2.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\help** | diagnostics.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\images** | banner.gif<br>bigdown.gif<br>ceicafiles.gif<br>checklist.gif<br>compliancechecklist.gif<br>disk04.ico<br>doc04.gif<br>doc07.gif<br>getacro.gif<br>help_main.gif<br>logo.gif<br>note02.gif<br>paperclip.gif<br>paperclipdown.gif<br>partslist.gif<br>postit.gif<br>postitnew.gif<br>prudentiallogo.gif<br>prudentialslogan.gif<br>readonlycheckboxchecked.gif<br>readonlycheckboxunchecked.gif<br>repairplan.gif<br>sf.gif<br>smalldown.gif<br>smallup.gif<br>spacer.gif<br>superiorbanner.gif<br>tabs_login.gif<br>thumbs.db<br>topbackground.gif<br>typewr1.gif |

| <u>**Modified**</u><s>**Corrected**</s> **Modules** | **Schedule 2** |
|---|---|

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\inscompadmin** | approvalq.asp<br>approvalqinfo.asp<br>apprqmanage.asp<br>apprqprocess.asp<br>assignmenttype.asp<br>assignmenttypeedit.asp<br>capabilities.asp<br>checklistedit.asp<br>companyadmin.asp<br>compliancechecklist.asp<br>contactinfo.asp<br>contacts.asp<br>default.htm<br>findtp.asp<br>finduser.asp<br>orgentaudit.asp<br>orgentdispatch.asp<br>orgentmisreports.asp<br>orgentreceiveassignments.asp<br>orgentreports.asp<br>orglevels.asp<br>requestq.asp<br>requestqinfo.asp<br>requestqprocess.asp<br>tradingpartner.asp<br>tradingpartnerinfo.asp<br>user.asp<br>userinfo.asp<br>useroffices.asp<br>viewchecklist.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\main** | default.htm<br>help.asp<br>login.asp<br>mainmenu.asp<br>tradingpartnerenable.asp<br>tradingpartnerlogin.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\maskededit** | gettext.asp<br>maskededit.asp<br>maskededit.htm<br>mimetest.asp |

**Modified~~Corrected~~ Modules**                                        **Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\mis** | ctdates.asp<br>ctreport.asp<br>default.asp<br>defaultorig.asp<br>distributionorg.asp<br>distributionsetup.asp<br>distributiontarget.asp<br>findproviders.asp<br>findprovidersmodal.asp<br>getcolumns.asp<br>getcolumnsmodal.asp<br>getdates.asp<br>getsendto.asp<br>misdates.asp<br>misreport.asp<br>misreportorig.asp<br>misreportsetup.asp<br>misreportstatus.asp<br>printmisreport.asp<br>processsendto.asp<br>reporttype.asp<br>tesmm.asp<br>test.asp<br>testpage.asp<br>testwrite.asp<br>thirdpartyview.asp<br>trendorg.asp<br>trendsetup.asp<br>trendtarget.asp<br>zreporttest.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\printerfriendly** | pfapprovalrules.asp<br>pfclaim.asp<br>pfcommentlog.asp<br>pfestimate.asp<br>pfeventlog.asp<br>pfimage.asp<br>pfimages.asp<br>pfvehiclestatus.asp<br>pfvehiclestatushistory.asp<br>pfviewassignment.asp<br>pfwindshieldlist.asp |

**Modified~~Corrected~~ Modules**                                        **Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\reports** | buildsql.inc<br>completedsql.inc<br>csv.asp<br>datedecipher.inc<br>default.asp<br>defaultpage.js<br>dispatchedsql.inc<br>display.asp<br>display.js<br>displaynew.asp<br>displayproviders.asp<br>displaytotalsdetail.inc<br>displaytotalssummary.inc<br>displaytrackingsummary.inc<br>displaytrackingsummaryorig.inc<br>gethistory.inc<br>loadtree.inc<br>opensql.inc<br>partssummary.inc<br>parttotalssql.inc<br>progress.asp<br>reportfunctions.inc<br>reportheader.inc<br>reporttableheader.inc<br>reporttypedecipher.inc<br>saveselectfieldsdata.inc<br>selectfields.asp<br>selectfields.js<br>targetssql.inc<br>totallosssql.inc<br>totalsdetailsql.inc<br>totalssummarysql.inc<br>tracking.inc<br>trackingsummarysql.inc |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\request** | automaticassignment.asp<br>default.asp<br>message.asp<br>newmessage.asp<br>partnerrequest.asp<br>partnershipresponse.asp<br>printmanualrequest.asp<br>response.asp<br>responselist.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\treecontrol** | default.asp<br>tree.asp<br>tree.htm |

