UNITED STATE DISTRICT COURT
NORTHERN DISTRICT ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Hyperquest, Inc. | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 08 C 483 |
| N'Site Solutions, Inc., et al., | ) | **Honorable Milton I. Shadur** |
| Defendants. | ) | **Magistrate Judge Michael T. Mason** |

### N'SITE SOLUTIONS, INC.'S MEMORANDUM REGARDING REASONABLENESS OF ATTORNEY'S FEES

Defendant, N'Site Solutions, Inc. n/k/a ClaimHub, Inc. ("N'Site"), hereby files this Memorandum in support of its Motion for Attorney's Fees ("Motion") addressing the reasonableness of its attorney's fees, and the reasonableness of the attorney's fees of N'Site's indemnitee, Unitrin Direct Insurance Company ("Unitrin").

### *Preliminary Statement*

Plaintiff, Hyperquest, Inc. ("Hyperquest"), opposes the reasonableness of the fees sought by Defendants with a flurry of arguments. Some of Hyperquest's arguments apply to both Defendants, while others target one or the other.

N'Site[1] answers these allegations below in the following order: (1) Those arguments that attack the fees of both Defendants; (2) those issues raised only as to Untrin; and (3) those addressed solely to N'Site.

*Argument*

**I.     Response to Arguments Against the Fees of Both Defendants**

**A.  The Court Should Accept Counsel's Actual Billing Rates as Reasonable**

Hyperquest argues that there is no evidence that the attorneys' fees sought are reasonable because the declarations submitted by N'Site and Unitrin did not provide sufficient evidence of market rate or fees awarded in other cases. (Hyperquest Supp. Br. at 5.)  But, not surprisingly, the cases that Hyperquest relies upon for this proposition are cases in which the lawyers seeking fees were not billing their clients on an hourly basis.  A litigant need not present evidence of prevailing rates in the community where there is evidence of actual rates paid for the actual or comparable legal work.  *See Mathur v. Bd. of Trustees of So. Ill. Univ.,* 317 F.3d 738, 743 (7th Cir. 2003) ("Only if an attorney is unable to provide evidence

---

[1]  Neither N'Site nor its general counsel is qualified to offer an expert opinion as to whether the legal rates for Unitrin's counsel are reasonable.  They instead rely upon counsel's affidavit.  No member of N'Site's management has been an attorney at a large Chicago firm or has experience retaining such services in Chicago.  As for the amount of time spent by Unitrin's counsel on the representation, N'Site must, in candor, reveal that it was surprised by the large volume of time charged by Unitrin's counsel.  Of course, such surprise came in "hindsight" and neither N'Site nor its agents have personal knowledge of the actual time spent or the instructions Unitrin's counsel received from its client.  Therefore, it has taken Unitrin's counsel at their word, and has presented their bill, their supporting argument, and documentation supplied by them to this Court for evaluation as to whether those charges were reasonable.  Unitrin's counsel's affidavit, and the other documentation Unitrin has provided, is the best (and only) evidence before this Court of the reasonableness of their charges.  Furthermore, Hyperquest has put forth no evidence undermining Unitrin's counsel's rates or the time spent.  Clearly, Hyperquest was required to do more than merely provide conjecture as to what Unitrin or its counsel might have done differently.
  The Court should note that Unitrin's litigation strategy and its counsel's efforts were questioned by Hyperquest. Thus, N'Site asked for (and has incorporated) Unitrin's written defense of their attorney's fees in this document without substantive change.

of her actual billing rates should a district court look to other evidence, including rates similar experienced attorneys in the community charge paying clients for similar work.").[2]

Thus, "[t]he attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. Of Ed.,* 90 F.3d 1307, 1310 (7th Cir. 1996). *See also, Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n of Ill.,* 2001 U.S. Dist. LEXIS 11671 at *19 (N.D. Ill. 2001) ("it is market forces rather than a judge's subjective impressions that best valuate the hourly rate that an attorney merits based on his or her experience, skills and efficiency"). "Once an attorney provides evidence of his billing rate, the burden is upon the defendant to present evidence establishing 'a good reason why a lower rate is essential.'" *People Who Care,* 90 F.3d at 1313.