SOFTWARE LICENSE AGREEMENT
effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

*N'Site Draft*
*2/6/04*

**Modified~~Corrected~~ Modules**                                    **Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\treecontrol\images** | minus.gif<br>nothing.gif<br>plus.gif |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\uploaddownload** | beginattachmenttransaction.asp<br>commitattachmenttransaction.asp<br>getemsfilelist.asp<br>insertemsestimate.asp<br>insertfileattachment.asp<br>insertimage.asp<br>insertprintdocument.asp<br>readassignment.asp<br>readassignmentexport.asp<br>reademsfile.asp<br>writefile.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutions\vehiclestatus** | email.asp<br>parts.asp<br>partsreport.asp<br>pfvehiclestatushistory.asp<br>requestnewstatusrecord.asp<br>sendnewlist.asp<br>showcomment.asp<br>statuscomments.asp<br>statussetup.asp<br>statussetup.js<br>updatevehiclestatus.asp<br>vehiclerepairstatus.asp<br>viewimage.asp<br>viewimageframe.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp** | default.htm<br>download.asp<br>global.asa<br>nstyle.css<br>search.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\admin** | default.htm<br>provideradmin.asp |

**Modified**~~Corrected~~ **Modules**                                      **Schedule 2**

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\assignments** | addstatus.asp<br>agent.asp<br>attachments.asp<br>claimant.asp<br>claimoffice.asp<br>copy of default.asp<br>createassignment.asp<br>debugdefault.asp<br>default.asp<br>displayname.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimates.asp<br>frameestimate.asp<br>frameimages.asp<br>iamanagement.asp<br>insured.asp<br>mailmerge.asp<br>owner.asp<br>pfestimate.asp<br>pfimage.asp<br>postfunctions.asp<br>printimages.asp<br>repairfacility.asp<br>selectcompany.asp<br>setup.asp<br>statuslog.asp<br>test.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewestimate.asp<br>viewestimate.js<br>viewfile.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewimageold.asp<br>viewpd.asp |

SOFTWARE LICENSE AGREEMENT
effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

**Modified~~Corrected~~ Modules**                                                    **Schedule 2**

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\calendarcontrol** | calendar.asp<br>calendar.htm | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\claim** | addcomment.asp<br>agent.asp<br>approvalviewassignment.asp<br>assignmentmain.js<br>claimant.asp<br>claimoffice.asp<br>closeframe.asp<br>commentlog.asp<br>default.asp<br>deleteme.asp<br>editadmin.asp<br>editagent.asp<br>editclaimant.asp<br>editclaimoffice.asp<br>editinsured.asp<br>editlocation.asp<br>editowner.asp<br>editrepairfacility.asp<br>estimateimages.asp<br>eventlog.asp<br>exit.htm<br>frameestimate.asp<br>frameimages.asp<br>getviewonlyinfo.asp<br>html page1.htm<br>insured.asp<br>newassignment.asp<br>originalassignment.asp | owner.asp<br>pdimages.asp<br>pdleft.asp<br>pdtop.asp<br>ppsave.asp<br>printpreferences.asp<br>printpreferences.js<br>processviewonlyinfo.asp<br>repairfacility.asp<br>selectclaim.asp<br>selectclaim.js<br>statuslog.asp<br>vehlocation.asp<br>viewassignment.asp<br>viewassignment.js<br>viewclaim.asp<br>viewclaim.js<br>viewestimate.asp<br>viewestimate.js<br>viewfa.asp<br>viewimage.asp<br>viewimageframe.asp<br>viewpd2.asp<br>viewpd3.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\claim\delete** | deleteclaim.asp<br>deleteclaim.asp.vsss.tmp<br>deleteimage.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\dispatch** | workpage.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\editmask** | editmask.asp<br>editmask.htc<br>editmask2.asp | |

SOFTWARE LICENSE AGREEMENT
effective as of _____ __, 2004 by and between
Safelite Glass Corp. and N'Site Solutions, Inc.