Both Mr. Tiedemann and Mr. Kitch attested to the standard rates charged by the attorneys in this case. (*See* Tiedemann Decl. at ¶ 5, a copy of which is attached hereto as **Exhibit "1"** ("I generally bill clients, other than JPB Enterprises, Inc. and its wholly-owned subsidiaries, on the basis of hourly rates. My rate in 2008 is $350 per hour. The time spent on this matter were billed at this rates."); Kitch Decl. at ¶ ¶ 14, 16 , a copy of which is attached hereto as **Exhibit "2"** (detailing standard hourly rates for Nixon Peabody attorneys).) Since N'Site and Unitrin presented evidence of their attorneys' actual billing rates, Hyperquest was obligated to present evidence establishing a good reason why a lower

---

[2] The primary case on which Hyperquest relies, *Blum v. Stenson,* 465 U.S. 886 (1984), involved attorneys' fees sought by a legal aid clinic, rather than a private firm that charged standard billing rates. This Court has explained that an attorney's actual billing rate is presumptively the market rate for those attorneys who have a billing rate, and that for those attorneys (such as legal aid attorneys and those who work on contingency) who do not have a standard billing rate, "the court should look to the next best evidence--the rate charged by lawyers in the community of reasonably comparable skill, experience and reputation." *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n of Ill.,* 2001 U.S. Dist. LEXIS 11671 at *14 (N.D. Ill. 2001) *quoting People Who Care,* 90 F.3d at 1310. Hyperquest essentially asks the Court to ignore the best evidence of market rate and go straight to a finding that the declarations lacked the "next best" evidence.

rate in this case was essential.  *People Who Care,* 90 F.3d at 1313.  Hyperquest has presented

no such evidence.

For these reasons, Unitrin and N'Site do not believe that they have any burden to

prove that the rates their lawyers charge are in line with those prevailing in the community.

However, in the event that the Court disagrees and would like to assure itself that Nixon

Peabody's rates are in line with rates charged by similarly experienced lawyers at comparable

firms, Nixon Peabody will submit for *in camera* review a confidential report prepared by

PricewaterhouseCoopers LLP on 2007 Billing Rates of Chicago lawyers practicing at firms

with greater than 250 lawyers, which shows that Nixon Peabody's lawyers are billed at rates

comparable to similarly experienced lawyers at these other firms.[3]  Furthermore, N'Site has

provided the affidavit of another Maryland attorney attesting to the reasonableness of Mr.

Tiedemann's hourly rates.  (*See* David K. Stesch, Esq. Affidavit, a copy of which is attached

hereto as **Exhibit "4".**)

### B.  To The Extent There Was Duplication of Effort Between N'Site's and Unitrin's Counsel, It Was Both Warranted And Appropriate.

Hyperquest's argument that it should not have to pay the fees incurred by both

N'Site and Unitrin is similarly unavailing.  Hyperquest chose to sue two separate parties for

copyright infringement in the same case.[4]  Both defendants were exposed to risk, Hyperquest

sought to essentially shut down the operations of both parties, and both reasonably retained

counsel to defend against Hyperquest's claims.  Had Hyperquest filed two separate actions

and defendants prevailed in each of them, there would be no question that each prevailing

---

[3]    Nixon Peabody currently has more than 700 lawyers. (Kitch Supp. Decl. at ¶ 14, a copy of which is attached hereto as **Exhibit "3".**)

[4]    Hyperquest simultaneously sued another corporate defendant (and its president in his individual capacity) for copyright infringement of the same license at issue in this case, in a separate action which Judge Norgle recently dismissed for lack of personal jurisdiction.  *See Hyperquest, Inc. v. NuGen I.T., Inc.*, 08 C 485 (N.D. Ill.).

defendant would be presumptively entitled to an award of attorneys' fees under 17 U.S.C. §

505. There is no reason why Hyperquest's decision to file a single action, even if expedient

for Hyperquest, should lead to a different result.

N'Site and Unitrin are completely different companies, with completely different

businesses and business considerations. N'Site provides software solutions to the insurance

industry relating to insurance claims. Unitrin sells insurance. Unitrin uses the software at

issue in the operation of its business on a daily basis. Under these circumstances, even if the

legal services that were performed by N'Site's and Unitrin's counsel were entirely duplicative

(although in fact they were not), this would not be a basis to limit the attorneys fee award.