*N'Site Draft
2/6/04*

**Modified~~Corrected~~ Modules**                                    Schedule 2

| Category | Details |
|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help** | diagnostics.asp |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help\htmfiles** | privacypolicy.htm |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\help\images** | setup.jpg |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\images** | bigdown.gif<br>ceicafiles.gif<br>checklist.gif<br>compliancechecklist.gif<br>edoccircle.gif<br>edoclogosmall.gif<br>edocplugin.gif<br>getacro.gif<br>help_main.gif<br>logo.gif<br>nsolutions.gif<br>paperclip.gif<br>paperclipdown.gif<br>partslist.gif<br>postitnew.gif<br>readonlycheckboxchecked.gif<br>readonlycheckboxunchecked.gif<br>repairplan.gif<br>smalldown.gif<br>smallup.gif<br>spacer.gif<br>topbackground.gif |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\main** | copy of mainmenu.asp<br>default.htm<br>help.asp<br>login.asp<br>mainmenu.asp |

**Modified~~Corrected~~ Modules**                                    **Schedule 2**

| Category | Details | |
|---|---|---|
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\msadc** | msadcs.dll | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\printerfriendly** | pfclaim.asp<br>pfcommentlog.asp<br>pfestimate.asp<br>pfeventlog.asp<br>pfimage.asp<br>pfimages.asp<br>pfvehiclestatus.asp<br>pfvehiclestatushistory.asp<br>pfviewassignment.asp<br>pfwindshieldlist.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\request** | automaticassignment.asp<br>copy of partnerrequest.asp<br>default.asp<br>message.asp<br>newmessage.asp<br>partnerrequest.asp<br>partnershipresponse.asp<br>printmanualrequest.asp<br>response.asp<br>responselist.asp<br>tradingpartneroutline.htm | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\signup** | billing.asp<br>confirm.asp<br>default.asp<br>signupconfirmation.asp<br>updateconfirmation.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\signup\help** | help.asp | |
| The files listed at right which are in the following subdirectory below the root directory of the Software:<br><br>**\nsolutionstp\vehiclestatus** | default.htm<br>download.asp<br>global.asa<br>parts.asp<br>partsreport.asp<br>pfvehiclestatushistory.asp<br>provideradmin.asp<br>equestnewstatusrecord.asp<br>sendnewlist.asp | showcomment.asp<br>statuscomments.asp<br>statussetup.asp<br>statussetup.js<br>updatevehiclestatus.asp<br>vehiclerepairstatus.asp<br>viewimage.asp<br>viewimageframe.asp |

| **Modified**~~Corrected~~ **Modules** | **Schedule 2** |

| Category | Details |
|---|---|
| The Microsoft SQL Server tables listed at right: | Approval<br>ApprovalQueue<br>ApprovalQueueRule<br>ApprovalRuleAction<br>Assignment<br>AssignmentClaimant<br>AssignmentClaimOffice<br>AssignmentComment<br>AssignmentCompany<br>AssignmentCompanyStack<br>AssignmentEstimatics<br>AssignmentEstimator<br>AssignmentExports<br>AssignmentInspectionSight<br>AssignmentInsuranceAgent<br>AssignmentInsured<br>AssignmentLink<br>AssignmentLoss<br>AssignmentOwner<br>AssignmentRepairFacility<br>AssignmentRepairStatus<br>AssignmentStatus<br>AssignmentStatusHistory<br>AssignmentType<br>AssignmentVehicle<br>AssignmentVehicleLocation<br>AttachmentTransaction<br>AuditClaimFilesScope<br>AuditQuery<br>AuditQueryRule<br>AuditQueryRuleAction<br>AuditQueryType<br>AuditQueryReport<br>AuditQueryReportAssignment<br>AuditReportStatus<br>ClaimFile<br>ClaimInformationFields<br>ClaimOffice<br>ClaimPrintPreferences<br>ClientAccessUsers<br>Company<br>CompanyContact<br>Company Exports<br>ComplianceItem<br>ComplianceList<br>ComplianceListItem<br>Country<br>DispatchAssignmentScope<br>DispatchFavorites<br>DispatchHistory<br>DispatchHistoryType |