*See Tidwell v. Schweiker*, 677 F.2d 560, 570 (7th Cir. 1981) (finding alleged duplication of

counsel's effort was not a reason to limit fee award where lawyers were representing two

separate and distinct parties). Multiple fee awards are simply a risk one takes when it sues

multiple defendants for copyright infringement.

Moreover, Unitrin and N'Site did not have "a complete unity of interests" in this

case. In fact, Hyperquest's own memorandum acknowledges that their interests were merely

"almost" identical. (*See* Hyperquest Supp. Br. at 2.) Also, at the February 27, 2008, status

hearing, the Court expressed its belief that the Hyperquest's case against Unitrin may stand

in a completely different posture than Hyperquest's case against N'Site, specifically indicating

that Hyperquest could have exclusivity vis-à-vis Unitrin, even if Hyperquest did not have

exclusivity vis-à-vis N'Site. (*See* 2/27/08 Transcript of Proceedings at 8-10, a copy of which

is attached hereto as **Exhibit "5".**) The court then invited Unitrin to file a reply brief to

explain the extent to which Unitrin stood on the same footing as N'Site and why Hyperquest

did not have exclusive rights to bring an action against Unitrin. *Id.* There was therefore no

duplication of effort in the preparation of this reply.

### C.  The Fact That The Bills Were Paid By Unitrin Indicates Their Reasonableness.

As argued by Hyperquest itself, a "fundamental metric of reasonableness" is the client's willingness to pay the amount of fees that have been billed by the attorney. (Hyperquest Supp. Br. at 4.)  Indeed, Hyperquest explains that "[i]t is black letter law, in the Seventh Circuit and elsewhere, that 'the best evidence of the market value of legal services is what people pay for it.'" *Id.* at 3, *quoting Balcor Real Estate Holdings v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996) (emphasis added):

> Courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it.  **Indeed, this is not "evidence" about market value; it is market value.**  Although courts interpolate the word "reasonable" into clauses of this kind, the best guarantee of reasonableness is willingness to pay.  Balcor asked Walentas to make good its actual outlays.  Although Walentas denies that Balcor got its money's worth, it does not deny that these were real bills that Balcor paid and it does not argue that Balcor's lawyers ran the meter because they thought that Walentas would have to cover the tab. Corporate inside counsel monitor bills submitted by outside counsel; nothing in this record suggests that these bills received less than the usual review.  They were deemed commercially reasonable and paid.

*Id.* (emphasis added).  In other words, the court's job is much simpler when it is reviewing actual bills that have been paid because in such cases the market may dictate the reasonableness of the fee:

> If the bills were paid, this strongly implies that they meet market standards. The fees in dispute here are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself. These are bills that MHC *actually paid* in the ordinary course of its business.

*Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, 200 F.3d 518, 520-21 (7th Cir. 1999) (finding fact that prevailing party paid all of the attorneys' bills at a time when its ultimate recovery was uncertain was an indicator of the reasonableness of the fees).

In a very recent case from the Eastern District of Wisconsin, the court offered a

thorough explanation of why there is less need for rigorous judicial scrutiny of actual bills

that have been paid:

> A law firm is a business, and like any business its charges must be
> commercially reasonable or its client base will dry up. Thus, before a bill is
> sent to a client, the bill is typically examined by the partner responsible for
> that client, who may decide to reduce some of the charges in order to keep
> the client happy. Sometimes attorneys may be encouraged to cut their hours
> in a manner not even reflected on the bill itself. Of course, once the firm's
> internal review process is complete, the bills are subject to the client's own
> review. Many clients are not shy about objecting to fees, and whether they
> object or not, the bill was sent with the expectation that it will not offend
> the client -- that it is "reasonable." When a client finally pays the bill and
> continues to retain the law firm's services, it has already implicitly conceded
> the reasonableness of the fees charged. . . . All this is not to say that market
> forces are a complete substitute for a judge's independent review of
> reasonableness . . . but it seems instead that the need for judicial scrutiny is
> simply less acute when the fees sought are those that were already billed and
> paid in the normal course of business.