**Modified~~Corrected~~ Modules**                                      **Schedule 2**

| Category | Details |
|---|---|
| The Microsoft SQL Server tables listed at right: | EMSAdditionalProfile<br>EMSAdministration1<br>EMSAdministration2<br>EMSAdministrationType<br>EMSBettermentType<br>EMSCountry<br>EMSDeductibleType<br>EMSDetail<br>EMSDetailTransactionType<br>EMSEnvelope<br>EMSEstimate<br>EMSEstimateStatus<br>EMSEstimatingPlatform<br>EMSHeaderProfile<br>EMSInspectionType<br>EMSLaborOperation<br>EMSLaborRates<br>EMSLaborType<br>EMSLossCategory<br>EMSMaterialsCalculationMethod<br>EMSMaterialsRates<br>EMSMaterialsType<br>EMSNonOEMSupplier<br>EMSPartsRates<br>EMSPartsType<br>EMSPaymentType<br>EMSPointsOfImpact<br>EMSPrimaryCustomer<br>EMSSocialTitle<br>EMSState<br>EMSSubtotals<br>EMSTaxTierProfile<br>EMSToEnglish<br>EMSTotals<br>EMSTotalType<br>EMSTransactionType<br>EMSVehicle<br>EMSVehicleType<br>EMSWhoPays<br>EMSYearMapping<br>FileAttachment<br>FTP<br>GeneralReportsScope<br>Image<br>InsuranceAgent<br>Insured<br>LaborDepartment<br>ManageApprovalQueueScope<br>MISAssignmentGroupStatistics<br>MISColumn<br>MISColumnFormat<br>MISDailyTotals |

SOFTWARE LICENSE AGREEMENT
effective as of _____ __, 2004 by and between
<u>Safelite Glass Corp. and N'Site Solutions, Inc.</u>

*N'Site Draft*
*2/6/04*

| <u>Modified<s>Corrected</s> **Modules**</u> | **Schedule 2** |

| Category | Details |
|----------|---------|
| The Microsoft SQL Server tables listed at right: | MISDistributionRow<br>MISEstimateStatistics<br>MISExecutedReport<br>MISExecutedReportStatus<br>MISReport<br>MISReportType<br>MISScope<br>MISTrendTimeUnit<br>MISVariable<br>OrganizationalUnit<br>PagerMessageType<br>PagerType<br>PrintDocument<br>ProcessApprovalsScope<br>ProcessRequestsScope<br>Provider<br>ProviderStatus<br>ProviderStatusHistory<br>ProviderType<br>ReceiveAssignmentsScope<br>Report<br>ReportDateFrame<br>ReprotOption<br>ReportTarget<br>ReportType<br>Request<br>RequstQueue<br>RequestQueueType<br>SuperUsers<br>TargetType<br>TempEMSEsimate<br>TempFileAttachment<br>TempImage<br>TempPrintDocument<br>TradingPartnerCategory<br>TradingPartnership<br>TradingPartnershipAdjustment<br>TradingPartnershipLaborRates<br>TradingPartnershipPartsDiscounts<br>TradingPartnershipPartMarkup<br>TradingPartnerType<br>Users<br>VehicleTracking<br>VehicleTrackingComplianceItem<br>VehicleTrackingMilestone<br>VehicleTrackingMilestoneType<br>WorkerType<br>WorkOfficeScope<br>WorkOrderLine<br>WorkOrderLineDistribution<br>ZipCodes |