*Armament Systems and Procedures, Inc. v. IQ Hong Kong Ltd.*, 546 F. Supp. 2d 646, 649-50 (E.D.

Wis. 2008).

Like the defendants in *Armament*, Unitrin paid the invoices attached to N'Site's

attorneys' fees motion. (*See* Ex. 3, Kitch Supp. Decl. at ¶ 6 and Decl. Ex. A through E

thereto.)[5]  These invoices were submitted to Unitrin's inside corporate counsel, whose job it

is to monitor such bills, and the fact that they were subsequently paid indicates that Unitrin

found the bills to be commercially reasonable.  Furthermore, Unitrin has continued to retain

Nixon Peabody to handle the present litigation in addition to other matters.  (Ex. 3, Kitch

Supp. Decl. at ¶ 12, 13.)  Under Seventh Circuit law and Hyperquest's own arguments, this is

strong evidence that the fees billed by Nixon Peabody were reasonable.

---

[5]  The June 2008 invoice (*see* Ex. 3, Kitch Supp. Decl. at ¶8 and Decl. Ex. F) has been submitted for
payment, but has not yet been paid.  The July 2008 invoice (*see* Ex. 3 Kitch Supp. Decl.  at ¶9 and
Decl. Ex. G) is a preliminary bill and has not yet been submitted to Unitrin.

**D.  Although N'Site's Legal Fees Have Not Been Paid, There Are Other Indicia Of the Reasonableness of N'Site's Fees.**

N'Site's has not yet paid Mr. Tiedemann for his services.  Mr. Tiedemann has a unique practice whereby the majority of his time is spent representing numerous loosely-related clients.  That said, his contract with his employer, JPB Enterprises, Inc., allows him to be paid directly for litigation services provided to his clients.  Due to the financial condition of N'Site, Mr. Tiedemann has not yet been paid.  He does, however, expect to be paid for his services by N'Site pursuant to the bill provided to N'Site.

In order to bolster the argument that Mr. Tiedemann's counsel fees are reasonable, and given that N'Site has not yet paid his fee, N'Site refers the Court first to Mr. Tiedemann's affidavit filed in this matter wherein he attests to the reasonableness of his fee. (*See* Ex. 1, Tiedemann Decl.) Moreover, N'Site also offers the affidavit of another Maryland attorney confirming the reasonableness of Mr. Tiedemann's hourly rate.  (*See* Ex.4, Stesch Aff.)

Perhaps most persuasive, however, N'Site notes that Mrs. Hogan, Hyperquest's counsel, has concurrently prosecuted an almost identical infringement lawsuit involving the very same copyright license at issue in this case (*i.e.*, the eDocs software) in this District.  In that case, filed on the same date and with virtually the same causes of action as the instant matter, Ms. Hogan (according to her sworn statement) spent "over 200 hours" on that matter between the filing date and June 10, 2008.  (*See* Hogan Affidavit showing more than 200 hours billed by Hyperquest's counsel in NuGen case, a copy of which is attached hereto as **Exhibit "6"**.)  Mr. Tiedemann, in this matter, spent only 132.7 hours through May 14,

2008.  Although N'Site is not aware of Ms. Hogan's firm's fees in this matter[6], surely the fact

that her firm spent (on a similar matter over substantially the same period) more than 150%

of the time spent by Mr. Tiedemann in this case speaks directly to the reasonableness of Mr.

Tiedemann's time investment in defending his client in this case.


## II.     UNITRIN'S ATTORNEYS' FEES AND COSTS SOUGHT ARE REASONABLE

Hyperquest brought its copyright infringement lawsuit against two defendants,

seeking an injunction and extensive damages.  The requested injunction would have seriously

impacted the ability of Unitrin Direct Insurance Company ("Unitrin") to conduct its

business.  For this reason, Unitrin instructed its lawyers to aggressively defend against the

charges levied by Hyperquest, and its lawyers were forced to deal with complicated legal and

factual issues on a compressed schedule (insisted upon by Hyperquest), at great expense to

Unitrin.  Counsel made reasonable choices, given the potential exposure, the compressed

schedule, and the complicated nature of the issues, in staffing and defending the case –

achieving excellent results.  Unitrin has paid the fees charged by its attorneys for this defense

in their entirety.

In opposition, Hyperquest makes several non-specific charges of unreasonableness –

from spending too much time on particular motions to improper allocation of time among

partners and associates – that are nothing more than the "impermissible hindsight and

second guessing" this Court has cautioned against.  *Cunningham v. Gibson Electric Co.,* 63 F.

---

[6] Ms. Hogan's firm refused to provide this information prior to N'Site's filing of this document and learned of the amount of fees charged by Mrs. Hogan's firm only minutes before it filed this document.  Remarkably, Ms. Hogan's firm allegedly charged Hyperquest approximately $110,000.00. *See* Docket Entry No. 65 at 4.  N'Site says this is "remarkable" because the "average" of the fees for N'Site and Unitrin are almost exactly $110,000 ($220,000 divided by 2).  It would seem that an average fee per party to this case of $110,000 is acceptable to Hyperquest, and that is exactly what N'Site is asking it to pay.

Supp. 2d 891, 893 (N.D. Ill. 1999). Given the circumstances, the Court should find that the

attorneys' fees sought are reasonable, and reject Hyperquest's arguments to the contrary.

> **A.      Hyperquest's Arguments Regarding Unreasonableness Do Not Justify A Reduction in Fees.**

First, Hyperquest argues that Unitrin's lawyers spent too many hours on the tasks at

hand. Second, Hyperquest argues that Unitrin's lawyers improperly allocated time among

partners and associates. For the reasons that follow, Hyperquest's arguments directly solely

at Unitrin are incorrect and should be rejected.

> **1.      Hyperquest Does Not Justify Its Contentions On The Allegedly Excessive Number Of Hours Spent**

Hyperquest argues that Nixon Peabody spent too much time on the briefing of

motions and in responding to discovery. The importance of the case to Defendants'

business operations, however, justified significant expenditures of time in its defense. It is

reasonable to expect Unitrin's attorneys, faced with such risk, to take the time to do their

best work. Indeed, it would be unreasonable to expect Defendants to cut corners and hope

that the Court nonetheless ruled in their favor.

Specifically, Hyperquest faults Unitrin's counsel for wasting the time and resources

of the Court and parties for filing a two-page Rule 12(b)(4) motion to dismiss for insufficient

service of process. (Hyperquest Supp. Br. at 6.) The Court, however, confirmed at oral

argument that listing a defendant's incorrect name is in fact a flaw that comes within Rule

12(b)(4)'s constraints. (*See* 5/1/08 Transcript of Proceedings at 4, a copy of which is

attached hereto as ***Exhibit "7"*.*) Thus, Unitrin's short motion was well-founded. And

Hyperquest filed a substantial response to the 12(b)(4) motion, in which Hyperquest cited

more than twenty cases and several treatises. (Dkt. Entry 40.) Unitrin's lawyers, of course,

spent additional time reviewing Hyperquest's lengthy response and the authority cited.

Hyperquest also filed a separate motion to amend to correct the corporate name of Unitrin, which the Court indicated that Hyperquest should have done in the first instance. (Ex. 7, 5/1/08 Transcript of Proceedings at 4.) Thus, Hyperquest may have wasted the Court's and parties' time and resources in this regard.

Hyperquest also complains about the amount of time defense counsel spent on briefing the ultimately-dispositive motion to dismiss. Had Unitrin gambled on presenting a less thorough argument, however, it may not have ultimately prevailed. As this Court stated in another matter, "counsel were well justified in expending the time and effort that they reasonably viewed as necessary in order for their client to prevail – and, once again, second guessing will not do on that score either." *Cunningham*, 63 F. Supp. 2d at 895 (rejecting defendant's numerous challenges to the time spent by plaintiff's attorneys as assertedly excessive because "any party who is confronted with serious motions . . . cannot afford to treat such motions lightly, in the optimistic hope that the court will rule favorably even if counsel does less than his or her best in addressing them").

And Hyperquest completely ignores that the Unitrin's fees were driven up further by the fact that Hyperquest sought, and was granted, leave to file a supplemental memorandum in opposition to the motion to dismiss. In that 15 page memorandum, Hyperquest presented an extended foray into patent law to argue that it was an exclusive licensee with standing to sue for copyright infringement. Unitrin's lawyers had to undertake significant additional legal research and analysis to respond to Hyperquest's new arguments in the two weeks Unitrin was granted to file a supplemental reply. (*See* 4/14/08 Transcript of Proceedings, a copy of which is attached hereto as **Exhibit "8"**.)

Moreover, Hyperquest inappropriately equates the number of pages of the brief with its value in attorney time, essentially arguing that Unitrin's reply brief and supplemental

briefs were not worth much because they were only 9 pages each.  (Hyperquest Supp. Br. at

6.)  One is reminded of a famous quote that is variously attributed to either Blaise Pascal or

Mark Twain, apologizing that "this letter is rather long because I did not have time to make

it shorter."  In fact, in their case, prior drafts of Unitrin's reply brief were far lengthier than

the version that was ultimately filed.  (Ex. 3, Kitch Supp. Decl. at ¶15.)  Indeed, a shorter

brief may in many cases take more time and effort than a longer one.

It is the quality of the product, and not the number of words that matters.  Indeed,

"the most critical factor in determining the reasonableness of a fee award is the degree of

success obtained." *Johnny's Icehouse*, 2001 U.S.Dist. LEXIS 11671 at \*20 (*quoting Farrar v.

Hobby*, 506 U.S. 103, 114 (1992) (internal quotations omitted)).  Here, the Court found

Unitrin's briefing to have "completely scotched Hyperquest's position" and in fact did so

"so thoroughly and persuasively" that the Court adopted Unitrin's presentation whole-cloth.

(*See* Docket Entry 44, this Court's 5/1/08 Memorandum Opinion and Order at 9-11.)

Where the prevailing party has obtained such an excellent result, it should recover a fully

compensatory fee, which in this case is all of the fees that were billed and paid for.

As for Hyperquest's claim that an excessive amount of time was spent on responding

to discovery, this Court should not credit the numbers that Hyperquest provides.

Hyperquest gives no explanation as to how it got to its numbers, and they are not consistent

with the actual invoices.  Hyperquest states, without citation or explanation that the amount

of time Nixon Peabody spent in responding to Hyperquest's discovery responses "resulted

in nearly 50 hours of time billed by Nixon Peabody, at a total cost of more than $17,000.00."

(Hyperquest Supp. Br. at 7.)[7]  Likely Hyperquest is inappropriately counting the entire time

---

[7]        Hyperquest hedges its statements regarding the invoices, stating that "Because Nixon
Peabody's bills often contain multiple tasks in a single day's entry, it is impossible to determine the
precise portion of each entry that is attributable to a particular task. Accordingly, the numbers

spent for entries to which multiple tasks were listed.  For example, on March 4, 2008, Mr.

Kitch recorded 9.5 hours, which included time spent on reviewing N'Site's responses to

Hyperquest's discovery requests, along with many other tasks.  (Ex. 3, Kitch Supp. Decl. at

Decl. Ex. C.)  In fact, Nixon Peabody spent significantly less than 50 hours investigating and

responding to Hyperquest's discovery requests (much closer to 22 hours for a total of less

than $8,000).  (Ex. 3, Kitch Supp. Decl. at ¶¶16-18.)[8]

Finally, courts have sometimes found the hours expended by the opposing counsel

to be relevant to the reasonableness determination.  Because of this, counsel for N'Site

requested that Hyperquest's counsel provide their billing records in advance of the August

5th deadline set by the Court as this was the same deadline for the filing of the present brief.

Hyperquest refused, and accordingly, should not be allowed to rely on those records.[9]

### 2.    Work Was Properly Distributed Among Partners And Associates

Hyperquest next argues that Nixon Peabody partners did not delegate enough work

to associates.  Hyperquest makes these contentions only generally, and does not point to

specific instances it believes work should have been delegated but was not.  That is precisely

---

presented here are approximated."  Hyperquest Supp. Brief at 6.  This suggests, however, that the actual time spent on the tasks identified in Hyperquest's brief were lower, as not all of the time incurred in a day should be allocated to one task if there is more than one task in an entry for that day.

[8]    Hyperquest similarly provides numbers that purport to show the time spent on briefing that are similarly inaccurate and unsupported by the record.  The fact is that the invoices detail a variety of tasks that do not fall conveniently into one of the three buckets that Hyperquest seeks to force most of the billed hours.

[9]    Regardless, in this particular case the time spent by Hyperquest's lawyers may not be probative for two reasons.  First, Hyperquest's counsel is the wife of its President, and thus attorney time may easily have been billed at a sizeable discount and/or counsel may not have billed for all usually billable time.  Second, Hyperquest is concurrently prosecuting at least one other infringement lawsuit involving the same copyright and thus its time spent on such things as legal analysis and factual investigation may have been split among matters.  (Ex. 6, Hogan Aff. (showing 200 hours billed by Hyperquest's counsel in Nugen case).)

the type of "impermissible hindsight and second guessing" this Court has cautioned against. *Cunningham,* 63 F. Supp. 2d at 893.

For example, Hyperquest takes issue with "legal research" being performed by partners, the implication being that partners should not do legal research because it would be inefficient. First, this ignores the fact that an experienced partner is often able to research an issue more quickly than a less experienced associate. *See, e.g., Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir. 1996) ("If in our example the lawyer gets $1,000 an hour because he is five times as fast as the lawyer who charges $ 200 an hour, there would be no objection to his higher hourly fee; the bottom line would be the same."). Second, there is nothing that is intrinsically "junior level" about the analysis of legal authority, and Defendants suspect that even this Court, with its wealth of experience, reads a case or two before issuing its opinions. *See also Steinlauf v. Continental Illinois Corp.*, 962 F.2d 566, 570 (7th Cir. 1992) ("No matter how experienced a lawyer is, he has to conduct (or have conducted for him) research to deal with changes in the law, to address new issues, and to refresh his recollection.").

In this case, the partners delegated what they reasonably could. (*See* Kitch Decl. at ¶ 18.) Where it was more efficient for the partners to do the work, the partners did the work. These types of staffing decisions require judgment on the part of the attorneys to balance cost and efficiency as well as results. Hyperquest has not presented any real reason why the Court should second guess the allocation of work chosen by the attorneys.

Unitrin was also entitled to have Mr. Kitch, the lawyer with whom it had a prior relationship, perform the lion's share of work on its case. As the *Armament* court noted in rejecting the same argument that work done by an IP partner could have been done by an associate billing at a lower rate:

> Armament's unsubstantiated assertion is based on its flawed assumption that the
> defendants were entitled to only the cheapest, most bare bones defense of their case

possible.  The fact is that **Emissive was fully entitled to have a partner with who it was obviously comfortable perform significant amounts of work on its case**.

*Armament Sys. and Procedures, Inc. v. IQ Hong Kong Ltd.*, 546 F. Supp. 2d 646, 655 (E.D. Wis. 2008) (emphasis added).

### III.  N'Site's Counsel Fees Are Reasonable.

Hyperquest's objections that are focused solely on N'Site's legal bills were few. Simply put, Hyperquest alleged that N'Site's counsel (1) improperly charged for travel and travel time; (2) failed to use assistants; and (3) sought payment for redacted portions of the bills from Summit Law Group.

### A.  N'site's Counsel Did Not Improperly Bill For His Travel.

Even with travel time, N'Site's counsel spent less than 2/3 of the time that Hyperquest's attorneys spent prosecuting a related case over essentially the same time period.  (*See*  Ex. 6, Hogan Aff. (132.7 hours for Mr. Tiedemann vs. 200+ hours for Mrs. Hogan).)  Moreover, Hyperquest chose to sue an out-of-state company, *i.e.*, N'Site, in Chicago.  It is reasonable that such a company would want its own attorney to travel to and attend some hearings.  In fact, N'Site was "fully entitled" to hire an attorney with whom it was "obviously comfortable".  *See Armament, supra.*  N'Site's counsel participated in some hearings via telephone and some in-person.  The deciding factor for N'Site was that it wanted its attorney present when it appeared that a decision on the merits might be made at a hearing.  Clearly, N'Site did not have its counsel attend every hearing or conference and was judicious with his time.  N'Site decided that it was appropriate for its counsel to attend just two of the several hearings before this Court.

Hyperquest also argues that N'Site should have saved money by hiring local Chicago counsel.  Again, N'Site has the right to select counsel of its own choosing. Moreover, given Hyperquest's objection to Unitrin's hourly rates, had N'Site hired a large Chicago firm, it

certainly would have paid much more per hour for its attorney's time. It appears that by

using Mr. Tiedemann, N'Site has saved Hyperquest money.

### B.  N'site's Counsel Does Not Bill For Assistant Time.

N'Site's counsel is a sole practitioner. As a practice, he does not bill for assistant time.

If Hyperquest wants to pay for Mr. Tiedemann's assistants' time, he will submit a bill to

them and will gladly accept payment.

### C.  N'site's Counsel, At Summit Law Group, Should Be Paid For The Redacted Portions Of Their Bill.

Summit Law Group's bills were redacted to the extent that they revealed the content

of privileged attorney-client communications. The bills were properly placed before the

Court for review and, should this Court require *in camera* review, the same will be provided.

However, the bill from Summit Law Group is relatively small and represents time that

N'Site's corporate attorneys had to search for documentation, review the same, and discuss

matters with Mr. Tiedemann. Summit was N'Site's counsel at the time of the events

complained of in the Complaint, knew many facts helpful to counsel, and had possession of

the documents potentially responsive to Hyperquest's actual and anticipated discovery. It

was Hypequest's discovery request that precipitated much of the charges from Summit.

### IV.  Additional Fees Continue To Mount.

As this matter continues to move forward, and as Hyperquest continues to oppose

Defendants, Defendants' fees (not related to the pending appeal) continue to mount. N'Site

has incurred an additional $8,155.00 in fees with no expenses billed. (*See* Tiedemann Bill,

attached hereto as **Exhibit "9"**; *see also* Tiedemann Affirmation *infra*.). Unitrin has incurred

an additional $29,114.32 in fees and expenses. (*See* Ex. 3, Kitch Supp. Decl. at ¶¶7-9 and

Decl. Ex. E-G.)  Thus, N'Site seeks for itself and for Unitrin an additional $37,269.32.

*Conclusion*

The evidence offered so far to the Court supports the requested award. The amount of the fees sought by N'Site, for itself and for its indemnitee Unitrin, is again set forth here, with an added amount for fees since May 14, 2008:

1.  Costs and Expenses for N'Site:                                  $1,198.67
    (includes travel, hotel, filing fees)

2.  N'Site outside counsel:                                         $945.00
    (bill for N'Site's attorney involved
    in prior Safelite transactions to review
    and produce documents to
    Hyperquest.)

3.  Counsel fees for N'Site:                                        $46,315.00

4.  Counsel fees for Unitrin:                                       $171,390.00

5.  Costs and Expenses for Unitrin:                                 $2,972.00

6.  Additional Fees Since Original Motion
        i.  N'Site                    $8,155.00
       ii.  Unitrin                        $29,114.32

    **Total Due:**                                                 **$260,089.99**

Respectfully submitted,

_____/s/_____
Steven L. Tiedemann

8820 Columbia 100 Parkway, Suite 400
Columbia, Maryland 21045
(410) 884-1960
(410) 884-1457 (fax)

Attorney for N'Site Solutions n/k/a
ClaimHub, Inc.

17

**AFFIRMATION OF COUNSEL**

I hereby affirm under penalty of perjury, and based upon personal knowledge, that

the attached Exhibit 9 is authentic and that the charges represented thereon are reasonable.

The contents of Exhibit 1 remain true as of August 5, 2008.

_____/s/_____
Steven L. Tiedemann

CERTIFICATE OF SERVICE

I hereby certify that, on the 5th day of August, 2008 the forgoing was served via the
Court's ECF system on the below, and that I mailed and emailed a copy of the foregoing
on August 6, 2008 to:

Deborah Hogan, Esq.
Goldberg Kohn
55 East Monroe Street
Suite 3300
Chicago, Illinois   60603-5792
Deborah.hogan@goldbergkohn.com

and to

Paul Kitch, Esq.
Nixon Peabody
161 N. Clark Street
48th Floor
Chicago, IL 60601-3213
pkitch@nixonpeabody.com

_____/s/_____
Steven L. Tiedemann